Rebecca A. Mc Intyre
July 15, 2024

U.S. DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


DONQUARION LEWIS; KE'AUJANAA

SHEPHERD-FRIDAY; and K.B.,

by and through her parent

and next friend, H.B.,          Case No. 1:22-cv-00838-RJJ-PJG

                Plaintiffs,     Hon. Robert J. Jonker

      vs.                       Mag. Phillip J. Green

MICHIGAN DEPARTMENT OF

EDUCATION, a governmental

agency,

                Defendant.

_____


        The Deposition of REBECCA A. MC INTYRE,

        Taken at 525 West Ottawa Street,

        Lansing, Michigan,

        Commencing at 10:01 a.m.,

        Monday, July 15, 2024,

        Before Peggy S. Savage, CSR-4189, RPR.

Rebecca A. Mc Intyre
July 15, 2024

1    A.   Until they come into compliance and everything is

2         verified and deemed corrected.

3    Q.   Okay.

4    A.   We -- there is another level.  So our TA provider

5         would be -- whenever corrective action is issued out

6         of a state complaint, one of those state-level

7         monitors gets that corrective action and they oversee

8         it.  So if the district submits they have -- you know,

9         they have to have an updated progress report and

10        everything giving us their policies and procedures by

11        three months.  Then those would go to that state-level

12        monitor.  They would review those if there's -- if

13        they're not acceptable and there's something -- an

14        issue in there, they would work with the district to

15        say, "This is what's not -- we're not approving this

16        yet.  This is what you need to address still."

17             So they are involved in that -- to that

18        level, but they are not like in the weeds with the

19        district at that point.

20   Q.   Okay.  And McKee is in the weeds with the district --

21   A.   Yes.

22   Q.   -- is what you're saying?

23             Okay.  Okay.  Still on page 36.  The last

24        paragraph says:  An SEA may take over the direct

25        provision of special ed and related services in

Rebecca A. Mc Intyre
July 15, 2024

```
 1        certain circumstances.  One of the circumstances is
 2        that if the LEA is unable to establish and maintain
 3        programs of FAPE, meeting Part B requirements, then
 4        the SEA must use payments that would otherwise have
 5        been available to the district.
 6                    Has MDE ever done this with any school
 7        district?
 8   A.   To my knowledge, no, but ISD has.
 9   Q.   How has the ISD done that?
10   A.   And they have done that with our support.
11   Q.   Okay.  So which ISD are you speaking to?
12   A.   Because the state education agency flows money out to
13        the ISDs.  So for the purposes of the -- the uniform
14        grant guidance, that is the LEA is the ISD.  They are
15        the subrecipients of the grant.
16   Q.   Okay.
17   A.   So what the -- what the ISD does from there with their
18        IDEA dollars, every ISD is different in how they do
19        that, but, yes, they have -- there are ISDs who are
20        withholding dollars and hiring people and operating
21        programs.
22   Q.   Do you know which ISDs have done that?
23   A.   I know that Kent ISD has done it in the past, because
24        I was a part of that.
25   Q.   Okay.
```

Rebecca A. Mc Intyre
July 15, 2024

```
 1        ISDs based on --
 2   A.   No.
 3   Q.   -- the issues established?  No.  Okay.
 4             So from what I understand based on the
 5        flow-through money, the SEA takes money, sends it to
 6        the ISDs.  The ISDs are viewed as the LEA at that
 7        point in time?
 8   A.   Yes.
 9   Q.   Under IDEA, the LEA is responsible for providing a
10        FAPE, correct?
11   A.   For -- yes, for ensuring that a FAPE is provided.
12   Q.   Okay.  Does MDE OSE have any opinion about the ISDs
13        claiming that they have no responsibility to provide
14        or ensure FAPE at the due process level?
15   A.   We are working on that.
16   Q.   Tell us more about that.
17   A.   That -- that has been communicated for the last seven
18        years.
19   Q.   Okay.  Is there anything that MDE OSE is doing to try
20        and rectify that situation so that students receive
21        FAPE?
22   A.   We have been -- well, our new Deputy Superintendent
23        Michelle Harmala has actually gotten in front of a
24        number of audiences that we have not been able to get
25        in front of before.  They actually just met with -- I
```

Rebecca A. Mc Intyre
July 15, 2024

1   A.   Yes.

2   Q.   Okay.  And you mentioned the assistant superintendents

3        going before different audiences to try and speak to

4        them about this issue?

5   A.   Yeah.

6   Q.   Are you aware that ISDs are filing motions to dismiss

7        based on the fact that they are not responsible for

8        ensuring FAPE for students in due process hearings?

9   A.   No.

10  Q.   Okay.  Are there any other avenues that MDE is

11       pursuing to ensure that LEAs are taking responsibility

12       for ensuring a FAPE?

13  A.   We have recently released our working document, it's

14       like 82 pages long, that shows the whole integrated

15       mon- -- all eight components, what we've been doing

16       within that work.  We have, like I said, the -- we met

17       with five ISDs who, as part of this document, were the

18       first -- this document being the OSE- --

19  Q.   OSE- --

20  A.   -- OSEP's document --

21  Q.   Okay.  Yep.

22  A.   -- were the first to go through the credible

23       allegations, because they were identified in news

24       articles regarding special education transportation

25       and students with IEPs.

Rebecca A. Mc Intyre
July 15, 2024

1                       And so we started work with each of those

2          five ISDs, inquiring about what the ISDs have done to

3          ensure their local districts, you know, what -- what's

4          going on with these.  And in working with them, we met

5          with their superintendents.  We shared the information

6          and actually gave them the -- what they have to fill

7          out annually through the State for the IDEA grant

8          dollars; and showed them that when they fill out that

9          application, the very first thing that they are

10         agreeing to is ensuring FAPE for students within

11         their -- with IEPs in their jurisdiction.

12                      And so that has, I believe, had a profound

13         effect on them.  I don't think the problem is -- I

14         don't want to keep saying "I don't think."  The

15         problem isn't the special education directors

16         necessarily, as we have to get superintendents to

17         understand, and so that's where the focus is.

18    Q.   Okay.  Which five ISDs are involved?

19    A.   Lapeer, Oakland, Wayne, Washtenaw, Macomb.  I have to

20         picture the faces around the table.

21    Q.   Do you see a difference between the responsibility to

22         provide a FAPE-appropriate public education and the

23         responsibility to ensure a FAPE-appropriate public

24         education?

25    A.   Yes, I do.

Rebecca A. Mc Intyre
July 15, 2024

```
 1                    DEPOSITION EXHIBIT 69

 2                    11:17 a.m.

 3    BY MS. DIAZ:

 4    Q.   And this says it's the OSC Continuum of Improvement,

 5         Correction, Incentives, and Sanctions.  Is that

 6         correct?

 7    A.   Yes.

 8    Q.   Okay.  This document was from October of 2022, and it

 9         has a draft watermark on it.  Do you know if there's

10         been a finalized document?

11    A.   It is part of -- I believe part of the big document.

12    Q.   The big one.  Okay.

13                    And this document discusses sanctions

14         towards ISDs; is that correct?

15    A.   Yes, among other things.

16    Q.   And, again, this is not directed at districts

17         themselves?

18    A.   Mmm-hmm.

19    Q.   Why not?

20    A.   Because the intermediate school districts have

21         jurisdiction over their member districts.

22    Q.   Okay.  And because they have jurisdiction over their

23         member districts, do you expect the ISDs to bring

24         their member districts in line with the law?

25    A.   They need to monitor -- monitor being not just going
```

Rebecca A. Mc Intyre
July 15, 2024

```
1        the concern with LRE issues that --

2   A.   Yes.

3                   MARKED FOR IDENTIFICATION

4                   DEPOSITION EXHIBIT 4

5                   12:16 p.m.

6   BY MS. DIAZ:

7   Q.   Okay.  Let's look at Exhibit 4 then.

8                   Before you dive into that one, you said

9        that the ISDs are more and more looking at their

10       districts.  Why is this happening more and more?

11  A.   Because the special education directors are

12       understanding they do have a general supervision

13       responsibility.  It's -- in some cases, it's do they

14       have the support of their superintendent and

15       understanding.  And then in other cases, they've --

16       they have taken the lead and demonstrated to their

17       superintendent where that responsibility is and

18       they've created a system.  I think the -- although I

19       have not seen it, Eastern UP ISD has created a system,

20       is what they've told us.  Saginaw ISD.  Again, I keep

21       trying to picture faces in the room.  I don't know.

22       There were a number of people in the room that said --

23       because I asked, how many of you actually have a

24       developed system, and I was surprised.  Because I knew

25       about Kent, but I was surprised at the number in the
```

Rebecca A. Mc Intyre
July 15, 2024

```
 1          room that raised their hand.
 2    Q.    And what do you think is the reason for this new
 3          understanding or finally coming to an understanding of
 4          the responsibilities they have?
 5    A.    Because we talk about it at every single director
 6          meeting and any at MAASE Summer Institute.  We
 7          received feedback last year that they are sick of
 8          hearing about general supervision and want to know
 9          when we're just going to make it a breakout instead of
10          a keynote and -- but that's the work of our office.
11          So we won't -- so they're -- they get it.
12    Q.    Okay.  And when did you start talking about this to
13          the point where they were getting sick of it?
14    A.    Ad nauseam.
15    Q.    Yeah.
16    A.    Well, I mean, since 2019, since I've been on board.
17    Q.    Okay.  And why did you start -- why did this shift
18          occur, this, you know, talking campaign about the
19          ISDs' responsibility occurring?
20    A.    I think it really -- listening to what Teri has said,
21          and she shares out with everybody, that this really
22          started with an understanding with U.S. Department of
23          Ed and John Andrejack talking fiscally; and
24          understanding that in Michigan, our ISDs are the LEAs.
25          That's who we -- that's who the subrecipients are, but
```

Rebecca A. Mc Intyre
July 15, 2024

1           we were treating 980 school districts as

2           subrecipients, but they weren't our subrecipients,

3           so -- they were the ISDs' subrecipients.  Actually,

4           there's no -- there is no subrecipient to a

5           subrecipient, so that was a misstatement, but, yeah,

6           they were under the purview of the ISDs.

7    Q.     Okay.

8    A.     And so that whole thing, that -- that was chaos for

9           like the first two years of trying to message that

10          out.  And so -- but I think more and more we'd just

11          done it so much that more and more people are hearing

12          it and accepting it, and they're just finally moving

13          forward with their work.

14   Q.     Why was that so chaotic the first few years?

15   A.     Because it's a complete change in understanding, and

16          ISDs have always felt that they are service agencies.

17          They're there to provide a service.  But in providing

18          that service, they also felt that they had to protect

19          their local districts.  And so by putting them in the

20          driver's seat and saying you're a subrecipient, you

21          have general supervision responsibilities, they now,

22          all of a sudden, are like how -- how do we do that,

23          how do we protect our districts but yet come in and be

24          enforcer to our direct.

25                      So it's that being an enforcer that they

Rebecca A. Mc Intyre
July 15, 2024

```
 1          have resisted, and we've tried to help them see that

 2          it's not monitoring, monitoring, monitoring, like

 3          student record reviews and everything, but it's like

 4          monitoring your weight, keeping -- you know, keeping

 5          your pulse on things and providing technical

 6          assistance and looking at data.  And that's why we

 7          created our 82-page document to say, "This is the work

 8          that we've been doing for the last six years and this

 9          is, you know, how we're doing it."

10                    We reserve the right to continuously

11          improve our system.  Because as we look at data, that

12          data is going to continue to inform us where we need

13          to do better in our work or we need to focus

14          differently, and they're seeing that, and they're

15          starting to do it.

16     Q.   Okay.  Why do you think they resisted enforcing with

17          their local districts?

18     A.   I think in their opinion, they were the -- they had

19          to -- they were the protectors, the service providers

20          and the protectors of their member districts.

21     Q.   Who were they protecting the member districts from?

22     A.   Is that a rhetorical question or a real question?

23     Q.   A real question.  Who did they think --

24     A.   We ask the same questions.  So they're protecting them

25          from us and from -- from parents.
```

Rebecca A. Mc Intyre
July 15, 2024

```
 1        improving our integrated monitoring.  So every day we

 2        get better at what we do and ...

 3   Q.   Okay.  Let's look at Exhibit 72.

 4                    MARKED FOR IDENTIFICATION

 5                    DEPOSITION EXHIBIT 72

 6                    4:27 p.m.

 7   BY MS. DIAZ:

 8   Q.   These are -- well, it's part of the slides from a SEAC

 9        presentation.  What is SEAC?

10   A.   Special Education Advisory Committee.  It's a

11        state-level committee.

12   Q.   Okay.  And then if you turn to page 55, it's the

13        second page, it says:  Due Process Complaints and

14        Hearings, and Rebecca McIntyre.

15             Why would you be presenting at SEAC?

16   A.   It's a requirement.

17   Q.   Under what?

18   A.   Under IDEA.  We report out all final decisions to

19        SEAC.  The state education agency has to report, share

20        with SEAC.

21   Q.   All final decisions on what?

22   A.   Due process hearings.

23   Q.   Okay.  Do you get input from SEAC based on those due

24        process hearing decisions?

25   A.   They review the decisions that are fully redacted, and
```

Rebecca A. Mc Intyre
July 15, 2024

1    then they provide input into what -- what gaps in

2    understanding there may be, and they help us identify

3    if there is guidance that's needed, if -- because

4    there are, what, 80-some different people in there

5    bringing different perspectives as do we need to

6    understand things differently, be able to present the

7    information and requirements differently.  So this is

8    one of the essential functions of SEAC.

9  Q.  And on page 56, it looks like you reported out about a

10    KSF decision.

11  A.  Mmm-hmm.

12  Q.  And it looks like this is a situation where you had to

13    place a state complaint in abeyance.

14            Do you know what happened with that state

15    complaint?

16  A.  Do I know what happened with it?

17  Q.  Were the issues resolved with that state complaint

18    or --

19  A.  Well, it was -- it was put into abeyance, and I

20    believe that -- I would have to go back and look, but

21    I think that this -- well, he came -- the ALJ issued a

22    final decision, and so I don't know what that final

23    decision was.  We would have had to -- this is

24    probably the state complaint we had to dismiss.

25  Q.  Okay.  But without seeing it, you're not exactly sure

Rebecca A. Mc Intyre
July 15, 2024

1    BY MS. DIAZ:

2    Q.    Okay.  And then let's look at 73 -- oh, I think we

3          already talked about that.  Let me check.

4                      No, let's look at 73, and then 37 of it.

5                      MARKED FOR IDENTIFICATION

6                      DEPOSITION EXHIBIT 73

7                      4:31 p.m.

8    BY MS. DIAZ:

9    Q.    This is a SEAC New Member Orientation from September

10         of 2020, slide deck, and page 37 talks about

11         administrative law judges.

12                     Do you recall if you would have presented

13         this information at SEAC?

14   A.    Yes.

15   Q.    Okay.  And it says that there's certain requirements

16         for ALJs, and one of them is that they possess

17         knowledge of an ability to understand the provisions

18         of IDEA, federal and state regs pertain to IDEA, legal

19         interpretations of IDEA by federal and state courts,

20         conduct hearings in accordance with appropriate

21         standard legal practice, and render and write

22         decisions.  Correct?

23   A.    Correct.

24   Q.    Okay.  How does MDE know that the ALJs possess the

25         knowledge and ability to do those things?

Rebecca A. Mc Intyre
July 15, 2024

1    A.    We provide them training annually, and that's part of

2          looking at the final decisions, sharing final

3          decisions with SEAC, and getting input.

4    Q.    Okay.  What training do you provide to ALJs annually?

5    A.    We would have to look back at the record.  Each year

6          it's different.  They used to go to Lehigh, go to LRP.

7          Last year they received a two-day training from

8          Pingora.  They just received a two-day training again

9          from Pingora, as well as they've attended CASE -- I

10         think it was CASE and CADDRA.

11              So we're trying to provide them as much --

12         the Pingora trainings are Michigan specific, because

13         we have told them, you know, that Lehigh, LRP, CADDRA,

14         those are all from a national perspective and topic

15         specific, where we need process specific.

16   Q.    Okay.  So you provide the trainings for the ALJs.  Is

17         there any assessment done to determine what they've

18         learned through those trainings?

19   A.    Assessment, I think, plus watching the data.

20   Q.    Okay.  How does watching the data determine whether or

21         not they've learned?

22   A.    Because there's topic-specific information that they

23         are learning, and then we watch the data to see that

24         there's progress.

25   Q.    Okay.  What does it actually mean to watch the data?

Rebecca A. Mc Intyre
July 15, 2024

1   A.   Pull it, look at it, analyze it.

2   Q.   Are you looking -- like what data are you looking at

3        specifically?  What are you pulling?

4   A.   Hearing data.

5   Q.   Okay.  And what specific pieces of hearing data are

6        you looking at?

7   A.   File date, who's filing, who the attorneys are on both

8        sides, any motions that are made, when they're made,

9        looking at that information.

10  Q.   And who looks at that information to determine if ALJs

11       are demonstrating that they understand Michigan law

12       and federal law?

13  A.   I was looking.  I still look.  Our -- we have a due

14       process -- she's not a coordinator, but she's like a

15       support, administrative support, in our office, and

16       she -- she updates -- she keeps a spreadsheet and

17       updates us on all of the hearings, and we look at

18       issues and ...

19  Q.   Do you look at substantive issues as well as the time

20       lines?

21  A.   And when you say -- we look at the issue as a -- as

22       like the topics we're following.  We're not looking in

23       at all the details of a hearing and looking to see if

24       they got that information right.

25  Q.   Okay.  When you say a topic, what do you mean?

Rebecca A. Mc Intyre
July 15, 2024

```
1    Q.   That's different than the one we looked at today; is
2         that correct?
3    A.   That was state complaint investigators.
4    Q.   Okay.  So, yes, then that would be different.  Okay.
5    A.   I had COVID at that time, so I do not actually have a
6         copy of that.  You'll have to get that from Chantel.
7                   MS. HENDLEY:  What year was this?
8                   THE WITNESS:  That was August of '23.
9         Maybe it was September.  Sorry.  It was either August
10        or September.
11                  MS. HENDLEY:  That's fine.
12   BY MS. DIAZ:
13   Q.   Regarding the due process system, previously you had
14        said that you were not aware that ISDs were filing
15        motions to dismiss in due process proceedings alleging
16        that they weren't responsible for ensuring IDEA
17        compliance.  Do you remember talking about that
18        earlier?
19   A.   Yes.
20   Q.   Okay.  So for the purposes of this questioning, I'm
21        going to offer that they are doing that.  Does that
22        surprise you that they would file motions dismissing
23        that they are not responsible for ensuring IDEA is
24        implemented?
25   A.   I haven't been reviewing the complaints as they came
```

Rebecca A. Mc Intyre
July 15, 2024

```
 1           in.  So does it surprise me?  I -- I guess.  Maybe.
 2           Are they -- I guess I don't understand the situation.
 3           Is it just a stand-alone complaint filed against them
 4           or are they filed as a co?
 5    Q.     So, for example, a due process hearing filed against
 6           the school district and the ISD.
 7    A.     The co.  Okay.
 8    Q.     Yes.
 9    A.     Okay.  I understand better now.  I thought it was just
10           filed against them.
11                   Yeah, I guess it surprises me but doesn't
12           surprise me.  It surprises me it's happening.  It
13           doesn't surprise me that they are pushing back, and
14           that wouldn't -- that would be more probably their
15           attorney's --
16    Q.     Okay.
17    A.     -- defense.
18    Q.     When you talked about Michigan-specific training, are
19           the ALJs trained on the responsibilities that ISDs
20           have within Michigan?
21    A.     They are now.
22    Q.     Okay.
23    A.     They are coming up to speed.
24    Q.     When would that training have taken place?
25    A.     Like I said, I wasn't at the --
```

Rebecca A. Mc Intyre
July 15, 2024

1      You have SEAC that looks at the due process hearing

2      decisions and brings up any concerns that they see.

3      Based on that, would you then provide training to the

4      ALJs?

5   A.   Yes.

6   Q.   Okay.  Okay.  So I just want to go back, because I

7      think that we didn't necessarily get a complete answer

8      out of this one.

9           How does MDE actually ensure that the ALJs

10     possess the knowledge and ability to understand the

11     legal interpretations of IDEA and MARSE?

12           MS. HENDLEY:  Objection, form.

13  BY MS. DIAZ:

14  Q.   You can still answer it.

15  A.   Just reviewing data.  I guess there's no -- there is

16     no review and check, check, check.

17  Q.   To demonstrate that they understand IDEA and MARSE?

18  A.   Correct.

19           MS. DIAZ:  Okay.

20           MS. ABDNOUR:  Let's take -- can we take a

21     break?

22           MS. DIAZ:  Yeah.

23           (Off the record at 4:47 p.m.)

24           (Back on the record at 4:48 p.m.)

25  BY MS. DIAZ:

Rebecca A. Mc Intyre
July 15, 2024

 1   Q.   Okay.  So I hear that you're reviewing data, but

 2        you're not looking at the decisions specifically.  So

 3        how is MDE ensuring that the ALJs are actually -- that

 4        they actually have the ability to understand the legal

 5        interpretations of IDEA and MARSE?

 6                  MS. HENDLEY:  Objection, form.

 7                  You can still answer.

 8                  THE WITNESS:  So I gave you what I know.

 9        We look at the data.  We're following that.  We're not

10        looking at the substantive nature of the decisions.

11   BY MS. DIAZ:

12   Q.   Okay.  Who would know how MDE is ensuring that the

13        ALJs possess the knowledge of and ability to

14        understand legal interpretations of IDEA and MARSE?

15   A.   I don't know.

16   Q.   Okay.

17   A.   But -- I mean, I don't know.

18   Q.   Okay.  As a responsibility under IDEA, it's MDE's

19        responsibility to ensure that, correct?

20   A.   Yes.  We have a memorandum of understanding --

21   Q.   Yes.

22   A.   -- between MDE and MOAHR, which is part of LARA --

23   Q.   Yep.

24   A.   -- and LARA is responsible for ensuring that those

25        ALJs are following the memorandum of understanding,

Rebecca A. Mc Intyre
July 15, 2024

1        performance review.  Has MDE ever done a performance

2        review?

3    A.  The quality and timeliness of services provided.

4        Yeah, we do -- they send over -- they being MOAHR --

5        sends over a list of all of the hearings, and they

6        have -- they send it to Precious.  Precious sends it

7        on to myself, Chantel, and our due process

8        administrative support, and they ask us to verify --

9        or Precious asks us to verify the timeliness of those

10       and whether they are considered timely or not.

11   Q.  Okay.  And then what about the quality of the

12       services?

13   A.  Nope.

14   Q.  Okay.

15   A.  And quality is not just about the substantive written

16       portion.

17   Q.  Okay.  What does quality include?

18   A.  It's how decisions are being issued and how hearings

19       are being managed.

20   Q.  Okay.  And you said that there were five ALJs that are

21       able to do special education cases; is that correct?

22   A.  I believe there are.

23   Q.  Okay.  And how does MDE determine whether the ALJs are

24       able to do special education cases?

25   A.  LARA does.

Rebecca A. Mc Intyre
July 15, 2024

```
 1   Q.    LARA does.  Okay.

 2               Do you think that five ALJs is an adequate

 3         number of ALJs for special education cases?

 4   A.    So our ALJs are not assigned only to special

 5         education.  And that is a LARA process that we are --

 6         we have talked about, so -- with LARA.

 7   Q.    Okay.  So are you saying that five is or is not an

 8         adequate number?

 9   A.    It is not an adequate number.

10   Q.    Okay.  And it's not adequate because they're also

11         doing other cases too; is that what --

12   A.    Correct.

13   Q.    -- I'm understanding you saying?  Okay.

14               Do you think it would be adequate if they

15         were only doing special education cases?

16   A.    That's what we have asked for, at least some of them

17         need to do just special education cases.  And that, I

18         think, is going to be part of the new MOU.

19   Q.    Okay.  And when do you anticipate the new MOU being

20         out?

21   A.    Along with the MOU, they're developing -- "they" being

22         our office and our office administrative law -- are

23         developing a set of procedures that the ALJs have to

24         follow; so they're internal procedures.  Indiana has a

25         very similar set.  So we are starting with those and
```

Rebecca A. Mc Intyre
July 15, 2024

| | | |
|---|---|---|
| 1 | | Michiganizing them, and then they will be an appendix |
| 2 | | to our MOU, with the expectation that they'll follow |
| 3 | | those internal procedures. |
| 4 | Q. | And what will those internal procedures be covering? |
| 5 | A. | Process. |
| 6 | Q. | As in what? |
| 7 | A. | Process specific to IDEA and not process that can be |
| 8 | | utilized in insurance and -- |
| 9 | Q. | Okay. |
| 10 | A. | -- other things. |
| 11 | Q. | Okay.  How long have five judges been assigned for |
| 12 | | special education cases? |
| 13 | A. | I think probably for at least three years.  During the |
| 14 | | pandemic, we maybe had three.  And then coming out of |
| 15 | | the pandemic, we ordered two more.  We added. |
| 16 | Q. | Okay.  Prior to the pandemic, how many were there? |
| 17 | A. | I think there were four. |
| 18 | Q. | Okay.  How long have you been under the impression |
| 19 | | that five was not an adequate number of ALJs? |
| 20 | A. | Well, we just talked about this back in June with, I |
| 21 | | guess, deepening our understanding that the ALJs are |
| 22 | | not just covering special education.  Like I said, all |
| 23 | | of that is handled by LARA, so that's ... |
| 24 | Q. | And how did you learn that? |
| 25 | A. | Through meeting with them and asking questions. |

Rebecca A. Mc Intyre
July 15, 2024

1   Q.   Okay.  And what prompted all those questions?

2   A.   Our training and looking at the data.

3   Q.   Okay.  And which data specifically prompted that?

4   A.   The motions that were extending, extending, extending,

5        because that is an acceptable or an allowable -- I

6        don't know the right word to use -- under other

7        different types of procedures but not necessarily

8        under IDEA.

9   Q.   Okay.  So you're saying the extending of the time line

10       is allowable under other areas besides IDEA?

11  A.   Yeah.

12  Q.   Okay.  Okay.  Look at page 11.

13                 MS. HENDLEY:  We're still on 74, right?

14                 MS. DIAZ:  Yeah, we're still on MOU.  Just

15       a couple more questions.

16  BY MS. DIAZ:

17  Q.   A(3) actually says:  Include an adequate number of

18       ALJs, as determined by agreement, to hear the

19       anticipated caseloads.

20                 So did you -- was -- were you out of

21       compliance with MOU or was LARA out of compliance with

22       MOU if they were not providing an adequate number of

23       ALJs?

24  A.   I don't think that it was that they weren't providing

25       it.  I think they thought that they were providing it

Rebecca A. Mc Intyre
July 15, 2024

1       and we thought that they were providing it, but we

2       understand things differently now, and we have asked

3       for them to provide additional ALJs --

4   Q.  Okay.

5   A.  -- and they have agreed to that.

6   Q.  At what point did you determine that it was

7       inadequate?

8   A.  I think in our conversations with them back in June.

9   Q.  June.  So June of 2023?

10  A.  '4.

11  Q.  This past June?  Oh, we already had June.  Sorry.

12      This past June.  Okay.

13              And what caused that change in

14      understanding?

15  A.  Our conversation with them.  I guess that they -- they

16      shared how their ALJs are assigned, and we thought

17      that all five of them were dedicated specifically to

18      special education.  And understanding that they aren't

19      and looking at the volume of due process hearings that

20      we have, we -- we have asked for additional ALJs and

21      for them to be dedicated to special education.

22              MS. DIAZ:  Okay.  Can we go off the record

23      for one minute?  I just want to do a double-check to

24      see if there's anything else, and then I think we're

25      all set.