# EXHIBIT 2

**STATE OF MICHIGAN**
**MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES**

| | |
|---|---|
| **IN THE MATTER OF:** | **Docket No.: 23-034010** |
| **L.G. O/B/O G.G.,** | **Case No.:    DP-23-0117** |
|      **Petitioner** | **Agency:     Education** |
| **v** | |
| **KELLOGGSVILLE PUBLIC SCHOOLS,** | **Case Type:  ED Sp Ed Regular** |
|      **Respondent** | **Filing Type: Appeal** |

_____/

**Issued and entered**
**this 15th day of May 2024**
**by: Lindsay Wilson**
**Administrative Law Judge**

<u>**DECISION AND ORDER**</u>

<u>**Procedural History**</u>

On November 30, 2023, L.G. ("Petitioner"), by and through counsel, filed a Due Process Complaint and Hearing Request (Complaint) under the Individuals with Disabilities Education Act (IDEA), 20 United States Code (USC) 1400 *et seq.* with the Michigan Department of Education (MDE) on behalf of the minor child, G.G. ("Student").[1]

On December 1, 2023, Petitioner's Complaint was forwarded to the Michigan Office of Administrative Hearings and Rules (MOAHR) and was assigned to the undersigned Administrative Law Judge (ALJ) Lindsay Wilson.

On December 4, 2023, the undersigned issued an Order Regarding Timelines and Order Scheduling Prehearing Conference for December 7, 2023.

On December 4, 2023, Attorneys Michele Eaddy and Cathleen Dooley from Thurn Law Firm, P.C., filed an Appearance and Notice of Appearance on behalf of Kelloggsville Public Schools ("District" or "Respondent").

On December 7, 2023, the prehearing conference was held as scheduled.

---

[1] Student will be used in place of child's name to protect the minor child's identity.

23-034010
Page 2

On December 7, 2023, the undersigned issued an Order Following Prehearing Conference and Notice of Hearing (December 7, 2023, Order). The December 7, 2023, Order set forth the issues for hearing and scheduled the hearing for January 30, 2024, through February 1, 2024.

On December 11, 2023, the District filed a response to Petitioner's Complaint.

On December 27, 2023, Petitioner's counsel filed an adjournment request due to a scheduling conflict. Petitioner requested an adjournment of 45 days and indicated that Petitioner wished to amend the Due Process Complaint.

On December 29, 2023, Respondent filed an objection to Petitioner's adjournment request.

On January 2, 2024, the undersigned issued an Order Scheduling Second Prehearing Conference for January 4, 2024.

On January 4, 2024, the prehearing conference was held as scheduled. On January 5, 2024, the undersigned issued an Order Granting Adjournment, Order Setting Deadlines, and Re-Notice of Hearing (January 5, 2024, Order). The January 5, 2024, Order directed Petitioner to file an amended complaint no later than January 12, 2024, scheduled a prehearing conference for January 23, 2024, and adjourned and rescheduled the hearing for February 27, 2024 through February 29, 2024.

On January 11, 2024, Petitioner, by and through counsel, filed a First Amended Complaint and Request for Due Process Hearing (Amended Complaint). Petitioner's Amended Complaint was also filed against Kent Intermediate School District, which was assigned a separate docket number, Docket No. 24-001329.

On January 18, 2024, the undersigned issued an Order Regarding Timelines and Order Scheduling Prehearing Conference for January 23, 2024, for Docket No. 24-001329.

On January 19, 2024, Respondent filed a First Amended Response to Petitioner's First Amended Complaint.

On January 22, 2024, Kent Intermediate School District ("Kent ISD") filed a Motion to Dismiss (Kent ISD's Motion) for lack of subject matter jurisdiction against Kent ISD. In its Motion to Dismiss, Kent ISD also noted that the Amended Complaint was signed by Petitioner's attorney, making the Amended Complaint facially defective as Petitioner's attorney lacks standing to bring the matter. Kent ISD further indicated that a copy of the Amended Complaint was never provided to Kent ISD by Petitioner.

23-034010
Page 3

On January 23, 2024, the prehearing commenced, but did not conclude. At the prehearing, Petitioner's attorney requested a brief adjournment of the prehearing and on January 23, 2024, an Order Adjourning and Rescheduling Prehearing Conference for January 24, 2024, was issued to the parties.

On January 24, 2024, the prehearing conference was held as scheduled. Following the prehearing conference, Petitioner filed a second First Amended Complaint on January 24, 2024, which was served on counsel for Kent ISD and included Petitioner's signature to cure the previous defect.

On January 25, 2024, the undersigned issued an Order Following Prehearing and Order Setting Deadlines, which required Petitioner to file a response to Kent ISD's Motion to Dismiss by February 5, 2024.

On February 5, 2024, Petitioner filed Petitioner's Opposition to Kent ISD's Motion to Dismiss.

On February 7, 2024, the undersigned issue a Decision and Order Granting Respondent Kent ISD's Motion to Dismiss.

On February 12, 2024, Petitioner's counsel filed a request for a telephone conference to discuss matters related to scheduling. On February 12, 2024, the undersigned issued an Order Scheduling Telephone Conference for February 12, 2024.

On February 12, 2024, the telephone conference was held as scheduled. At the telephone conference, Petitioner's counsel requested that the hearing be adjourned due to an unforeseen personal matter.

On February 13, 2024, the undersigned issued an Order Granting Request for Adjournment and Order Setting Deadlines, which rescheduled the hearing for March 20, 2024 through March 22, 2024.

On February 16, 2024, Petitioner's counsel requested a prehearing conference be scheduled to address potential settlement with the assistance of the ALJ.

On February 19, 2024, Respondent's counsel filed an objection to the request for prehearing conference to discuss settlement. Respondent's counsel noted that the parties had attempted to reach settlement by attending a mediation on December 23, 2023, which was unsuccessful. The parties also participated in a resolution session on January 26, 2024, after which the parties exchanged several offers and counteroffers and the District determined that settlement discussions were at an impasse.

23-034010
**Page 4**

On February 21, 2024, the undersigned issued an Order Denying Request for Prehearing, as the parties had participated in both resolution meetings and mediation, but to no avail. See 34 CFR 300.506 and 34 CFR 300.510. As such, the undersigned did not find that that scheduling a fifth prehearing conference to continue to discuss settlement would be productive or cost effective for the parties and therefore would not be appropriate under Mich. Admin. Code R 340.1725e(1)(d)(iv). The undersigned, however, continued to encourage the parties to keep working towards a potential resolution of the matter and noted that the February 21, 2024, Order did not prevent the parties from continuing to have settlement discussions prior to the hearing in hopes of settling as many issues as possible.

On March 20, 2024 through March 22, 2024, the hearing was convened via *Zoom* videoconference. The undersigned presided. Attorney Matthew McCann from Moss & Colella, P.C. appeared on behalf of Petitioner. Petitioner L.G. also appeared for the hearing. Attorney Cathleen Dooley appeared on behalf of Respondent. Kim Fountaine, Special Education Director, also appeared as a representative on behalf of Respondent.

At the conclusion of the hearing on March 22, 2024, the undersigned permitted both parties to submit post-hearing briefs. On March 25, 2024, the undersigned issued an Order Establishing Briefing Schedule and Order Extending Hearing Deadline, which allowed the parties to submit their post-hearing briefs by May 1, 2024, and extended the hearing deadline upon Petitioner's motion, without objection, to May 8, 2024, pursuant to 34 CFR § 300.515(c).

On April 25, 2024, Petitioner's counsel notified the undersigned that he had not received copies of the hearing transcript[2]. As a result, Petitioner's counsel requested an extension of the hearing deadlines pursuant to 34 CFR § 300.515(c). Respondent's counsel had no objection to the request.

On April 26, 2024, the undersigned issued an Order Granting Request to Extend Filing Deadline for Closing Briefs and Order Extending Hearing Deadline, which extended the deadline for closing briefs to May 8, 2024, and extended the hearing deadline to accommodate the request to May 15, 2024.

On May 8, 2024, both parties timely submitted their briefs summarizing their respective positions.

**Summary of Evidence**

The following individuals testified at the hearing on behalf of Petitioner:

---

[2] Hearing transcripts Volumes I through III were forwarded to Petitioner's counsel on April 25, 2024.

**23-034010**
**Page 5**

1. Michael Wolff, PsyD, Neuropsychologist and co-owner of Behavioral Resources and the Institute for Neuropsychological Services (BRAINS)

2. Jeremy Veenema, D.O. at Alger Pediatrics

3. Melissa Hoffmann, MA, CCC-SLP, ATP, Speech Pathologist at Mary Free Bed Rehabilitation Hospital

4. L.G., Petitioner

5. Jay Inwald, PsyD, Neuropsychologist at Neurobehavioral Consultants

6. Grace (Eyk) Koerber, MA, LBA, BCBA at Positive Behavior Supports

7. Stephanie Call, Behavior Analyst at Positive Behavior Supports

8. Natalie DeVries, CCC-SLP, Speech Pathologist at Mary Free Bed Rehabilitation Hospital

The following individuals testified at the hearing on behalf of Respondent District:

1. Kaitlyn Urena, MA, CCC-SLP, Speech Language Pathologist for Respondent

2. Jenna Jobin, Early Childhood Special Education Teacher for Respondent

3. Paul Dymowski, Director of Special Education Center Programs at Kent ISD

4. Makayla Metcalf, ASD Teacher for Respondent

5. Kimberlee Fountaine, Director of Student Services for Respondent

**<u>Exhibits</u>**

The following exhibits were offered on behalf of Petitioner and admitted into the record:

1. Exhibit 5 is an Eligibility Recommendation, dated May 10, 2023.

2. Exhibit 7 is email correspondence from Petitioner to Kim Stevens, dated October 4, 2022.

3. Exhibit 8 is email correspondence between Petitioner, Kim Stevens, and Jenna Jobin, dated October 4, 2022 and October 5, 2022.

23-034010
**Page 6**

4. Exhibit 10 is email correspondence from Petitioner to Kim Stevens, dated October 11, 2022, with an attached Confidential Neuropsychological Evaluation from Rush Pediatric Neuropsychology, dated October 3, 2022.

5. Exhibit 14 is the Cooperative Agreement to Provide Special Education Countywide Programs and Services within the Kent Intermediate School District for 2023-24.

6. Exhibit 15 is a copy of electronic medical records for Student from Alger Pediatrics PC.

7. Exhibit 16 is an Evaluation of Student in Mary Free Bed Hospital Campus Outpatient Speech Language Pathology, dated February 10, 2023.

8. Exhibit 19 is an Evaluation in Mary Free Bed Hospital Campus Outpatient Speech Language Pathology for Student by Natalie Devries, SLP, dated July 14, 2023 (pages 21 through 35).

9. Exhibit 21 is an Augmentative Communication in Mary Free Bed Rehab Technology Center Grand Rapids Campus Outpatient Speech Language Pathology, dated September 28, 2023.

10. Exhibit 22 is an Augmentative Communication in Mary Free Bed Rehab Technology Center Grand Rapids Campus Outpatient Speech Language Pathology, dated October 12, 2023.

11. Exhibit 27 is a letter to Dr. Jeremey Veenema from Jay Inwald, Psy.D, LP, Pediatric Psychologist and Neuropsychologist with Neurobehavioral Consultants, P.C., dated September 2, 2021.

12. Exhibit 28 is a letter to Dr. Jeremey Veenema from Jay Inwald, Psy.D, LP, Pediatric Psychologist and Neuropsychologist with Neurobehavioral Consultants, P.C., dated April 3, 2023.

13. Exhibit 29 is Positive Behavior Supports Corporation Session Notes for January 31, 2022 through December 29, 2022.

14. Exhibit 30 is Positive Behavior Supports Corporation Session Notes for December 29, 2022 through January 2, 2024.

15. Exhibit 32 is a Positive Behavior Supports Corporation initial plan, written on January 31, 2022.

**23-034010**
**Page 7**

16. Exhibit 33 is a Positive Behavior Supports Corporation updated plan, written on October 31, 2022.

17. Exhibit 34 is a Positive Behavior Supports Corporation updated plan, written on April 24, 2023.

18. Exhibit 36 is a Positive Behavior Supports Corporation updated plan, written on October 9, 2023.

19. Exhibit 42 is a copy of medical notes for Student signed by Nicole Caugherty Han, DLLP, for a visit date of September 12, 2022.

20. Exhibit 43 is a copy of medical notes for Student signed by Michael Wolff, PsyD, ABPdN, for a visit date of February 16, 2024.

Petitioners' exhibits 1, 2, 3, 4, 6, 9, 11, 12, 13, 17, 18, portions of 19 (pages 1 through 20), 20, 23, 24, 25, 26, 31, 35, 37, 38, 39, 40, and 41 were not offered.  These proposed exhibits are not part of the record[3].

The following exhibits were offered on behalf of Respondent District and admitted into the record:

1. Exhibit A is an IEP Team Report dated September 24, 2021.

2. Exhibit B is an IEP Team Report dated September 23, 2022.

3. Exhibit C is an IEP Team Report dated March 8, 2023.

4. Exhibit D is an IEP Team Report dated May 22, 2023.

5. Exhibit E is an Eligibility Recommendation from Wyoming Public Schools, dated September 29, 2020.

6. Exhibit F is a Review of Existing Evaluation Data (REED) and Evaluation Plan from Respondent, signed on March 23, 2023, an Eligibility Recommendation from Respondent, dated May 10, 2023, and an Agreement to Extend Evaluation Timeline, dated May 10, 2023.

7. Exhibit G is Progress Reporting for Student regarding September 2022 IEP, dated December 2022.

---

[3] Petitioner's proposed exhibits 3, 4, and 6, were not admitted as they were duplicative of Respondent's admitted exhibits B, C, and D.

23-034010
Page 8

8.  Exhibit H is a copy of Invitations to Attend a Meeting, dated September 23, 2022, March 3, 2023, March 16, 2023, May 10, 2023, and April 27, 2023.

9.  Exhibit I is a copy of Contact Logs between staff and Petitioner from September 16, 2020 to May 11, 2023.

10. Exhibit J is a Service Record for Student from September 29, 2020 to August 11, 2023.

11. Exhibit K is a Confidential Neuropsychological Evaluation from Rush Pediatric Neuropsychology, dated October 3, 2022, and a Lakeshore Regional Entity Autism Enrollment For, dated October 3, 2022.

12. Exhibit L is an Early Childhood Special Education Report Card for Student for February 2023 and Early Childhood Report Cards for Student 2022-2023.

13. Exhibit M is Family-Teacher Conferences 2 Stars and 1 Wish forms.

14. Exhibit V is a Thrive Learning Center- Waiver of Academic Services Liability, signed on August 10, 2023 (Bates 0383 only).

Respondent's exhibits N, O, P, Q, R, S, T, U, and portions of V (Bates 0364 through 0382 and 0384 through 0388) were not offered. These proposed exhibits are not part of the record[4].

## Issues

As identified and clarified at the prehearing conferences, the issues for hearing were as follows:

1.  Whether Respondent failed to allow Petitioner to meaningfully participate in the IEP development process and educational decision making for Student for the 2022-2023 and 2023-2024 school years.

2.  Whether the IEPs for Student for the 2022-2023 and 2023-2024 school years were reasonably calculated to enable Student to make appropriate progress considering Student's diagnoses, educational needs, and other relevant circumstances.

3.  Whether Respondent failed to take steps to ensure Student had a FAPE for the 2022-2023 and 2023-2024 school years.

---

[4] Respondent's proposed exhibits P, R, and S were not admitted as they were duplicative of Petitioner's admitted exhibits 33, 34, and 36.

23-034010
**Page 9**

4. Whether Respondent failed to provide Student a FAPE for the 2023- 2024 school year when it denied Student a placement at Respondent's Pine Grove Learning Center.

5. Whether compensatory education or services should be awarded and if so, of what type and/or amount?

6. What other remedies are appropriate in the event Respondent is found to have committed FAPE violations?

## Applicable Law

### A.  Burden of Proof

In due process administrative hearings, the burden of proof is on the party seeking relief. *Schaffer v Weast*, 546 US 49 (2005).

With respect to Student's Parents' Complaint, as the party challenging the District's determination or implementation of special education and related services, have the burden of proof by a preponderance of the evidence for all claims raised in this matter. *Schaffer v Weast,* 546 US 49; 126 S Ct 528; 163 L Ed 2d 387 (2005); *Doe v Defendant I,* 898 F2d 1186 (CA 6, 1990).

As the Michigan Supreme Court has stated, "[p]roof by a preponderance of the evidence requires that the fact finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence."  *Blue Cross and Blue Shield of Michigan v Milliken*, 422 Mich 1; 367 NW2d 1 (1985).  A "preponderance of evidence" is best described as that evidence having the greatest weight.

### B.  Special Education Regulations and Case Law

The Code of Federal Regulations, 34 CFR § 300.39(a)(1)(i) and (ii), defines "special education" as follows:

> Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including— (i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education.

Michigan Administrative Rules for Special Education (MARSE), R 340.1701c(c), Rule 1c, defines "special education" as follows:

> "Special education" means specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a

23-034010
Page 10

    disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services.

34 CFR § 300.39(b)(3), define "specially designed instruction" as follows:

    Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—

    (i) To address the unique needs of the child that result from the child's disability; and

    (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

Students protected by the provisions of IDEA are entitled to be appropriately identified, evaluated, placed, and provided a free appropriate public education (FAPE) that includes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.  20 USC § 1400(d); 34 CFR § 300.1.

Under 20 USC § 1415(f)(3)(E), it may be found that FAPE has been denied to a disabled student based on either substantive or procedural violations of the Individuals with Disabilities Education Act (IDEA or Act).  To find a denial of FAPE based on procedural violations of the Act, it must also be found that the procedural violation impeded the student's right to FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to their child, or caused a deprivation of educational benefits.

In *Board of Education of Hendrick Hudson Central School District v Rowley,* 458 US 176, 102 S Ct 3034, 73 L Ed 2d 690 (1982), the U.S. Supreme Court articulated the two bases for assessing the provision of FAPE.  The first was whether the school district had complied with the procedural requirements of the Act, and the second was whether the student's Individualized Educational Program (IEP) was "reasonably calculated" to enable the student to receive educational benefits.  *Id.* at 206-07.

In assessing whether a student's IEP was reasonably calculated to enable the student to receive educational benefits under *Rowley*'s second basis above, our Sixth Circuit Court of Appeals noted that nothing in *Rowley* precludes the setting of a higher standard than the provision of "some" or "any" educational benefit, and held that the IDEA requires an

23-034010
**Page 11**

IEP to confer a "meaningful educational benefit gauged in relation to the potential of the child at issue." *Deal v Hamilton County Bd of Ed*, 392 F3d 840, 862 (CA 6, 2004). Nevertheless, the IDEA requirement that school districts provide disabled children with a free appropriate public education does not require that a school either maximize a student's potential or provide the best possible education at public expense. *Doe v Tullahoma City Schools,* 9 F3d 455 (CA 6, 1993); *Fort Zumwalt Sch Dist v Clynes,* 119 F3d 607, 612 (CA 8, 1997), *cert den,* 523 US 1137 (1998).  In *Endrew F. v. Douglas County Sch. Dist. RE-1,* 137 S Ct 988 (U.S. 2017), the US Supreme Court expanded its explanation of FAPE concerning *Rowley's* second prong.  In *Endrew F,* the US Supreme Court stated that for a school district "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

The primary responsibility for formulating the education to be accorded a disabled child, and for choosing the educational method most suitable to the child's needs, was left by IDEA to state and local educational agencies in cooperation with the parents or guardians of the child.  Reviewing courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. *McLaughlin v. Holt Pub Schs*, 320 F3d 663 (CA 6, 2003).

C. <u>IEP Regulations</u>

34 CFR § 300.323, when IEPs must be in effect, states the following, in pertinent part:

(a)  General. At the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320.
* * *

(c)  Initial IEPs; provision of services. Each public agency must ensure that -

(1)  A meeting to develop an IEP for a child is conducted within 30 days of a determination that the child needs special education and related services; and

(2)  As soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP.

* * *

(e)  IEPs for children who transfer public agencies in the same State. If a child with a disability (who had an IEP that was in effect in a previous

**23-034010**
**Page 12**

public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either -

(1) Adopts the child's IEP from the previous public agency; or

(2) Develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324.

\* \* \*

(g) Transmittal of records. To facilitate the transition for a child described in paragraphs (e) and (f) of this section -

(1) The new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled, pursuant to 34 CFR 99.31(a)(2); and

(2) The previous public agency in which the child was enrolled must take reasonable steps to promptly respond to the request from the new public agency.

34 CFR § 300.324, development, review, and revision of IEP, states the following, in pertinent part:

\* \* \*

(a) Development of IEP -

\* \* \*

(2) Consideration of special factors. The IEP Team must -

(i) In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior;

\* \* \*

23-034010
Page 13

(b) Review and revision of IEPs-

(1)  General. Each public agency must ensure that, subject to paragraphs (b)(2) and (b)(3) of this section, the IEP Team -

(i) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and

(ii) Revises the IEP, as appropriate, to address -

(A) Any lack of expected progress toward the annual goals described in § 300.320(a)(2), and in the general education curriculum, if appropriate;

(B) The results of any reevaluation conducted under § 300.303;

(C) Information about the child provided to, or by, the parents, as described under § 300.305(a)(2);

(D) The child's anticipated needs; or

(E) Other matters.

34 CFR § 300.301, initial evaluations, states the following, in pertinent part:

(a) General. Each public agency must conduct a full and individual initial evaluation, in accordance with §§ 300.304 through 300.306, before the initial provision of special education and related services to a child with a disability under this part.

34 CFR § 300.303, revaluations, states the following:

(b) General. A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311 -

(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2)  If the child's parent or teacher requests a reevaluation.

**23-034010**
**Page 14**

(b) Limitation. A reevaluation conducted under paragraph (a) of this section -

    (1)  May occur not more than once a year, unless the parent and the public agency agree otherwise; and

    (2)  Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.

Additionally, 34 CFR § 300.304, evaluation procedures, addresses how a public agency must conduct an evaluation, as follows:

(a) *Notice.* The public agency must provide notice to the parents of a child with a disability, in accordance with § 300.503, that describes any evaluation procedures the agency proposes to conduct.

(b) *Conduct of evaluation.* In conducting the evaluation, the public agency must—

    (1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining—

        (i)  Whether the child is a child with a disability under § 300.8; and

        (ii)  The content of the child's IEP, including information related to enabling the child to be involved in and progress in the general education curriculum (or for a preschool child, to participate in appropriate activities);

    (2) Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

    (3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(c*) Other evaluation procedures.* Each public agency must ensure that—

    (1)  Assessments and other evaluation materials used to assess a child under this part—

**23-034010**
**Page 15**

    (i)  Are selected and administered so as not to be discriminatory on a racial or cultural basis;

    (ii)  Are provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer;

    (iii) Are used for the purposes for which the assessments or measures are valid and reliable;

    (iv) Are administered by trained and knowledgeable personnel; and

    (v)  Are administered in accordance with any instructions provided by the producer of the assessments.

(2)  Assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

(3)  Assessments are selected and administered so as best to ensure that if an assessment is administered to a child with impaired sensory, manual, or speaking skills, the assessment results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (unless those skills are the factors that the test purports to measure).

(4)  The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities;

(5)  Assessments of children with disabilities who transfer from one public agency to another public agency in the same school year are coordinated with those children's prior and subsequent schools, as necessary and as expeditiously as possible, consistent with § 300.301(d)(2) and (e), to ensure prompt completion of full evaluations.

23-034010
Page 16

(6) In evaluating each child with a disability under §§ 300.304 through 300.306, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.

(7) Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided.

D. <u>Least Restrictive Environment Regulations, Rules, and Case Law</u>

The Code of Federal Regulations, 34 CFR §300.116, provides for determining educational placement as follows:

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that-

(a) The placement decision-

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;

(b) The child's placement-

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

(c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

Additionally, the Regulations provide that each public agency must ensure that (i) to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and (ii) special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 34 CFR § 300.114(a)(2).

20 USC 1412(a)(5)(A) presumes that the first placement option considered for each child with a disability is the regular classroom in the school the child would attend if not disabled, with appropriate supplementary aids and services to facilitate such placement.

The Sixth Circuit has found that the Act's requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference for the placement of disabled students in the general education environment. *Roncker v Walter,* 700 F2d 1058, 1063 (CA 6, 1983). The court also held, however, that the Act does not require mainstreaming in every case, and cited three situations in which education in a segregated special education setting may be necessary: (1) when a disabled student would not benefit from mainstreaming, (2) when any marginal benefits derived from mainstreaming are outweighed by benefits gained from services which cannot feasibly be provided in the general education environment, or (3) when the student is too disruptive to the education of the other general education students. *Id.*

It is a substantive denial of FAPE for an IEP to provide for education of a student in a more restrictive environment than that in which it could otherwise be achieved satisfactorily with any needed supplementary aids and services. In saying this, though, it must also be emphasized that the Act expressly acknowledges that the nature or severity of a student's disability may be such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily, and Congress has thus recognized that despite the LRE preference, general education classrooms simply are not a suitable setting for the education of many disabled students. *Rowley,* 458 US at 181, n 4.

In determining whether the District provided a free appropriate public education in the least restrictive environment for the student in this case, it must first be asked whether the District has complied with the procedures set forth in the IDEA in developing the IEP, and second, whether the IEP developed through those procedures was reasonably calculated to enable the student to receive a meaningful educational benefit gauged in relation to the student's potential. *Rowley,* 458 US at 206-07; *Deal*, 392 F3d at 862.

23-034010
Page 18

And finally, in *Dansbury v Conn State Educ Agency*, 115 LRP 1631 (2014), the hearing officer concluded that a district is not necessarily required to try every placement on the least restrictive environment continuum before placing a student in a more restrictive environment.

## Findings of Fact

Based on the entire record in this matter, including the testimony and admitted exhibits, the following findings of fact are established:

### A.  Student's Background and Diagnoses

1. Student is presently 6 years old. [Tr. Vol. I, p. 114].

2. Petitioner is Student's mother. [Tr. Vol. I, p. 114].

3. In August 2021, Student had his first wellness visit with Jeremy Veenema, D.O., at Alger Pediatrics. At that time, Student was still in the process of being formally evaluated by a psychologist for autism. [Tr. Vol. I, pp. 43-44, 61].

4. Student is non-verbal. Student is able to produce sounds but cannot communicate using expressive language abilities to communicate his wants, needs, or frustrations. Student can sometimes become emotionally dysregulated when he is unable to express himself. [Tr. Vol. I, pp. 25-26, 54-55, 85, 118].

5. Student often engages in stimming behaviors when he is anxious or excited. Student will stim by flapping, waving his hands in front of his face, and making noises. [Tr. Vol. I, pp. 97-98, 116; Tr. Vol. II, pp. 306-307, 366; Resp. Exh. K, Bates 0193].

6. Student uses both augmentative and alternative communication (AAC) devices and speech-generating devices (SGD) to communicate. [Tr. Vol. I, pp. 110-111, 118, 120-121; Tr. Vol. II, pp. 241-242].

7. Student needs assistance with dressing and toileting needs. Student is currently reliant on diapers or Pull-Ups. [Tr. Vol. I., pp. 26-27, 54, 115; Tr. Vol. II, pp. 364-365].

8. Student is able to feed himself finger foods but needs assistance when using utensils. [Tr. Vol. I, pp. 115-116].

9. On September 2, 2021, Student was evaluated by Jay Inwald, PsyD, with Neurobehavioral Consultants, P.C. Following the evaluation, Dr. Inwald sent a

23-034010
**Page 19**

letter to Dr. Veenema to provide a summary of his findings of Student. The letter stated Dr. Inwald's findings in pertinent part:

> [Student] was nonverbal during the entire neurobehavioral evaluation. He did not make eye contact. He engaged in flapping and uttered unintelligible grunting/screeching sounds.
>
> [Student] is a three-year-old, significantly cognitively impaired child who will no doubt require significant assistance throughout his life, especially during the critical early childhood development. His deficits are highly consistent with birth trauma. Given his age, the degree of intellectual disability is difficult; however, it appears to be severe in nature. Therefore, a Global Developmental Delay diagnosis (F88) is appropriate given his many delays. Furthermore, he clearly suffers from impairments in communication that are severe and would interfere with not only daily functioning, but future learning.
>
> [Student] will no doubt require significant services including in-home Applied Behavioral Analysis, speech and language services, occupational therapy, and physical therapy. While he would benefit from an Augmentative/Alternative Communication system, the specifics are deferred to a speech and language therapist. Again, [Student] will require a great deal of services. These should focus on basic fundamental/functional skills, including listening, following directions, and being able to express his needs at a basic (nonverbal) level.
>
> [Tr. Vol. I, pp. 179-181, 183; Pet. Exh. 27].

10. Dr. Inwald found Student to be significantly cognitively impaired because Student was behind what he would expect of a typical three-year-old in terms of his social interaction, communication, and ability to care for himself at an age-appropriate level. [Tr. Vol. p. 187].

11. Dr. Inwald diagnosed Student with Global Developmental Delay, which is a diagnosis for an individual with significant cognitive impairments under the age of five years old. Dr. Inwald indicated that Student presented as a child who might have autism, although he did not diagnose Student with autism because he did not spend much time with Student and did not think there were enough data points to draw that conclusion. [Tr. Vol. I, pp. 209-210, 212].

23-034010
Page 20

12. On January 29, 2022, an initial assessment of Student was conducted by Grace Eyk, MA, BCBA, LBA, at Positive Behavior Supports (PBS) Corporation. Following her initial assessment of Student, Ms. Eyk indicated, in part:

> Upon entering the data and information provided during this assessment, results of the VB-MAPP Milestones Assessment showed [Student] is mainly in Level 1, with some splinter skills in Level 3 related to letters, numbers, and writing. He scored 17.0 points out of 170 points possible, with visual perceptual and play skills being his areas of greatest strength and manding, tacting, and social skills being his areas of greatest deficit. . ..

> [Pet. Exh. 32, p. 1; Tr. Vol. II, pp 279-280].

13. The Verbal Behavior Milestones and Assessment Placement Program (VB-MAPP) looks at 16 domains of typical development. The Level 1 skills are the type of skills expected of an individual within the first year of development, which includes manding (being able to ask for things you need or being able to say "no"), tacting (being able to label or identify things), and listener response (following directions or responding to your name). Student's scores showed that Student was delayed for those particular Level 1 milestones. [Tr. Vol. II, pp. 283-286].

14. Ms. Eyk also performed a Functional Behavioral Assessment (FBA) of Student's tantrum and aggressive behaviors between January 28, 2022 and January 29, 2022. She concluded that the "primary maintaining reinforcer for [Student's] tantrum and aggressive behaviors is immediate access to preferred items or activities." Ms. Eyk developed a Behavior Intervention Plan (BIP) to be put into place through the ABA services being provided to Student. [Pet. Exh. 32, pp. 3-4; Tr. Vol. I, pp. 287-288].

15. From May 2022 to October 2022, Student stopped receiving ABA services from PBS Corporation due to a change in insurance. [Pet. Exh. 33, p. 1; Tr. Vol. II, p. 312].

16. In August 2022, Dr. Veenema diagnosed Student with ADHD, predominantly hyperactive type. Dr. Veenema indicated that Student has significant hyperactivity that interfere with activities of daily living, e.g., difficulties with sitting still for a period of time, impulse control, and emotional regulation. [Tr. Vol. I, pp. 47-48, 53-54, 120].

23-034010
Page 21

17. Dr. Veenema prescribed Student with Methylin 5 mg for ADHD, also known as Ritalin, three times daily. At a wellness visit on January 31, 2023, Dr. Veenema noted that Ritalin has been helpful because Student was less hyperactive and better able to sit still. [Pet. Exh. 15, pp. 1, 5; Tr. Vol. I, pp. 47, 51-52, 120].

18. On September 12, 2022, Nicole Caugherty Hahn, DLLP, with Behavioral Resources and Institute for Neuropsychological Services (BRAINS), had an intake appointment and consultation with Student. Michael Wolff, PsyD, was the supervising neuropsychologist during that consultation. Dr. Wolff indicated that BRAINS only performed a consultation as opposed to a formal evaluation as they knew Student was already in the process of being evaluated by another neuropsychologist. [Tr. Vol. I, pp. 24-25; Tr. Vol. III, pp. 558-559, 577; Pet. Exh. 42].

19. On October 3, 2022, Shana J. Rush, PhD, CCC-SLP, performed a neuropsychological evaluation of Student for Autism Spectrum Disorder (ASD). Dr. Rush's report observed that Student "did not appear to understand what he was being asked to do" and that he rarely made eye contact. Dr. Rush's report noted that Student had a "brief attention span" and "sometimes lost interest in activity before fully manipulating or playing with something." Dr. Rush's report indicated that Student "did not follow simple directives, such as "come, sit here" and "get the ball" even with visual cues", although "[h]e did allow [Dr. Rush] to guide him to do those things." Dr. Rush further observed that Student's "play was mostly repetitive and he exhibited stereotypies. The following behaviors were observed: hyperlexic tendencies (obsession with letters and numbers); rapid hand/arm flapping; repeatedly lining up (horizontally) toys (blocks, vehicles, etc.); banging toys together apparently just to make noise; and a lot of humming/vocalizations." Dr. Rush's report also described Student as "generally calm, but easily excitable." [Resp. Exh. K, pp. 1, 3-4].

20. Under Diagnostic Impression and Recommendations, Dr. Rush's report states, in pertinent part:

> Based on review of available records, history, interview, and psychometric test results, [Student] fully meets criteria for Autism Spectrum Disorder (ICD-10-CM: F84.0). . . . [Student's] deficits require very substantial support (Level 3) for communication and for restricted interests and repetitive behaviors. Additionally, results of cognitive testing indicated very low developmental skills at this time. While it is difficult to accurately measure [Student's] overall cognition due to lack of pointing response, lack of communication, and problems with joint attention, he exhibits at least **Mild Intellectual Disability** (ICD-10-CM: F70) associated with ASD.

23-034010
Page 22

> I am concerned that he is already five years old, and he does not use any words, not even in an echolalic manner. The prognosis for [Student] developing functional verbal communication is guarded; he most certainly needs intensive intervention to address communication and to use an AAC device both at home and at school.
>
> **[Student] is in need of intensive full-day therapeutic programming to address ASD symptoms. He requires both school-based special education services and ABA therapy at a minimum. Outpatient speech/language therapy and occupational therapy are also suggested.**
>
> [Resp. Exh. K, Bates 0194-0195].

21. On February 10, 2023, Dr. Hahn issued a report based on her consultation with Student in September 2022. Dr. Hahn's report also concluded that Student met the criteria for an autistic disorder. A second diagnosis was listed for Student of "oth [sic] symptoms and signs w [sic] cognitive functions and awareness", indicating there are development delays in multiple areas for Student. The final diagnosis listed is "other lack of coordination", indicating that Student was not effectively able to use motor skills consistent with his age. [Tr. Vol. I, pp. 28-30; Pet. Exh. 42, p. 2].

22. Dr. Wolff was of the opinion that Student's scores on the Mullen Scale more appropriately reflected a moderate intellectual disability range based on Student's motor skills, adaptive behaviors, his need for significant guidance from Petitioner, and not meaningfully engaging with the world around him. Despite this disagreement, Dr. Wolff found Dr. Rush's report to be "very prudent and effectively done" and thus made the decision not to repeat an evaluation of Student. [Tr. Vol. I, pp. 36-37; Tr. Vol. III, pp. 570-571].

23. On or about January 4, 2023, Student was diagnosed with dysphagia. For Student, the dysphagia diagnosis is related to his limited acceptance of foods or a picky appetite. Student also previously had sensory issues with his ability to tolerate textures or knowing how much food to put into his mouth, which can cause him to gag or choke. [Tr. Vol. I, pp. 49-51, 124; Tr. Vol. II, pp. 420-421; Pet. Exh. 15, p. 3; Pet. Exh. 16, p. 3; Resp. Exh. K, Bates 0191].

24. On September 28, 2023, Dr. Veenema referred Student to Mary Free Bed Rehabilitation Hospital to obtain an AAC device. His referral diagnosis was apraxia, a motor speech disorder, with a date of onset of September 8, 2023. [Tr. Vol. I, pp. 55-56, 82; Pet. Exh. 15, p. 13; Pet. Exh. 21, p. 3].

23-034010
Page 23

25. Based on his experiences and knowledge of Student, Dr. Veenema is of the opinion that Student's best type of learning environment would be a special education setting with peers who have a similar severity of autism, such as an ASD classroom. [Tr. Vol. I, pp. 61, 67, 73].

## B. 2020-2021 School Year

26. For the 2020-2021 school year, Student attended Wyoming Public Schools through March 31, 2022. When Petitioner moved out of the Wyoming Public Schools district in the Spring of 2022, Student was disenrolled from Wyoming Public Schools. [Tr. Vol. I, p. 162; Resp. Exh. K, Bates 0190].

27. On September 29, 2020, Wyoming Public Schools performed an evaluation of Student and determined Student was eligible for special education services under the primary eligibility category of Early Childhood Developmental Delay (ECDD). Student was noted to have met the following qualifying criteria: communication; fine motor; self-care/self-help. [Resp. Exh. E, Bates 0070-0078].

28. On September 24, 2021, Wyoming Public Schools met for an IEP annual review team meeting. Student's identified areas of need were Speech and Language (Receptive and Expressive), Perception/Motor/Mobility (Fine Motor), and Medical/Health/Physical (Personal care). [Resp. Exh. A, Bates 0001-0003].

29. Under the Present Level of Academic Achievement and Functional Performance (PLAAFP) section for Expressive Language, it stated that Student "is beginning to explore the use of low tech and high tech AAC systems and is able to request snack, drinks, and colors from an array of 15 icons via a high tech AAC device when given minimal prompting." [Resp. Exh. A, Bates 0001-0003].

30. The September 2021 IEP provided the following supplementary aids and services for Student: (i) direct speech and language for 15 to 20 minutes, three to four times a month; (ii) consultative speech and language for 10 to 15 minutes, one to four times a month; and (iii) occupational therapy and social work services for 15 to 20 minutes, three to four times per month. The IEP also provided for daily personal care services.  [Resp. Exh. A, Bates 0006, 0011].

31. In 2021, Student started using a speech-generating device (SGD) with the program LAMP for Life (LAMP). When Student changed districts, Wyoming Public Schools required Student to return the SGD. [Tr. Vol. I, pp. 120-121; Tr. Vol. II, pp. 241-242].

32. From April 1, 2022 through September 2022, Student was not enrolled in any educational programs. [Tr. Vol. I, p. 163].

23-034010
**Page 24**

C.  <u>Beginning of the 2022-2023 School Year and September 23, 2022 IEP</u>

33. Student began attending Respondent district in September 2022. [Tr. Vol. I, pp. 162, 165].

34. Since Student's IEP was last reviewed in September 2021, Respondent district decided to convene an IEP meeting to maintain compliance with the IDEA. Petitioner received an invitation to attend an IEP meeting scheduled for September 23, 2022. The IEP meeting was to convene before Student actually started attending school. [Tr. Vol. I, pp. 165-166; Tr. Vol. II, p. 247; Tr. Vol. III, pp. 780-781; Resp. Exh. H, Bates 106].

35. Prior to the September 2022 IEP meeting, Respondent district did not perform any evaluations of Student and did not conduct any assessment with respect to Student's need for an AAC or SGD device. [Tr. Vol. II, pp. 505, 514; Tr. Vol. III, p. 643].

36. When a student is coming in from another district, Respondent district's standard practice is to wait 30 days to get to know the student before deciding whether to implement the previous IEP as written or convene their own IEP. [Tr. Vol. III, p. 781].

37. On September 23, 2022, Petitioner attended the IEP meeting. The other individuals listed as being in attendance included: Jenna Jobin, Special Ed Provider; Kaitlyn Urena, Speech Pathologist; and Kimberlee Stevens (Fountaine), Ed.S. The IEP incorrectly identified Eunice Benavidez, Social Worker, as being present. [Tr. Vol. I, p. 166; Tr. Vol. II, pp. 249-250; Resp. Exh. B, Bates 0015].

38. Petitioner was provided with a draft copy of the IEP to review at the IEP meeting. [Tr. Vol. II, p. 258].

39. As Respondent district did not have an opportunity to get to know Student prior to drafting the IEP, they relied upon Student's previous IEP dated September 24, 2021, the evaluation performed by Wyoming Public Schools in September 2020, and Petitioner's input. [Tr. Vol. I, p. 166; Tr. Vol. III, p. 787; Resp. Exh. B, Bates 0015].

40. In preparation for the IEP meeting, Petitioner provided Respondent district with the contact information for the BCBA and behavior technician who worked with Student at PBS Corporation. Petitioner also provided the information regarding Student's six weeks of food therapy at Helen DeVos Children's Hospital as well as the letter from Dr. Inwald dated September 2, 2021. [Tr. Vol. I, p. 164; Tr. Vol. II, p. 252; Pet. Exh. 27].

23-034010
Page 25

41. Under the section of the September 23, 2022, IEP for "Parent/Guardian Concerns", it states, "Mom concerned about that he will be in the back of the room and left behind. He is concerned about other children not being nice to him. He does not have a lot of fear". [Resp. Exh. B, Bates 0015].

42. Petitioner indicated the description under "Parent/Guardian Concerns" did not fully capture the concerns she raised at the IEP meeting, which included concerns about Student's autism, his being taught the same things from the previous year, as well as his incontinence and eating habits. Petitioner also let the IEP team know that Student already knew his ABC's and how to count to 30. [Tr. Vol. I, pp. 123-124, 168-169; Tr. Vol. II, pp. 250-251].

43. In response to Petitioner's concerns about Student's eating habits, the Early Childhood Special Education teacher, Jenna Jobin, asked Petitioner what Student's food preferences would be. [Tr. Vol. II, p. 254].

44. At the September 23, 2022, IEP meeting, Petitioner expressed her disagreement with ECDD eligibility category and indicated that she wanted Student's eligibility changed to ASD. [Tr. Vol. III, p. 783].

45. The IEP team did not change Student's eligibility category at that time because they could not do so without first doing a REED and conducting an evaluation for a new eligibility recommendation. [Tr. Vol. III, pp. 783-784].

46. Petitioner requested a REED evaluation and informed the IEP team that once she received additional outside testing results, she would be requesting an updated IEP. [Tr. Vol. II, pp. 248, 252-254, 527].

47. Under the PLAAFP for "Perception/Motor/Mobility", the information for Student's Progress on Most Recent Goals and Objectives was taken from the previous year's IEP. Under Data Sources and Description of Need, it indicates that Student's fine motor skills, visual perceptual skills, and visual motor skills "are in the 24-30 month range". Student was also identified as being able to tower cubes 6-7 high, put large and small items into a pegboard, complete puzzles with 8-9 pieces, and match and sort 8 colors and shapes. [Tr. Vol. I, pp. 169-170; Resp. Exh. A, Bates 0003; Resp. Exh. B, Bates 0016].

48. Student's short-term objectives for fine motor included improving on "his bilateral hand skills". The fine motor objectives were copied from the previous year's IEP. [Resp. Exh. A, Bates 0009; Resp. Exh. B, Bates 0020].

23-034010
Page 26

49. Petitioner agreed with the description of Student's skills as listed in the September 2022 IEP for fine motor and that this continued to be an area of need for Student. [Tr. Vol. I, pp. 172-175].

50. Under the PLAAFP for "Socio-Emotional/Behavioral", the information for Student's Progress on Most Recent Goals and Objectives was taken from the previous year's IEP. Under Data Sources and Description of Need, it indicates Student's "overall levels in the areas of self-regulation & responsibility, interpersonal skills, and self-concept are delayed." Student "continues to need support in the area of play, sharing/trading with peers and staff along with greeting skills to increase appropriately interact with peers."  [Tr. Vol. I, pp. 175-176; Resp. Exh. A, Bates 0004; Resp. Exh. B, Bates 0016-0017].

51. Student's short-term objectives for socio-emotional/behavioral included Student being able to greet one to two staff or peers and participate in 5-8 turns and trades during play activities with staff prompting 60% of the time by January 2023 and 80% of the time by September 2023. [Resp. Exh. B, Bates 0021].

52. Under the PLAAFP for the subarea of Receptive Language, the Data Sources and Description of Need indicated that "[a]ccording to previous provider notes from Spring of 2022, [Student] presents with an impairment in receptive language skills. He is able to follow commands within familiar routines, but struggles to follow directions involving less routine instructions." Under Baseline Data and Starting Point for Instruction it states, "[Student] has not been able to be seen for services since April of 2022, so most recent data reported in April of 2022 has been used to update baseline knowledge." According to this provider, Student was "identifying pictures of objects based on their function with >80% accuracy. He continues to struggle with following of single step directions outside of routines and with multi-step directions." [Resp. Exh. B, Bates 0017].

53. Student's short-term objectives for Receptive Language included Student being able to "follow basic 1-step routine commands (i.e. sit down, come here, give me …) in structured activities given minimal verbal or visual prompts" with 80% accuracy and "will follow 1-step directions (e.g. put your backpack in your locker, put the paper on the table) in structed activities with minimal verbal or visual prompts. [Resp. Exh. B, Bates 0022].

54. Under the PLAAFP for the subarea of Expressive Language, the Data Sources and Description of Need indicated that "[p]er previous provider notes from Spring of 2022, [Student] is beginning to explore the use of low tech and high tech AAC systems to use words for a variety of pragmatic functions. He is using an average of 4 core words and some fringe words to request, greet, and refuse given minimal-moderate cues." It was also noted that the "[p]revious provider recommended

23-034010
**Page 27**

working on increasing consistency of communication attempts and working on increase 2-word combinations." [Resp. Exh. B, Bates 0017-0018].

55. Student's short-term objectives for Expressive Language included Student being able to "use 1+ words to communicate a variety of functions (e.g. greet others, label functional vocabulary, protest) given minimal cues using his preferred communication modality (words, approximations, signs, or symbols)" 10 times per day over 3 consecutive days and "will use 2+ words to communicate a variety of functions 5 times per day over 3 consecutive days. [Resp. Exh. B, Bates 0023].

56. Student's prior September 2021 IEP provided for "assistance with toileting and diaper changes"; however, the September 2022 IEP did not include any provisions for toileting services. [Resp. Exh. A, Bates, 0004; Resp. Exh. B].

57. Petitioner acknowledged that Respondent district was assisting Student with toileting needs, although she indicated it should have been included in Student's area of need in the September 2022 IEP. [Tr. Vol. II, p. 251; Resp. Exh. A, Bates, 0004; Resp. Exh. B].

58. Petitioner informed the IEP team that Student was utilizing an SGD with the LAMP program. Petitioner was informed that Respondent district did not have the LAMP program, but instead used a program called Tobbi Dynavox Snap (Snap). At that time, Petitioner was informed that the Snap device was a board with laminated pictures with an adhesive on the back. [Tr. Vol. I, p. 125; Tr. Vol. II, pp. 242-244, 457-458, Tr. Vol. III, p. 789].

59. The LAMP application uses one unique path to access a certain word, which helps with motor planning because the location does not change. [Tr. Vol. II, pp. 457-458].

60. Tobbi Dynavox Snap Core uses a home page with fringe vocabulary separated onto different pages that have to be navigated to. Tobbi Dynavox Snap later released an application similar to LAMP. [Tr. Vol. II, pp. 457-458].

61. In the September 23, 2022 IEP, under Special Factors, Supplementary Aids and Assessments, it stated that Student did not need supports and/or services for communication needs or for assistive technology devices and services. The IEP indicated that these services were not selected because Student's "offer of FAPE includes access to an ECSE program with embedded communication supports, therefore, no additional supports are needed." [Resp. Exh. B, Bates 0019, 0027; Tr. Vol. III, pp. 802-803].

23-034010
**Page 28**

62. In the September 23, 2022 IEP's Program and Services, Student was offered direct speech therapy services for 20 to 25 minutes at three to four times per month. [Resp. Exh. B, Bates 0024].

63. Petitioner indicated that Student should have been receiving more frequent speech and language services than provided for in his September 2022 IEP given his severe deficits in communication. [Tr. Vol. II, pp. 255-256, 259-260].

### D.  Email Correspondence between Petitioner and Respondent District staff

64. On October 4, 2022, Petitioner sent an email to Kimberlee Fountaine, Director of Student Services, which stated, in part, that Student "had his testing done yesterday and from the findings I would like to schedule a [sic] iep for the updated information that the school will be receiving in the next few days". [Pet. Exh. 7; Tr. Vol. I, p. 126].

65. On October 4, 2022, Ms. Fountaine replied to Petitioner's email stating that she had copied Jenna Jobin on the email and asked Ms. Jobin to "reach out to [Petitioner] to discuss concerns and schedule a meeting". [Pet. Exh. 8, p. 2, Tr. Vol. I, p. 128].

66. On October 5, 2022, Ms. Jobin replied to Petitioner and stated, in part, "[w]e can definitely have an IEP update meeting. I am out the rest of this week. Do you have any availability next week for meeting? . . ." Ms. Jobin also requested that Petitioner provide a "short summary from the testing". That same day, Petitioner replied she could meet anytime except for Monday. [Pet. Exh. 8, p. 1; Tr. Vol. I, pp. 128-129; Tr. Vol. III, p. 648].

67. On October 11, 2022, Petitioner sent an email to Ms. Fountaine, attaching a Confidential Neuropsychological Evaluation for Student from Rush Pediatric Neuropsychology, dated October 3, 2022. Petitioner's email gave permission for Ms. Fountaine to share the report with Student's teacher, Ms. Jobin. [Pet. Exh. 10; Tr. Vol. I, p. 130].

68. Ms. Fountaine did not immediately review Dr. Rush's report. [Tr. Vol. III, p. 827].

69. No meeting was scheduled for an IEP update in October 2022. The next IEP meeting was not scheduled until March 8, 2023. [Tr. Vol. I, pp. 129, 131; Tr. Vol. III, pp. 826-827].

70. Ms. Jobin does not know why she did not schedule an IEP update meeting until March 2023. [Tr. Vol. III, pp. 648-649].

23-034010
**Page 29**

E. <u>**Early Childhood Special Education Classroom (2022-2023 School Year)**</u>

71. Jenna Jobin is the Early Childhood Special Education (ECSE) Teacher at Respondent district. Ms. Jobin was Student's teacher for the 2022-2023 school year when Student attended the morning session of the ECSE program. The morning session ran from approximately 8:20 a.m. to 11:20 a.m., four days a week. [Tr. Vol. III, pp. 590, 592, 778].

72. The ECSE classroom prepares students for kindergarten by teaching the students elementary skills such as colors, shapes, letters, and numbers. [Tr. Vol. III, pp. 610, 777].

73. The ECSE classroom had a maximum of 12 students. All students in the ECSE classroom had IEPs with varying ranges of disability, including ASD. The ECSE classroom also has a full-time paraprofessional as well as speech therapists, occupational therapists, and social workers that rotate into the room to provide related services. [Tr. Vol. III, pp. 593, 600].

74. The students in the ECSE were provided with breakfast at the start of the school day. [Tr. Vol. III, pp. 607, 778].

75. Student did not typically eat breakfast; however, he would sometimes eat food that Petitioner sent with him to school. Student did not eat lunch at the school. [Tr. Vol. II, p. 270; Tr. Vol. III, p. 607].

76. Petitioner had no concerns about Respondent district providing medication to Student during the 2022-2023 school year because he only went to school for a half day. [Tr. Vol. II, p. 530].

77. The students in the ECSE classroom do not get actual grades but instead get a report card indicating their social emotional skills, language skills, fine motor skills, gross motor skills, self-help skills, and pre-academic skills. [Tr. Vol. III, p. 611; Resp. Exh. L, Bates 0198-0199].

78. Ms. Jobin characterized Student as having middle to high level academic abilities compared to the other students in the ECSE classroom because Student knew his letters, numbers, and how to write his name. Ms. Jobin characterized Student as being on the lower end in terms of his social skills compared to the other students. [Tr. Vol. III, p. 594].

79. Ms. Jobin indicated that Student did not exhibit any behaviors that were disruptive to the learning of other students and did not exhibit aggression towards staff or peers. [Tr. Vol. III, pp. 604-606].

23-034010
Page 30

80. Ms. Jobin never observed Student having a tantrum. She indicated that Student would sometimes get overstimulated or frustrated if he did not want to do something. When he was overstimulated Student would flap, jump, or engage in vocal stimming. [Tr. Vol. III, pp. 604-605, 652-653].

81. Student would at times refuse to engage in certain classroom activities and Ms. Jobin would have to encourage him to participate.  [Tr. Vol. III, p. 653].

82. Student preferred to sit on the trampoline at circle time and would sometimes use the trampoline during play time. Student used the trampoline approximately one hour a day. [Tr. Vol. III, pp. 644-645].

83. Student did not have a Functional Behavioral Assessment (FBA) or a Behavior Intervention Plan (BIP) implemented during the 2022-2023 school year. [Tr. Vol. III, pp. 663-664, 836].

84. Ms. Jobin never had concerns about Student's safety in the ECSE classroom. [Tr. Vol. III, p. 638].

85. The ECSE classroom had three dedicated classroom iPads with the Snap Plus program available for the students to use. Ms. Jobin and the speech pathologist modeled how to use these iPads with students throughout different classroom activities. [Tr. Vol. II, pp. 455-456; Tr. Vol. III, pp. 595-596, 641].

86. Student was not the only student in the classroom without the ability to communicate verbally; however, he was the only student who was using a communication device full-time. [Tr. Vol. III, pp. 594, 646].

87. At the start of the 2022-2023 school year, Student did not have the option of taking the iPad home with him. Respondent district did allow Student to take the Snap AAC device home. [Tr. Vol. I, p. 122].

88. Student did not demonstrate any understanding of how to use the Snap AAC device at home. As a result, Petitioner had Student use a whiteboard to communicate at home and started sending the whiteboard to school with Student. [Tr. Vol. I, pp. 145-146].

89. Student communicated with Ms. Jobin by using the whiteboard or an iPad, although he showed a slight preference for the whiteboard. [Tr. Vol. III, pp. 594, 596, 603].

23-034010
**Page 31**

90. Based on her observations of Student in the ECSE classroom, Ms. Jobin is of the opinion that a self-contained classroom, such as an ASD classroom, is appropriate for Student. [Tr. Vol. III, p. 638].

91. Kaitlyn Urena, MA, CCC-SLP, Speech Language Pathologist for Respondent, provided speech services to Student for the 2022-2023 school year. [Tr. Vol. II, pp. 441-442, 444].

92. Ms. Urena was in the ECSE classroom two days a week, where she provided each student their individual speech services. [Tr. Vol. II, p. 462; Tr. Vol. III, p. 595].

93. Ms. Urena provided the direct speech services identified in Student's IEP. She typically provided services once a week for about 25 minutes, depending on whether both she and Student were present on the day in question. [Tr. Vol. II, pp. 468, 478, 508].

94. Ms. Urena frequently works with two students at the same time because it also allows for students to work on their social and peer relationship skills. [Tr. Vol. II, pp. 469, 508-509].

95. Student received additional supportive speech services through modeling from the ECSE teacher. [Tr. Vol. II, pp. 468-469].

96. Ms. Urena began using low-tech options with Student, such as communication picture boards and Picture Exchange Communication System (PECS), rather than high-tech options. [Tr. Vol. II, pp. 452-453].

97. Ms. Urena observed that Student would utilize the AAC devices with prompting but that he did not show much interest in using the AAC device. [Tr. Vol. II, pp. 454-456].

## F.  ABA Services in October 2022

98. In October 2022, Student restarted ABA services with PBS Corporation. Ms. Eyk completed an updated Intervention Plan for Student, which stated that the results of the VB-MAPP "show improvement especially in the areas of listener response and motor imitation skills compared to his initial assessment; however, [Student's] score in independent play decreased by 1.5 points since January 2022. Total score increased by 7.5 points to 24.5 points out of 170 points possible." [Pet. Exh. 33, p. 2].

99. Ms. Eyk observed that the increase to 7.5 points was not a big change, although she was not surprised by the small increase given that Student had not been receiving any ABA services and had stopped receiving school services from April 2022 to September 2022. [Tr. Vol. II, pp. 291, 315].

100. On October 24, 2022, a Quality-of-Life Questionnaire was completed by Student's parent or caregiver to ask the level of support that Student needs in areas including health and safety; self-advocacy; social relationships; productive activity; and community participation. For each of these categories, Student's Average Level of Support was recorded as "High". [Pet. Exh. 33, p. 5; Tr. Vol. II, pp. 291-292].

101. Ms. Eyk also conducted an updated FBA between October 24, 2022 and October 27, 2022. The FBA again concluded that "[Student's] aggressive behaviors are primarily maintained by immediate access to initial or continued access to preferred items or activities, while his behaviors that are unsafe to himself are maintained by automatic sensory reinforcement." The target problem behaviors were identified as Aggression and Unsafe to Self, both of which were identified as new behaviors. The Unsafe to Self-behaviors included "climbing on objects that are not intended to be climbed on". [Pet. Exh. 33, p. 7].

**G. Student's Report Cards and Progress Notes for 2022 Fall Semester**

102. On September 29, 2022, Ms. Urena had her first speech and language therapy session with Student. Ms. Urena observed that Student "appeared to be overstimulated by noises within the environment and frequently attempts to elope into the bathroom. He appeared to enjoy using noise cancelling headphones to help with this overstimulation." Ms. Urena also modeled the use of Snap+core with Student and Student "used Snap+core to label/describe items during play within sensory bin independently." [Resp. Exh. J, Bates 0148-0149].

103. There are two bathrooms located within the ECSE classroom. Ms. Urena indicated that Student would attempt to elope to the bathroom when he felt overwhelmed. Ms. Urena also observed that Student preferred to be on his own and would isolate himself from his peers in the classroom. When these behaviors occurred, staff would open the bathroom door but allow time for Student to decompress before attempting to start a new activity. [Tr. Vol. II, pp. 475-476].

104. The behavior of trying to elope to the bathroom decreased as the school year went on. Ms. Urena never observed Student trying to elope outside of the classroom. [Tr. Vol. II, pp. 475, 509-510].

105. In the fall of 2022, Ms. Jobin completed an ECSE Report Card for Student, which indicated that Student was still working on his social emotional, language, and daily

living skills. Ms. Jobin wrote that Student "has made a nice transition into the ECSE room. He is doing great with the AAC device and communication boards. [Student] is doing great with his fine motor skills and early academic skills. Keep up the awesome work." [Resp. Exh. L, Bates 0202-0204].

106. On October 31, 2022, Ms. Urena completed a Monthly Progress Summary, indicating Student "participated in 2/4 of the speech therapy sessions". The missed sessions were due to her own absence on one occasion and Student's absence on another. Ms. Urena noted that Student was able to identify "familiar objects from a group, using AAC device/communication board to label and request, and following of 1-step directions with spatial concepts." Ms. Urena indicated Student made "slight progress towards his goals this month." [Resp. Exh. J, Bates 0146].

107. On November 30, 2022, Ms. Urena completed a Monthly Progress Summary, indicating that Student "was seen 2/6 attempts for speech therapy" due to the Thanksgiving holiday and Student's absences. Ms. Urena observed that Student was "following 1-step directions" and using "single words to label target vocabulary using AAC device or communication board." Ms. Urena indicated that Student has improved with the Snap + Core device "to label and request preschool level vocabulary words and is beginning to demonstrate understanding of how to navigate between core word page and some category pages." Ms. Urena further indicated that Student made "slight-moderate progress" towards his goals. [Resp. Exh. J, Bates 0144].

108. On December 13, 2022, Ms. Urena indicated that Student was "progressing as expected" on his receptive language short-term instructional objectives. Ms. Urena noted that Student was "following basic routine commands with ~40% accuracy." [Resp. Exh. G, Bates 0104].

109. On December 13, 2022, Ms. Urena indicated that Student was "progressing as expected" on his expressive language short-term instructional objectives. Under Comments on Progress it reads:

> [Student] has been making progress using AAC pictures and Snap + core app on AAC device to label and make requests. He has demonstrated ability to request for farm animals by name, label basic body parts and foods. [Student] also recently demonstrated ability to imitate use of 2-3 word phrase to request (I want _____) x3 during one session by navigating from core words page to the category page of the item he wanted. [Student] is not yet using words or picture to label or request assistance . . .

> [Resp. Exh. G, Bates 0105; Tr. Vol. II, p. 479].

110. On December 31, 2022, Ms. Urena completed a monthly progress summary, indicating that Student participated in only two speech therapy sessions due to the school closure for winter break. Student was noted to be "targeting identification of objects from a group (66% accuracy)", "improving in his ability to use AAC program (Snap + Core)", and "is beginning to request with 2+ word phrases using the device." Ms. Urena indicated that Student showed "slight-moderate progress" for December 2022. [Resp. Exh. J, Bates 0141].

## H.  Student's Report Cards and Progress Reports for 2023 Spring Semester

111. On January 27, 2023, Ms. Urena completed a Monthly Progress Summary, indicating that Student participated in three speech therapy sessions. Student missed the additional session due to his absence. Student was observed to follow "routine directions", follow "simple 1-step directions given gestural/visual cues", and using "single words for a variety of functions." Student was also noted to be "improving with the use of AAC device and whiteboard to make requests and greet others." Ms. Urena stated that Student showed "slight progress towards goals". [Resp. Exh. J; Bates 0139].

112. On February 24, 2023, Ms. Urena completed a monthly progress summary, indicating that Student participated in two speech therapy sessions. Student missed the additional sessions due to his absence and school closure. Student was again observed to be following "routine directions", following "simple 1-step directions given gestural/visual cues", and using "single words for a variety of functions." Student was again noted to be "improving with his use of the AAC device and whiteboard to make requests and greet others." Ms. Urena stated that Student showed "slight progress towards goals". [Resp. Exh. J, Bates 0136].

113. In February 2023, Ms. Jobin completed a spring ECSE Report Card for Student. It indicated that Student would imitate actions of students or teachers and participate in parallel play, but was unlikely to interact or play cooperatively with peers. Student was also working on speaking in sentences with at least two words with the AAC or whiteboard and following two-step directions. Ms. Jobin reported that Student was improving on using utensils, self-care, and dressing and undressing, but had not showed improvement with toileting. [Tr. Vol. III, pp. 611-612; Resp. Exh. L, Bates 0198-0201].

114. Petitioner reported to Ms. Urena that the AAC device being sent home was not working for Student because he was adverse to the texture of the Velcro on the back of the pictures for this device. [Tr. Vol. II, p. 454].

115. As a result of the Student not being successful with the AAC device, Respondent district requested an SGD device for Student to be able to take home with him. In

23-034010
**Page 35**

February 2023, Student received an iPad with the Tobii Dynavox Snap Core program. [Tr. Vol. II, pp. 455, 458].

116. Ms. Urena offered to show Petitioner how to use the Tobii Dynavox Snap Core program but did not receive a response from Petitioner.  [Tr. Vol. II, p. 459].

117. Student later had the new Snap program with the motor planning application programed onto his iPad. [Tr. Vol. II, p. 458].

118. In Spring 2023, Ms. Jobin completed a Family-Teacher Conference form, which indicated Student was good at communicating with the whiteboard, writing his name, and early academics, such as naming letters, numbers, shapes, and colors. Ms. Jobin indicated that she would like Student to "participate in play with his friends". [Tr. Vol. III, pp. 609-610; Resp. Exh. M, Bates 0205].

## I.    Student's Outside ABA Services During the 2022-2023 School Year

119. Stephanie Call, Behavioral Analyst at PBS, worked with Student at home during the 2022-2023 school year. Ms. Call was working with Student five days a week for three to six hours a day. [Tr. Vol. II, pp. 361-363, 367-368, 392-393, 399].

120. Ms. Call did not observe Student in the ECSE classroom. [Tr. Vol. II, p. 392].

121. Ms. Call indicated that Student's biggest challenge is his communication. When Ms. Call started working with Student, Student made very little noises or vocalizations and would communicate through pointing, writing on the whiteboard, or bringing you to things he wanted.  [Tr. Vol. II, pp. 363, 365-366, 368, 388, 394].

122. Ms. Call tried using the AAC Snap program with Student but was unsuccessful. Student was able to use the AAC device by indicating to Ms. Call what a certain picture depicted but did not appear to have an understanding of how to use the device to respond to questions. [Tr. Vol. II, pp. 386-388, 393].

123. Based on her work with Student during the 2022-2023 school year, Ms. Call observed that Student was making progress on his communication skills. [Tr. Vol. II, p. 393].

124. Near the end of the 2022-2023 school year, Student began bringing home an SGD device from school. Ms. Call did not work with Student on the SGD because she did not know how to use the device. [Tr. Vol. II, pp. 393-394].

125. Ms. Call indicated that Student gets off task very easily and needs reminders to stay on task. [Tr. Vol. II, pp. 368-369].

23-034010
**Page 36**

126. In her time working with Student, Ms. Call observed that Student is mostly dependent upon adults for purposes of assistance with communication, socialization, and his daily needs. [Tr. Vol. II, p. 363].

127. During her time working with Student, Ms. Call witnessed various behaviors from Student which included the following: crying episodes; screaming; overstimulation; difficulty concentrating on tasks; vocalizing a whining sound when engaging in an undesired activity; struggling with responding to his name or maintaining eye contact; hyperactivity; and chewing on items around the house, such as wooden toys, cardboard or coins. Ms. Call indicated that Student would also sometimes push up against her and try to climb on her. [Pet. Exh. 29; Pet. Exh. 30; Tr. Vol. II, pp. 371-385].

128. Ms. Call stated that Student exhibited very little awareness of danger or safety. At home, Ms. Call has observed Student climb up on counters and on the back of furniture. [Tr. Vol. II, pp. 367, 382-383].

129. Ms. Call stated that Student would engage in tantrums when he was asked to do something he did not want to do. Ms. Call would try to push Student to do more than the bare minimum so that he could learn how to regulate his emotions. [Tr. Vol. II, pp. 408-409].

130. Ms. Call indicated that Student's behaviors at home needed attention and redirection from her on a regular basis. Ms. Call believes that she saw more of these behaviors from Student because he was comfortable with her. [Tr. Vol. II, pp. 385-386, 406].

131. Ms. Call indicated that Student's unsafe behaviors decreased quite a bit in the last six months that she worked with Student. [Tr. Vol. II, pp. 383-384].

**J.  March 8, 2023 IEP**

132. On or about March 3, 2023, Petitioner received an invitation to attend the IEP meeting scheduled for March 8, 2023. [Resp. Exh. H, Bates 0108-0109; Tr. Vol. II, p. 261].

133. Petitioner was in attendance at the IEP meeting. Throughout the March 8, 2023, IEP meeting, Petitioner provided her thoughts and concerns to the IEP team. [Resp. Exh. C, Bates 0031; Tr. Vol. II, pp. 261, 263].

134. Under Parent/Guardian Concerns it states, "Mom is concerned that for the last couple years she has been asking [Student] to be placed in an ASD setting. She is also concerned for his safety in the classroom. Mom is concerned that she was

23-034010
Page 37

not notified about his ear being swollen and red. Mom would like to see school working more with him on comprehension." [Resp. Exh. C, Bates 0031-0032].

135. Petitioner's request for an ASD setting was a center-based program that provided individualized care. [Tr. Vol. II, p. 263].

136. Petitioner indicated that the March 8, 2023, IEP was still not reflecting Student's diagnoses of ASD and ADHD or his incontinence. [Tr. Vol. I, pp. 134-135; Resp. Exh. C, Bates 0031-0032].

137. Petitioner acknowledged that although incontinence was not in Student's IEP, Respondent district's staff were taking care of Student's toileting needs. [Tr. Vol. I, pp. 134-135; Tr. Vol. II, p. 529].

138. Petitioner also raised a concern about Student being taught the same things as the previous year. Petitioner was told by the IEP team that they were unable to teach Student beyond the scope of the other students in the ECSE classroom. Petitioner's concern was not listed in the March 2023 IEP. [Tr. Vol. I, pp. 134-135; Resp. Exh. C].

139. As with the prior September 2022 IEP, Student's areas of identified need were Speech and Language for both Receptive Language and Expressive Language, Socio-Emotional/Behavioral, and Perception/Motor/Mobility. [Resp. Exh. C, Bates 0033-0035].

140. Under the PLAAFP for Expressive Language, the March 2023 IEP states that Student's progress shows he "is using a whiteboard and SGD (speech generating device) to communicate more within the classroom and it [sic] using them to greet, label, and request given minimal-moderate prompting and intermittent modeling from SLP and special education teacher." It further states that Student "is beginning to combine words more consistently into structured phrases to request as well "I want ___" using both core words and fringe vocabulary." [Resp. Exh. C, Bates 0033].

141. Under Data Sources and Description of Need for Expressive Language, the IEP states, in part, "[Student] is not yet combining words into phrases for other pragmatic functions aside from requesting during structured activities using phrase "I want ____." [Resp. Exh. C, Bates 0033].

142. Under Baseline Data and Starting Point for Instruction for Expressive Language, the IEP states that Student "is making 1-2 word comments to request in ~ 46% of opportunities. He will greet others using SGD or whiteboard when prompted. Mother reports that [Student] does not use the SGD at home, so use of whiteboard

23-034010
**Page 38**

in conjunction with SGD and communication boards will be utilized in the classroom." [Resp. Exh. C, Bates 0033-0034].

143. Petitioner indicated that Student was not making any two-word requests at home. [Tr. Vol. I, p. 141; Tr. Vol. II, pp. 267-268].

144. Under the IEP's Goals and Objectives for Expressive Language, Student's short-term goals were updated from the September 2022 IEP to Student "will use 1-2+ words with preferred communication modality" in order "to gain help or attention during structured activities given minimal verbal and visual cues" and "to make requests for desired objects/activities/actions during structured activities given minimal verbal and visual cues" in 7/10 opportunities. [Resp. Exh. C, Bates 0038; Tr. Vol. II, p. 486].

145. Under the IEP's Goals and Objectives for Receptive Language, Student's first short-term goal of following 1-step routine commands with 80% accuracy remained the same as the September 2022 IEP. Student's second short-term goal was updated to Student being able to "follow basic 1-step directions involving qualitative (colors, shapes, sizes, etc.) and early special concepts (in, on, under, etc.) in structed activities with moderate verbal or visual prompts." [Resp. Exh. C, Bates 0037; Tr. Vol. II, pp. 485-486].

146. Unlike the September 2022 IEP, the March 2023 IEP did indicate that Student required supports and services for communication and a need for assistive technology devices and services. [Resp. Exh. B, Bates 0019; Resp. Exh. C, Bates 0036].

147. The March 2023 IEP did not identify that Student required supports and/or services for "[t]he use of positive behavioral interventions and supports, and other strategies, to address behavior because [Student] has behavior that impedes [Student's] learning or the learning of others". [Tr. Vol. II, pp. 300-302; Resp. Exh. B, Bates 0019; Resp. Exh. C, Bates 0036].

148. The frequency and number of minutes in Student's Speech and Language services increased in the March 2023 IEP. Starting in March 2023, Student was to receive five to seven direct monthly sessions for 20-25 minutes. [Resp. Exh. B, Bates 0024; Resp. Exh. C, Bates 0041].

149. Ms. Call believes that Student needed more significant one-on-one speech therapy at school based on the way he struggles to stay focused and needs multiple reminders to stay on task. [Tr. Vol. II, pp. 400-401].

23-034010
**Page 39**

150. At the March 8, 2023, IEP, the team discussed the option of a Center-Based ECSE Setting; however, this option was not selected "[b]ased on data from center-based programming obtained when [Student] previously attended there, he is not a candidate for center-based ESCE services". [Resp. Exh. C, Bates 0043].

## K.  Student's March 2023 REED

151. On March 16, 2023, Petitioner received an invitation to attend a Review of Existing Evaluation Data (REED) and Evaluation Plan to be held on March 23, 2023. Student was to be reevaluated for a change in eligibility in special education services. [Resp. Exh. F, Bates 0086; Resp. Exh. H, Bates 0114-0115; Tr. Vol. II, p. 272].

152. Petitioner was present at the REED meeting. [Tr. Vol. II, p. 273].

153. Ms. Jobin's classroom assessments and observations were included as part of Student's evaluation. Ms. Jobin indicated her concerns for Student were "continuing to find ways to communicate" and "continuing to regulate his sensory needs". Regarding his behavior, Ms. Jobin reported that his only behavior concern was "self-regulation" and indicated that Student "does need to be encourage to complete a task especially if it is something he is not interested in." Ms. Jobin estimated that the percentage of time Student was on task was 40%. Ms. Jobin also noted that Student does not have "an identifiable peer group" and that Student prefers to play by himself. [Pet. Exh. 5, pp. 1-2; Resp. Exh. F, Bates 0079-0080].

154. Ms. Jobin observed that Student would become overstimulated and would need help with self-regulation. When Student became overstimulated, Student was allowed to use headphones or jump on the trampoline. Ms. Jobin indicated that Student would become frustrated once or twice during the day, especially when doing a task that he was not interested in and would need daily encouragement or hand-over-hand assistance to complete the non-preferred task. [Tr. Vol. III, pp. 650, 654].

155. Ms. Jobin addressed social skills in the classroom by bringing the students together and encouraging them to play together. [Tr. Vol. III, pp. 656-657].

156. Ms. Jobin indicated that her observations and answers to the evaluation questions were an honest representation of what she saw in Student. [Resp. Exh. F; Tr. Vol. III, pp. 635-636].

157. Ms. Jobin completed the Developmental Profile- 4 (DP-4) Teacher Checklist. The DP-4 assesses for developmental delays. Ms. Jobin's scores ranked Student at

23-034010
Page 40

"Below Average" on the scale for Physical and Cognitive and "Delayed" for Adaptive Behavior, Social-Emotional, and Communication. For Communication and Social-Emotional, Ms. Jobin's scores rated Student at an age equivalent of less than a two-year-old, although Student was five years old at the time this checklist was completed. Ms. Jobin's scores revealed a General Developmental range of "Delayed" and ranked Student in the 2nd percentile. [Tr. Vol. III, p. 658; Pet. Exh. 5, pp. 2-3; Resp. Exh. F, Bates 0087-0088].

158. Petitioner also completed the DP-4 Parent Checklist for Student. Petitioner's descriptive ranges for Student were the same as Ms. Jobin's except that Petitioner's scores rated Student as "Average" on the scale for Physical. Petitioner's scores also revealed a General Developmental range of "Delayed", but ranked Student in the 1st percentile. [Pet. Exh. 5, pp. 8-9; Resp. Exh. F, Bates 0093-0094].

159. On the Teacher Report Form (TRF), Ms. Jobin's scores showed that Student was in the "Average Range" for syndrome scale scores of emotionally reactive; anxious/depressed; somatic complaints; withdrawn; attention problems; and aggressive behavior. [Pet. Exh. 5, p. 3; Resp. Exh. F, Bates 0088].

160. Petitioner completed a Parent Input Form and stated that she had concerns about Student "not being taught speech and the school ignoring [Student's] autism" and that "no pretend play" was being taught at school. [Pet. Exh. 5, p. 8; Resp. Exh. F, Bates 0093, Tr. Vol. I, p. 143].

161. For the Behavior Assessment System for Children (BASC-3) Teacher Rating Scale, Ms. Jobin rated Student in the average range for adaptability, borderline range for social skills, and average range for functional communication. Additionally, she rated Student as being in the average range for hyperactivity, aggression, anxiety, depression, somatization, attention problems and atypicality. She rated Student in the clinical range for withdrawal. [Pet. Exh. 5, pp. 3-4; Resp. Exh. F, Bates 0088-0089].

162. On the BASC-3 Parent Rating Scale, Petitioner rated Student as being in the clinical range for adaptability, social skills, functional communication, attention problems, atypicality, and withdrawal. Petitioner rated Student as being in borderline range for hyperactivity and depression and in the average range for aggression, anxiety, and somatization. [Pet. Exh. 5, pp. 7-8; Resp. Exh. F, Bates 0092-0093].

163. Ms. Urena administered the Preschool Language Scales -5th Edition (PLS-5) and the Communication Matrix as part of the evaluation of Student's speech and language skills. The PLS-5 test showed Student was "significantly below average"

23-034010
**Page 41**

in auditory comprehension and was at an age equivalent of 2 years and eight months. Student had a standard score of 55, which "indicates presence of a severe receptive language impairment." The Communication Matrix was used to "assess [Student's] expressive communication skills and his use of behaviors, symbols, and language to communicate with others." Student had a score of 48 (30%) and these results also "indicate a severe expressive language impairment." [Pet. Exh. 5, pp. 9-10; Resp. Exh. F, Bates 0094-0095; Tr. Vol. II, pp. 494-499].

164. In the course of completing the REED, the team also reviewed Dr. Rush's October 3, 2022, evaluation of Student, which indicated that Student met the criteria for ASD. [Tr. Vol. III, p. 807; Pet. Exh. 5, p. 6; Resp. Exh. F, Bates 0091].

165. On April 27, 2023, Petitioner was sent an invitation to attend a meeting for reviewing Student's eligibility for special education programs and services on May 10, 2023. Petitioner attended the meeting on May 10, 2023. [Resp. Exh. H, Bates 0120-0121; Tr. Vol. II, p. 533].

166. On May 10, 2023, Student was found eligible with a primary eligibility of Autism Spectrum Disorder (ASD). [Pet. Exh. 5, p. 12; Resp. Exh. F, Bates 0097].

167. After Student was found eligible for special education under the ASD category, Student's programming and services did not change because Respondent district renders services and interventions based on Student's level of need as opposed to their category of disability. [Tr. Vol. II, p. 501; Tr. Vol. III, pp. 782, 784].

## L.  Dr. Inwald's April 3, 2023 Letter

168. On April 3, 2024, Dr. Inwald sent a second letter to Dr. Veenema. In the letter, Dr. Inwald stated he "had the opportunity to review records from the Kelloggsville Public School System (IEP). However, there does not appear to be a recent evaluation. The last one was conducted on 09/29/2020." Dr. Inwald further stated that he received reports from EnCourage Institute for Teaching and Learning and from PBS Corporation. Dr. Inwald also referenced a report from Ms. Call who reported that Student's "language skills and comprehension are not progressing as depicted through the schools. There are also concerns that he is not using his assisted communication device and his speech generated device appropriately. Impairments in comprehension are noted . . . " [Pet. Exh. 28].

169. At the time of writing the April 3, 2023 letter, Dr. Inwald did not review Student's September 23, 2022 IEP or the March 8, 2023 IEP performed by Respondent district. [Tr. Vol. I, pp. 215, 217-219].

23-034010
**Page 42**

170. Dr. Inwald indicated that the observations in the reports from EnCourage Institute for Teaching and Learning and from PBS Corporation were consistent with what he observed of Student in September 2021. Dr. Inwald has not observed or visited with Student since his initial evaluation in September 2021. [Tr. Vol. I, pp. 193-194, 216, 224].

171. Prior to the hearing, Dr. Inwald reviewed the mission statement and core skills for Kent ISD's center-based program, Pine Grove Learning Center. Dr. Inwald believes that given their mission statement and description, Pine Grove Learning Center would be effective for Student. [Tr. Vol. I, pp. 203-205, 225-226].

172. Dr. Inwald is of the opinion that an ASD classroom would not be sufficient for Student, although he concedes he has no knowledge of the ASD classrooms or programs offered by Respondent district. [Tr. Vol. I, pp. 228, 230].

## M. ABA Therapy and School-Based Speech Services for Student in Spring 2023

173. On March 31, 2023, Ms. Urena completed a monthly progress summary for Student's speech and language services. Student attended four speech therapy sessions in March 2023 and missed an additional session due to his absence. Ms. Urena's progress report stated as follows:

> He engaged in activities targeting following of simple 1-step directions given gestural/visual cues, and use of single words for a variety of functions. He is also beginning to work towards following of directions with qualitative concepts, though he requires heavy/maximal support with this currently. [Student] is improving with his use of AAC device and whiteboard to make requests and greet others. He continued to work on using words/signs/symbols to gain attention to request assistance. Overall, slight progress towards goals was achieved this month.

> [Resp. Exh. J, Bates 0132].

174. From April 21, 2023 to April 24, 2023, an observation and skills assessment of Student was completed by PBS Corporation. The report states that the "[r]esults of the VB-Mapp Milestones Assessment show a 14.0 point increase overall compared to the previous assessment on 10/27/22. Due to the nature of an initial assessment, the VB-MAPP Barriers Assessment was not completed previously; however, baseline data gathered during this assessment show a score of 61.0 points. Areas of greatest deficit on the Barrier Assessment include prompt dependency, self-stimulation and hyperactive behavior, and defective articulation, intraverbal, echoic, and social skills." [Pet. Exh. 34, p. 2].

23-034010
Page 43

175. The score of 61.0 points on the VB-MAPP Barriers Assessment indicates that Student has maladaptive behaviors which significantly impairs his overall quality of life. [Tr. Vol. II, pp. 297-298].

176. On April 28, 2023, Ms. Urena completed a monthly progress summary for Student's speech and language services. Student attended three speech therapy sessions in April 2023 and missed an additional session due to school closure. Again, Ms. Urena reported as follows:

> He engaged in activities targeting following of simple 1-step directions given gestural/visual cues, and use of single words for a variety of functions. He is also worked towards following of directions with qualitative concepts, but continues to require heavy support with this currently.  [Student] is improving with his use of AAC device and whiteboard to make requests and greet others. He continues to work on using words/signs/symbols to gain attention or request assistance. Overall, slight progress towards goals was achieved this month.

> [Resp. Exh. J, Bates 0130].

177. On May 31, 2023, Ms. Urena completed a monthly progress summary for Student's speech and language services. Student attended three speech therapy sessions in May 2023 and missed an additional session due to Student's absence. Ms. Urena's report for May 2023 indicated as follows:

> He engaged in activities targeting following of simple 1-step directions given gestural/visual cues (~70%), and use of single words for a variety of functions. He is also beginning to work towards following of directions with qualitative concepts (~30%), though he requires heavy/maximal support with this currently.  [Student] is improving with his use of AAC device and whiteboard to make requests and greet others (4/10 trials to make requests, but improves with cueing). He continues to work on using words/signs/symbols to gain attention or request assistance. Overall, slight progress towards goals was achieved this month.

> [Resp. Exh. J, Bates 0128].

178. Ms. Urena indicated that motivation was a barrier for Student. When Ms. Urena was able to find some preferred tasks, Student would engage and demonstrated improvement on the skills they were targeting. [Tr. Vol. II, pp. 482-483].

23-034010
**Page 44**

N. <u>May 22, 2023, IEP</u>

179. On or about May 10, 2023, Petitioner received an invitation to attend the IEP meeting scheduled for May 22, 2023. [Resp. Exh. H, Bates 0116].

180. Petitioner was in attendance at the May 22, 2023, IEP meeting. Under Parent/Guardian Concerns it states,

> [Petitioner] shared the following concerns: "The school system is setting up my child to fail. Concerned that he is not making progress using the AAC device. His ABA therapist reports he is also not making progress using this. Not seeing what the school is saying at home and other settings. Not agreeing with the school target of 60% for transitions. I disagree with the speech score and with his comprehension because that is the biggest area he struggles with. His ABA is keeping track of his comprehension. Basically it lists that he does a number of things, using a phrase such as -I want- and he is not there. Not how it's suggested on the draft. It's embellished a lot." Mother is also concerned with feeding as well ([Student] eats a limited number of foods due to sensory aversions) and is concerned that [Student] is not being challenged academically within the classroom. She states that he exhibits behaviors within the home and during ABA therapy that she is concerned are/will impact him within the academic setting as well. Parent also reports that she believes [Student] needs a one-on-one support person for personal needs and for academic instruction.
>
> [Resp. Exh. D, Bates 0045-0046].

181. Under the PLAAFP for Receptive Language, Petitioner indicated that the reference to Student demonstrating "understanding of pronouns 'my' and 'your' when following directions (though not consistently)" was embellished because she has not seen Student use those pronouns. [Tr. Vol. II, pp. 519-520; Resp. Exh. D, Bates 0048].

182. Ms. Call indicated that she has also seen Student struggle with comprehending the use of the pronouns 'my' and 'your'. [Tr. Vol. II, pp. 402-403].

183. Regarding Student's progress on Receptive Language, the IEP states that Student "is progressing towards his receptive language goals to follow basic 1-step routine commands (i.e. sit down, come here, give me . . .) in structured activities given minimal verbal or visual prompts in 80% of opportunities and to follow 1-step directions involving qualitative (colors, shapes, sizes, etc.) and early spatial

23-034010
**Page 45**

concepts (in, on, under, etc.) in structured activities with moderate verbal or visual prompts with 70% accuracy." [Resp. Exh. D, Bates 0048].

184. Ms. Call indicated that Student was able to follow two to three step directions at home. [Tr. Vol. II, pp. 402, 404-405].

185. Under the PLAAFP for Expressive Language, it states:

> . . . [Student] is progressing towards his expressive language goals to use 1-2+ words with preferred communication modality (AAC device, signs, verbal approximations) to make requests for desired objects/activities/actions during structured activities given minimal verbal and visual cues. He is not yet using 1-2+ words with preferred communication modality to request assistance but will occasionally gain attention from others by bringing his whiteboard to staff with a word written on it naming a desired object, though this does not happen frequently.
>
> [Resp. Exh. D, Bates 0049].

186. Ms. Call agreed Student was making progress toward being able to use one to two words to make a request using the whiteboard, but not with the AAC device. [Tr. Vol. II, pp. 403-404].

187. Under the PLAAFP for Socio-Emotional/Behavioral, it states:

> [Student] is progressing as expected on his goal to transition between classroom activities when given verbal, visual, or physical prompts and engage in 5 turns or trades with a peer with staff support on 3 out of 5 observable opportunities or 60% of the time. [Student] has been participating in push-in social work services in the classroom during circle time and centers when he receives support during transitions and practicing turns/trades while interacting with peers. . . . [Student] will transition between activities 10% of the time with guidance from an adult utilizing visual, verbal and physical prompts. . . .
>
> [Resp. Exh. D, Bates 0047].

188. For Student's transition goals and objectives, the annual goal for Student was to "transition between classroom activities by himself with no more than 2 verbal, visual or physical prompts 60% of the time or 3 out of 5 observable opportunities, by May 2024 . . . ". [Resp. Exh. D, Bates 0058].

189. Petitioner expressed concern about Student transitioning on his own because she has observed Student having a risk of elopement. [Tr. Vol. I, pp. 149-150].

190. The May 22, 2023, IEP added a section under "Area of Need" for Medical/Health/Physical with the subarea of Personal Care. This section indicated that Student would need "classroom staff assistance in the following personal care skills: assistance with dressing and toileting." [Resp. Exh. D, Bates 0050-0051].

191. Petitioner expressed concern that the IEP did not include any accommodations for Student's sensory issues with food or the possibility of him choking. [Tr. Vol. II, p. 546].

192. Petitioner acknowledged that she did not have a concern about whether Respondent district is able to keep Student safe in terms of food consumption. [Tr. Vol. II, pp. 545-546].

193. Petitioner noted that Student's May 2023 IEP did not include any accommodations for the dispensing of medication for Student for the upcoming 2023-2024 school year. [Tr. Vol. II, p. 530].

194. Ms. Fountaine indicated that Respondent district has the ability to dispense medications for all students. [Tr. Vol. II, p. 530; Tr. Vol. III, p. 816].

195. With respect to Student's goals for Perception/Motor/Mobility, Petitioner again expressed concern that he was being taught the same things as the prior year. [Resp. Exh. D, Bates 0050; Tr. Vol. I, pp. 146-148].

196. The May 22, 2023, IEP did not identify that Student required supports and/or services for "[t]he use of positive behavioral interventions and supports, and other strategies, to address behavior because [Student] has behavior that impedes [Student's] learning or the learning of others". [Tr. Vol. II, pp. 300-303; Resp. Exh. D, Bates 0052].

197. Both Petitioner and Ms. Call believed that Student would benefit from the use of positive behavioral supports and interventions because of his autism. [Tr. Vol. I, pp. 148-149; Tr. Vol. II, p. 389].

198. The May 2023 IEP included a list of Student's supplementary aids that he would receive on a daily basis, which included: "sensory breaks as needed for the purpose of self-regulating when becoming overstimulated or overwhelmed during peer interactions or classroom transitions, including but not limited to the use of calming tools/fidgets"; "the use of headphones for the purpose of self-regulating

when becoming overstimulated or overwhelmed during peer interactions or classroom transitions"; "access to a whiteboard and AAC device to assist him in communicating with staff and peers in the classroom"; and personal care services for the purpose of maintaining access to school as documented on the personal care authorization form." [Resp. Exh. D, Bates 0052].

199. In the May 22, 2023, IEP's Program and Services, Student was offered direct speech and language services for 20 to 25 minutes at five to seven times per month. [Resp. Exh. D, Bates 0061].

200. Petitioner expressed disagreement with the frequency of the speech and language services being offered and believed Student should have received more frequent services as Student was non-verbal. [Tr. Vol. I, pp. 151-152].

201. At the May 22, 2023, IEP meeting, the team discussed Student's placement for the upcoming 2023-2024 school year. The team discussed the options of placing Student in the local ASD classroom versus the Pine Grove Learning Center center-based program. [Tr. Vol. III, p. 813; Resp. Exh. D, Bates 0063-0064].

202. At that time, Respondent district had made the decision to open a local ASD classroom for the 2023-2024 school year. The decision was based on the number of students who were classified with ASD in the district and the lack of available spaces at the other regional programs. Respondent district informed Petitioner that they would model their ASD program after the regional programs. [Tr. Vol. I, p. 136; Tr. Vol. III, pp. 794-797].

203. Petitioner had requested the placement of Student at Pine Grove Learning Center, which she had learned of through an internet search. Petitioner discovered that the Pine Gove Learning Center offered a more individualized program for students with various levels of autism. [Tr. Vol. I, pp. 155-157; Tr. Vol. II, pp. 525-526].

204. Ms. Fountaine went on a tour of the Pine Grove Learning Center and also spoke with the principal at Pine Grove Learning Center over the telephone. Ms. Fountaine explained to the principal Student's skillset and asked whether this was the type of student they would typically see in their classrooms at Pine Grove Learning Center. [Tr. Vol. III, pp. 815, 840-842].

205. Petitioner was not included in the conversation between Ms. Fountaine and the principal at Pine Grove Learning Center. [Tr. Vol. I, p. 159].

206. Ms. Fountaine had concerns about placing Student at Pine Grove Learning Center based on the characterization of the behaviors exhibited in the Pine Grove Learning Center classroom. Ms. Fountaine indicated that Student did not have the

types of significant behaviors that would warrant a setting such as Pine Grove Learning Center. [Tr. Vol. III, pp. 814, 843].

207. Respondent district ultimately did not select the option of placing Student at Pine Grove Learning Center because it "is a center-based program and the most restrictive placement option. The data related to [Student's] current developmental levels and progress on goals and objectives does not indicate he requires a center-based program. This would not be his least restrictive environment." [Tr. Vol. III, pp. 813-814].

208. Ms. Fountaine believes that the local ASD classroom would be able to meet Student's needs. [Tr. Vol. III, p. 839].

209. Petitioner noted her disagreement with the placement offered at the May 22, 2023, IEP meeting. Petitioner found the proposed placement to be concerning because she had very little information about the new ASD program, that it did not yet have a teacher, and did not have ab accreditation. [Tr. Vol. I, pp. 136-137, 154-155, 159; Tr. Vol. II, p. 525; Resp. Exh. D, Bates 0062].

210. Ms. Fountaine indicated that there is no accreditation procedure for the ASD classroom. [Tr. Vol. III, p. 799].

211. Petitioner does not agree with Student's placement in an ASD classroom because she believes that Student would be safe in a more restrictive environment. Petitioner bases this belief on Student's risk of elopement and lack of safety awareness. Petitioner also believes that Student receiving one-on-one care would be a better fit for Student's education. [Tr. Vol. I, pp. 117, 152-153].

## O. Respondent District's ASD Classroom

212. Respondent district opened the ASD kindergarten classroom for the 2023-2024 school year. [Tr. Vol. III, p. 794].

213. In May 2023, Makayla Metcalf was hired as the ASD teacher at Southeast Kellogssville Elementary for the 2023-2024 school year. [Tr. Vol. III, pp. 727, 762].

214. Ms. Metcalf has a certificate to teach in Michigan with an endorsement in cognitive impairment. Ms. Metcalf does not currently have an autism endorsement, but is working towards that endorsement. Ms. Metcalf attends Grand Valley State University and will complete her master's program in the summer of 2024. Ms. Metcalf will then be allowed to take state endorsement test for ASD in August 2024. [Tr. Vol. III, pp. 728-729, 758-760].

23-034010
**Page 49**

215. Ms. Metcalf was granted temporary approval to teach the ASD classroom as she is in an accredited program working towards the ASD endorsement. [Tr. Vol. III, p. 812].

216. To prepare for opening the ASD classroom at Respondent district, Ms. Fountaine requested that Kent ISD provide an ASD coach to assist with the classroom setup. The ASD coach went through the pillars of high-quality ASD classroom instruction, helped identify the structure of the classroom, and helped build a classroom schedule that would allow students to work on their IEP goals. [Tr. Vol. III, pp. 732, 798-799].

217. Ms. Metcalf received training and support from the ASD coach who came into the classroom once a week from the start of school of the 2023-2024 school year through December 2023. Ms. Metcalf also met with Ms. Fountaine who provided guidance and behavior strategies for the students. [Tr. Vol. III, pp. 732, 813].

218. The ASD coach disengaged from the classroom after ensuring that the program was being implemented with fidelity. [Tr. Vol. III, pp. 798-799].

219. Although the ASD coach is no longer in the classroom, Respondent district still has the opportunity to contact the ISD for additional support or consultation. [Tr. Vol. III, p. 799].

220. Respondent district's local ASD classroom is a low ratio classroom for kindergarten through second grade that allows for up to eight students. The ratio for the ASD classroom is three adults, consisting of the teacher and two paraprofessionals, to seven kindergarten students. [Tr. Vol. III, pp. 729-730, 745, 761].

221. Respondent district kept the eighth spot in the ASD classroom open for Student. [Tr. Vol. III, p. 801].

222. There are students in the ASD classroom that struggle with sensory issues, which include issues with texture, noise, and movement. [Tr. Vol. III, p. 738].

223. One student in the ASD classroom also has an ADHD diagnosis. [Tr. Vol. III, pp. 767-768].

224. There are five students in the ASD classroom who do not use speech as a communication method. Those five students use a combination of sign language, picture exchange communication system (PECS), or a classroom iPad with the Snap Core program. There are eight classroom iPads for the students to use and students can also bring in their own device. [Tr. Vol. III, pp. 734-735, 763].

23-034010
Page 50

225. The students who are verbal do interact with the non-verbal students in the ASD classroom. [Tr. Vol. III, p. 736].

226. There are currently two students who engage in refusal behavior in the ASD classroom. [Tr. Vol. III, p. 740].

227. There are currently four students who have elopement concerns in the ASD classroom. Those students have been able to get out of the classroom and into the hallway. On these occasions, Ms. Metcalf or another adult have been able to stop the students and take them back to the classroom. On one occasion, Ms. Metcalf had a student try to get out of an open window to go the playground. Ms. Metcalf indicated she no longer opens her window wide enough for a student to try to elope. The ASD classroom also has installed childproof door handles and cabinets. [Tr. Vol. III, pp. 741-744].

228. The ASD classroom has students who engage in aggressive behaviors towards staff or other students. This type of behavior is addressed by the use of a behavior plan. [Tr. Vol. III, p. 746].

229. There are currently two students in the ASD classroom who engage in climbing behaviors. These behaviors are addressed through positive reinforcement or by obtaining a preferred item for the student. The students are also redirected to climb on the plastic jungle gym located in the classroom. [Tr. Vol. III, pp. 765-766].

230. None of the students in the ASD classroom have a one-to-one support person assigned to them. [Tr. Vol. III, pp. 745-746, 758].

231. Ms. Metcalf was not aware of any students in the ASD classroom who have a significant cognitive impairment.  [Tr. Vol. III, p. 750].

232. Students in the ASD classroom begin school at 8:45 a.m. and end by 3:30 p.m. The students eat their lunch in the classroom. The two paraprofessionals provide support to the students during lunchtime. [Tr. Vol. III, pp. 731-732].

233. The ASD classroom staff would be able to facilitate a student who is working on eating particular kinds of food. [Tr. Vol. III, pp. 739-740].

234. The ASD classroom has a restroom located in the classroom. All students in the classroom require support for their toileting needs and five of the students wear diapers or pull-ups. The paraprofessionals in the classroom assist the students with their toileting needs throughout the day. [Tr. Vol. III, pp. 744-745].

235. The students in the ASD classroom have morning recess with nondisabled peers (young fives) and some of the students in the ASD classroom attend specials with nondisabled peers, such as gym, art, and music. [Tr. Vol. III, pp. 730-731].

236. The students' schedules in the ASD classroom consists of 15-minute intervals within an hour. The first 15 minutes begins with a structured group activity to work on building social skills and then they move to independent or small group for next 15 minutes. The students then have a break to play or do their sensory output for the following 15 minutes. The last 15 minutes consists of another group activity or activity to focus on individual goals. This schedule continues throughout the school day, with the exception of breaks for lunch and recess. [Tr. Vol. III, pp. 733-734].

237. Embedded in the ASD classroom schedule is a 45-minute daily segment where the speech pathologist comes in to provide services to the students based on their IEPs. The speech pathologist works with the students either one-on-one or in a small group setting. [Tr. Vol. III, pp. 736-737].

238. The school social worker and the occupational therapist come into the ASD classroom on a rotating, biweekly schedule. The biweekly schedule consists of three days for 45 minutes one week and two days for 45 minutes the next week. [Tr. Vol. III, pp. 737-738].

239. During the 2023-2024 school year, Ms. Metcalf has observed that some of the students in the ASD classroom have made some progress in their communication skills. For those who have not made progress, the goal is to keep having the student use concrete skills but also to challenge them by showing they can do more and by adding a few elements to help with functional communication. [Tr. Vol. III, pp. 752, 755].

240. Ms. Metcalf has students that attend outside ABA therapy. Ms. Metcalf communicates with the students' parents and collaborates on what kinds of skills the students are working on. [Tr. Vol. III, pp. 754-755, 767].

241. The ASD classroom has students that can perform greater academic skills than some of the other students. As such, Ms. Metcalf differentiates instruction based on the individual student's needs. [Tr. Vol. III, pp. 752-753].

242. For the upcoming 2024-2025 school year, all seven students in the ASD classroom will move up to the 1st grade level. [Tr. Vol. III, p. 761].

23-034010
**Page 52**

P.  **Pine Grove Learning Center**

243. Kent ISD operates nine programs for students with complex needs ranging from birth to 26. Three of the schools operated by the ISD work with students who have autism, severe cognitive impairment, and severe multiple impairment. Those schools are the Lincoln School, Pine Grove Learning Center (Pine Grove), and Lincoln Developmental Center (LDC), which are located in separate facilities from general education peers. Across these three schools, there are 107 students with autism, with 19 students in kindergarten through fifth grade, 16 middle school age students, 25 high school age students, and 46 students ages 18 to 26. [Tr. Vol. III, pp. 668, 670, 673, 682-684].

244. Pine Grove serves students from kindergarten through age 26 that live in the southwest side of Kent County. Pine Grove has four classrooms, which are divided by grade levels of elementary school, middle school, high school, and transition age students. At Pine Grove, there is currently one student in the kindergarten classroom. [Tr. Vol. III, pp. 682-684].

245. In the elementary level class at Pine Grove, there is an intense focus to teach core skills like functional communication, adaptive behavior, independent living skills, and functional academics. They spend a majority of the time focusing on very basic communication skills and adaptive behavior skills so the student can engage in academic instruction. [Tr. Vol. III, pp. 686, 709-710].

246. The Pine Grove classroom for kindergartners has a teacher and two instructional support specialists in the classroom. There are also other providers located in the building including a speech pathologist, BCBA, social worker, and additional support staff. Pine Grove's teachers are specifically trained to work with students with autism. The speech pathologists also have expertise in how to work with students with communication devices. [Tr. Vol. III, pp. 709-710, 714-715].

247. Pine Grove will often collaborate and partner with an outside agency such as ABA therapists, to ensure that the skills the students are learning in school can transfer to the home or the community. Pine Grove also has BCBA's and registered behavior technicians on staff that are trained to work with students with autism. [Tr. Vol. III, pp. 689-690].

248. Students that participate in the ISD center-based program at an early age are still developing basic functional communication and have very little peer interaction. The students also generally exhibit unsafe behaviors such as kicking, hitting, or biting. [Tr. Vol. III, pp. 685-686].

23-034010
**Page 53**

249. One student in the Kent ISD program engages in climbing behaviors, is unaware of his environment, and is an elopement risk. [Tr. Vol. III, p. 686].

250. Not all students with autism who use a speech generating device for communication are enrolled at the ISD's center-based program. [Tr. Vol. III, p. 717].

## Q. LRE Needs Review Process Within Kent ISD

251. On the continuum of services, the center-based programs operated by the ISD are considered the most restrictive setting because the students need highly specialized instruction, especially with behavioral needs, in order to make progress. These programs are offered by the ISD to the local school districts who do not have programs that can meet those needs. [Tr. Vol. III, pp. 673-674].

252. The local districts can create their own programs to meet the same needs as addressed by the programs operated by the ISD. [Tr. Vol. III, pp. 674-675, 693, 716].

253. Respondent district is a local district of Kent ISD. [Tr. Vol. III, pp. 676-677].

254. For the 2023-2024 school year, Kent ISD entered into a Cooperative Agreement to Provide Special Education Countywide Programs and Services Within the Kent ISD (Cooperative Agreement). Under the Cooperative Agreement's Operational Requirements provision, Paragraph 5(b) states, in part, that Kent ISD's programs are made available "if determined appropriate by an IEP or IFSP Team meeting, to eligible students with disabilities, as determined by an IEP or IFSP Team meeting, residing in any Resident District." The Operational Requirements provision further provides under Paragraph 5(f), "[f]ollowing a regional or Kent ISD LRE Needs Review Process, the Resident District shall invite the potential Operating District to the placement meeting of the IEP or IFSP Team by providing reasonable written notice of the meeting and the Operating District shall send such representative(s) as it deems appropriate to participate in the placement IEP or IFSP Team meeting. [Pet. Exh. 14, pp. 1-3].

255. When a local district is struggling to meet the needs of a student and is considering moving that student to a more restrictive setting, the LRE Needs Review Process must occur to ensure compliance with federal and state law and to allow the ISD an opportunity to make any recommendations, provide coaching support, professional development, training for staff, or any other needed assistance to ensure the local district is meeting their obligation to keep the student in the least restrictive environment. [Tr. Vol. III, pp. 678-679, 696-697].

256. Before recommending a change of placement, the ISD will consider whether a student's IEP goals were appropriately developed, whether the student is making progress on their IEP goals, whether the district has exhausted all their current resources in terms of programming, supplementary aids and services, and whether there has been an increase in programming and services. [Tr. Vol. III, pp. 679-680].

257. In determining whether a local district has met a student's communication needs, the ISD uses an AAC consultant to review what methods have already been tried and to consult on trialing different devices to determine the best methodology for communication. [Tr. Vol. III, pp. 687-688].

258. The ISD will also review what the local district has done to teach social skills with peer models as the ISD programs do not have appropriate peer models for students. [Tr. Vol. III, pp. 688-689].

259. The local district can request coaching support from the ISD, including behavioral coaches and autism coaches. These coaches can help local districts work on behavior plans, help develop IEP goals and objectives, and coach staff on best practices. Kent ISD has approximately 16 instructional coaches that support the local school districts, which includes behavioral coaches, BCBAs, and autism coaches. [Tr. Vol. III, pp. 680, 691].

260. Parents are only contacted about the LRE Needs Review Process once the ISD receives a request to initiate the process from the local district. [Tr. Vol. III, p. 697].

261. Kent ISD did not receive a LRE Needs Review Process request from Respondent district for Student. [Tr. Vol. III, pp. 681, 705].

**R.  2023-2024 School Year at Thrive Learning Center**

262. For the 2023-2024 school year, Petitioner enrolled Student at Thrive Learning Center. [Tr. Vol. I, p. 159].

263. When Student started attending Thrive Learning Center in September 2023, Ms. Call began working with Student in the school setting. In February 2024, Ms. Call stopped working with Student. [Tr. Vol. II, pp. 392-393, 395, 397].

264. Ms. Call observed that Student's behaviors did not happen as frequently at the Thrive Learning Center. [Tr. Vol. II, pp. 385-386].

265. Ms. Call indicated that most recently Student was using up to six words and making more complex sounds on a consistent basis. [Tr. Vol. II, pp. 366, 397].

23-034010
**Page 55**

266. Ms. Eyk also reported that Student has come incredibly far with his communication. While he still uses grunting or whining noises, Ms. Eyk has observed that Student is very motivated to be able to speak and can now imitate two to three sounds consistently. [Tr. Vol. II, pp. 282, 304].

## S.  **Student's Receipt of Outside Services During 2023-2024 School Year**

267. On July 14, 2023, Natalie DeVries, CCC-SLP, Speech Pathologist at Mary Free Bed, performed a Speech-Language Evaluation of Student. Ms. DeVries used the Rosetti-Infant Toddler Language Scale (RITLS) to evaluate Student. Student's strengths were identified as "communicative intent, use of sign and gesture to communicate, prompted written communication, and interest in AAC device when presented." His areas of growth included "functional communication of wants and needs via multimodal communication." It was concluded that "[s]killed therapy is warranted to address Speech-Language deficits to facilitate communication of safety and medical wants/needs as well as successful completion of I/ADLs." [Pet. Exh. 19, pp. 4-5; Tr. Vol. II, pp. 416, 426-427].

268. During her visits with Student, Ms. DeVries worked on getting Student more comfortable with the textures of foods as well as expanding his diet. [Tr. Vol. II, pp. 429-430].

269. Ms. DeVries indicated that a one-on-one aide or a speech therapist can implement the treatment plan for Student's dysphagia in the school setting. [Tr. Vol. II, pp. 431-432].

270. On September 28, 2023, Dr. Veenema referred Student to Mary Free Bed Rehab Technology Center for an AAC evaluation related to his diagnoses of apraxia and autism. [Pet. Exh. 15, p. 13].

271. In October 2023, Melissa Hoffman, SLP at Mary Free Bed Rehab Technology Center, became Student's speech pathologist. Ms. Hoffman specializes in AAC devices. [Tr. Vol. I, p. 79].

272. On October 20, 2023, Ms. Hoffman's assessment for Student was that Student "presents with severe expressive language deficits. Pt demonstrates progress in expressing basic wants and needs as evidenced by data collection and clinical observation." [Pet. Exh. 22, p. 3].

273. Ms. Hoffman observed that Student knows what he wants to say, but his apraxia makes it difficult for Student to produce sounds. Student would approximate words like "mah" for mom, "mo" for more, and "pe" for please. [Tr. Vol. I, pp. 82-83].

274. Since Student is not able to communicate effectively verbally, Ms. Hoffman obtained an QuickTalker Freestyle (QTF) iPad for Student with a communication app that allowed Student to express his wants and needs. [Tr. Vol. I, pp. 83, 85, 87-88, 121].

275. Ms. Hoffman determined that the best communication app for Student was LAMP because the program uses vocabulary aimed at individuals with autism and uses consistent motor coordination that allows individuals with autism to learn to communicate efficiently. LAMP also allows for a choice in the level of vocabulary and the ability to individualize the program to Student's needs. [Tr. Vol. I, pp. 85, 89, 109-110].

276. Ms. Hoffman found Student to be not that impaired in receptive language, although she indicated that he was behind for his age. [Tr. Vol. I, p. 96].

277. Ms. Hoffman indicated that Student continues to need speech and language services one-on-one but stated that Student would also really benefit from seeing things modeled in a classroom group setting. [Tr. Vol. I, pp. 98-99].

278. Ms. Hoffman observed that Student is proficient on the communication device and can communicate his basic wants and needs such as indicating when he is hungry, what he would like to eat, what he wants to play with, or if he needs to go to the bathroom. [Tr. Vol. I, p. 84].

279. Petitioner has also observed that Student has been successful using the LAMP program. [Tr. Vol. I, p. 121].

280. Ms. Eyk observed that the use of the SGD with LAMP is going well for Student. [Tr. Vol. II, p. 305].

**T.  Dr. Wolff's February 16, 2024 Consultation with Petitioner**

281. On February 16, 2024, Dr. Wolff had a consultation with Petitioner. Dr. Wolff did not meet with Student as part of this consultation. [Tr. Vol. I, p. 32; Tr. Vol. III, p. 577].

282. Dr. Wolff noted that Student was determined to be at an ASD level 3 under the Diagnostic and Statistical Manual Version V (DSM0-V), which requires continuous oversight and more intensive supports at school. Dr. Wolff is of the opinion that a more specialized categorical program would be more appropriate given Student's deficits in communication, his lack of ability to care for himself, and safety concerns. [Tr. Vol. III, pp. 559-560, 573-576].

23-034010
**Page 57**

283. Dr. Wolff reviewed the Pine Grove program as part of his consultation with Petitioner. Dr. Wolff is of the opinion that Pine Grove is an appropriate consideration for Student because it addresses many of Student's challenges and has low student to teacher ratios. [Tr. Vol. III, pp. 569-570].

284. Dr. Wolff acknowledged that Student has not demonstrated any behavioral issues such as physical aggression or willful defiance and stated that Student is a "fairly contented individual"; however, Dr. Wolff still expressed concerns of Student's lack of safety awareness and the concern that he will need guidance in a one-to-one or tight teacher to student ratio to ensure Student does not wander off and have no way to communicate to others who he is. [Tr. Vol. III, pp. 571-573].

285. Dr. Wolff has not observed Student in any environment outside of the clinical setting. Dr. Wolff last met with Student when he was seen by Dr. Hahn for an evaluation on September 12, 2022. [Tr. Vol. III, pp. 577-578; Pet. Exh. 42].

286. Dr. Wolff does not know the student to teacher ratio in Respondent district's ASD classroom and did not review the staff credentials for the ASD classroom. [Tr. Vol. III, pp. 582, 584].

## Conclusions of Law

Petitioner, as the party seeking relief, has the burden of proving by a preponderance of the evidence all claims raised in this matter. *Schaffer v Weast,* 546 US 49, 62 (2005). Proof by a preponderance of the evidence "requires that the fact finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence." *Blue Cross and Blue Shield of Michigan v Milliken*, 422 Mich 1; 367 NW2d 1 (1985).

The undersigned has reviewed the exhibits, the transcripts of the hearing, and the parties' post-hearing briefs in deciding this matter.  Each of the issues as set forth above are addressed in further detail below.

1. <u>Whether Respondent failed to allow Petitioner to meaningfully participate in the IEP development process and educational decision making for Student for the 2022-2023 and 2023-2024 school years.</u>

The federal regulations state that parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to (i) the identification, evaluation, and educational placement of the child; and (ii) the provision of FAPE to the child. 34 CFR § 300.501(b). The meetings must be conducted pursuant to the procedures set forth in 34 CFR § 300.322.

23-034010
Page 58

The IDEA regulations provide other requirements for school districts to inform parents about their right to participate in the IEP process, such as notifying parents early enough about an IEP team meeting.  34 CFR § 300.322(a)(1).

Here, Petitioner asserts that Respondent "failed to include [Petitioner] in the decision-making process with respect to [Student's] placement for the 2023-2024 SY." [Pet. Brief, p. 4]. In support of her argument, Petitioner states that Ms. Fountaine "had a conversation with Pine Grove, which is run by the ISD, and had unilaterally determined that [Student] did not qualify for Pine Grove." [Pet. Brief, p. 6]. Petitioner further indicates that she did not participate in this meeting "nor was she given any notice of such a meeting which would have allowed her to participate." [Pet. Brief, pp. 6-7].

34 CFR 300.501(b) provides, in pertinent part, as follows:

> (b) Parent participation in meetings.
>
> * * *
>
> > (4) A *meeting does not include informal or unscheduled conversations involving public agency personnel* and conversations on issues such as teaching methodology, lesson plans, or coordination of service provision. A *meeting also does not include preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting*.

(Emphasis added).

At the hearing, Ms. Fountaine acknowledged having a telephone conversation with Pine Grove's principal. This conversation was not a formal conversation to determine Student's placement. Rather, Ms. Fountaine credibly testified that she did not identify Student by name during the conversation but instead identified Student's skillset to ask whether that same skillset would be typical of a student at Pine Grove. [Tr. Vol. III, pp. 840-841]. Ms. Fountaine used the information she obtained from Pine Grove in preparation for the May 22, 2023 IEP, where Student's placement was going to be discussed. On review of the record, the undersigned concludes that Ms. Fountaine's telephone conversation with the principal at Pine Grove was not a meeting that required parent participation as contemplated under 34 CFR 300.501(b)(3). Thus, the undersigned cannot conclude that Petitioner met her burden to establish that she should have received notice of the conversation or that she should have been afforded an opportunity to participate in the conversation.

Additionally, under the Cooperative Agreement entered into between Respondent and the ISD, the ISD's programs are made available "if determined appropriate by an IEP or IFSP Team meeting". [Pet. Exh. 14, p. 2]. Following an LRE Needs Review Process,

23-034010
Page 59

Respondent would then invite the ISD to the placement meeting of the IEP. [Pet. Exh. 14, p. 3]. Here, the credible, unrebutted evidence establishes that the ISD never received a LRE Needs Review Process request from Respondent district for this Student. [Tr. Vol. III, pp. 681, 705]. Since Respondent did not initiate the LRE Needs Review Process with the ISD, Petitioner was not entitled to any notice.

Next, Petitioner argues that Respondent's witness, Mr. Dymowski, testified from a "document authored by the ISD entitled "Ensuring the Least Restrictive Environment through a Decision Making Process[.]" [Pet. Brief, p. 8]. Petitioner asserts that "this document was not provided to parents" nor was it discussed with parents, although it "directly impacted student placement."  [Pet. Brief, p. 8]. The undersigned does not find this argument to be convincing. Petitioner cites to no provision within the IDEA to establish that Respondent was required to provide or educate parents on all internally created documents related to the Least Restrictive Environment.

As to Petitioner's argument that it was "clear that Ms. Fountaine's sole discretion was the driving force behind the placement decision" and that she "inappropriately substituted her personal decision making for that of the collaborative decision making of the IEP team . . . . ", this argument is not persuasive. [See Pet. Brief, p. 9]. While the information obtained was undoubtedly used to form Ms. Fountaine's opinion, there was no evidence presented that Ms. Fountaine's opinion formed the basis of the opinion for any of the other IEP team members who participated in the placement decision. In fact, Ms. Jobin, a participant in Student's IEP on May 22, 2023, credibly testified that based on her observations of Student in the ECSE classroom, placement in a self-contained classroom, such as an ASD classroom, is appropriate for Student. [Tr. Vol. III, p. 638]. There was also no evidence presented to establish that Ms. Jobin's opinion was somehow influenced by Ms. Fountaine.

In the post-hearing brief, Petitioner did not assert that Respondent failed to allow Petitioner meaningful participation in any IEP meetings. Even if Petitioner had made such an argument, Petitioner would not have met her burden of proof. First, Petitioner acknowledged receiving invitations to each of the IEP meetings and REED meeting held by Respondent. [See Resp. Exh. H]. Petitioner further acknowledged that she attended each of the IEP meetings.

With respect to the September 23, 2022 IEP, Petitioner indicated she was able to share information about Student's prior outside evaluations and diagnoses. [Tr. Vol. I, p. 164; Tr. Vol. II, p. 252]. Petitioner also admits she was provided a draft of the IEP and other documents at the September 2022 IEP. [Tr. Vol. II, p. 258]. It is noted that the September 23, 2022 IEP did include updates from "previous provider notes from Spring 2022", which suggests that Respondent did take into consideration the outside provider information from Petitioner. [Resp. Exh. B, Bates 0017-0018].

23-034010
Page 60

Moreover, Petitioner did not dispute that she was able to provide her thoughts and concerns at both the March 8, 2023 and May 22, 2023 IEP meetings. Petitioner maintains that her concerns under the "Parent/Guardian Concerns" of the IEP did not fully capture the concerns she raised at the September 2022 or March 2023 IEP. While each and every concern raised by Petitioner at the IEP meetings may not have been listed in their entirety on the IEP's, this does not equate to a denial of meaningful participation in the meeting. It is clear from the record that Petitioner has attended all IEP meetings and has always been an active participant at the IEP meetings. Accordingly, Petitioner cannot establish that she was excluded from being a meaningful member of the IEP development process and educational decision making for Student for the 2022-2023 and 2023-2024 school years.

Of note, Petitioner's Amended Complaint also asserts that the "IEP team was not properly constituted" and that "the team did not have required members". [See Pet. Amended Comp., ¶¶ 20(f), 41(f), and 61(f)]. This assertion was not addressed in Petitioner's post-hearing brief. At the hearing, Petitioner also presented no evidence to establish that the IEP team was not "properly constituted". Petitioner did testify that the social worker listed as a participant on the September 23, 2022 IEP was not actually present; however, there was no evidence to suggest that this individual was a required team member pursuant to 34 CFR § 300.321(a). Therefore, this claim has also not been established.

> 2. Whether the IEPs for Student for the 2022-2023 and 2023-2024 school years were reasonably calculated to enable Student to make appropriate progress considering Student's diagnoses, educational needs, and other relevant circumstances and whether Respondent failed to take steps to ensure Student had a FAPE for the 2022-2023 and 2023-2024 school years.

In *Endrew F v Douglas County School District*, the U.S. Supreme Court held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F*, 137 S Ct at 999. The Court in *Endrew F* further held that an "educational program must be appropriately ambitious in light of [the child's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* The Court in *Endrew F* noted that "[a]n IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth" *Id.* at 999. This analysis must be performed on a case-by-case basis because "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 1001.

The undersigned will address Issues 2 and 3 together. Here, there were three IEP meetings convened for Student during the 2022-2023 school year. Each IEP will be addressed in further detail below.

23-034010
Page 61

a. September 23, 2022 IEP

First, Petitioner maintains that Respondent failed to create an IEP that allowed Student to make appropriate progress by "creating an IEP in September 2022 without ever having met or interacted with [Student], much less doing any observations of him in a classroom setting, or any assessments or evaluations, before putting in place an IEP . . ." [Pet. Brief, p. 3 (citations omitted)].

What Petitioner fails to mention is that Student's prior IEP dated September 24, 2021, was ready for an annual review at the time Student had enrolled with Respondent in September 2022. [Resp. Exh. A; Resp. Brief, p. 2]. Under the IDEA, Respondent was required to ensure that the IEP team reviews Student's IEP "not less than annually". See 34 CFR 300.324(b)(1)(i). Thus, Respondent's decision to implement an IEP before meeting, observing, assessing or evaluating Student was reasonable given the circumstances and was not in violation of the IDEA.

As to content of the September 23, 2022 IEP, Respondent had the choice of either adopting the prior IEP or developing its own IEP. Respondent acknowledges that the IEP "mirrored the September 2021 IEP in most respects but included updated present levels based on progress monitoring through March 2022 and parent input." [Resp. Brief, p. 2]. Upon review, the September 2022 IEP did contain 2022 updates to Student's areas of need in Receptive and Expressive Language. [Resp. Exh. B, Bates 0016-0018].

The September 2022 IEP failed to include an area of need for Student's "Medical/Health/Physical". [Resp. Exh. B]. This was a previously identified area of need for Student in the September 2021 IEP, which addressed Student's needs with assistance in toileting and dressing. [Resp. Exh. A, Bates 0004]. Respondent did not offer any explanation for why Student's toileting and dressing needs were not adopted as part of the newly developed IEP in September 2022. It is noted that Petitioner did not dispute that Respondent was still assisting Student with his toileting needs even though it was not included in the September 2022 IEP. [Tr. Vol. II, p. 251; Resp. Exh. A, Bates, 0004; Resp. Exh. B].

Petitioner also indicated that the September 2022 IEP failed to address Student's limited acceptance of foods and potential for choking or gagging (dysphagia). [Tr. Vol. II, pp. 260, 270]. Although it does not appear that Student had been formally diagnosed with dysphagia as of the September 2022 IEP, Respondent does not dispute that Petitioner raised her feeding concerns at the IEP meeting and provided Student's paperwork from Helen Devos Children's Hospital food therapy specialist. [Pet. Exh. 15, p. 3; Pet. Exh. 16, p. 3; Tr. Vol. II, p. 252]. Respondent again failed to indicate why this concern was not addressed within Student's IEP. Although Student's feeding related issues were not addressed in the IEP, Petitioner acknowledged that Student did not eat lunch at the school. [Tr. Vol. II, p. 270]. It was also undisputed that Petitioner would send food for

23-034010
**Page 62**

Student to eat as breakfast or a snack in the ECSE classroom, which addressed the concern about Student's limited acceptance of food. [Tr. Vol. III, p. 607].

Based on the evidence presented, while Respondent's failure to include provisions in the IEP for Student's incontinence and limited food acceptance was a procedural violation, it did not rise to the level of a substantive violation such that Student's right to a FAPE was impeded. See 34 CFR § 300.513(a)(2).

As to Student's Programs and Services for Speech and Language, Petitioner did not dispute that Respondent was providing speech services to Student, but asserted that the services were minimal. [Tr. Vol. II, pp. 255, 258]. The prior school district's September 2021 IEP provided direct speech and language for 15 to 20 minutes, three to four times a month and consultative speech and language for 10 to 15 minutes, one to four times a month. [Resp. Exh. A, Bates 0011]. Alternatively, Respondent's September 2022 IEP provided more direct speech and language services than the prior district at 20 to 25 minutes for three to four times per month, but removed the consultative speech services. [Resp. Exh. B, Bates 0024]. Even though Student's direct speech therapy minutes were increased from the prior year's IEP, Petitioner failed to explain how those services were "minimal" other than to state that she believed Student should have been receiving weekly sessions. [Tr. Vol. I, pp. 151-152]. It is noted, however, that three to four monthly sessions would amount to approximately one session per week, as suggested by Petitioner. Without further evidence, Petitioner's arguments that Student's IEP did not provide sufficient speech therapy are not adequately supported by the record.

Finally, Petitioner maintained that Student's autism was ignored by Respondent and that his diagnosis was not listed in the September 2022 IEP. [Tr. Vol. I, p. 143]. As of the date of the September 2022 IEP, Student did not yet have a formal diagnosis of autism. [See Resp. Exh. K]. Additionally, the letter provided by Petitioner to Respondent from Dr. Inwald did not indicate a diagnosis of autism. [Pet. Exh. 27; Tr. Vol. I, pp. 209-210, 212]. Thus, Petitioner's claim that Respondent failed to include Student's diagnosis of autism in the September 2022 IEP is without merit.

b. Respondent's failure to reconvene an IEP or conduct a REED between October 2022 and March 2023

Next, Petitioner argues that "[t]he second fundamental flaw by [Respondent] with respect to [Student's] 2022 – 2023 SY was failing to reconvene an IEP meeting once [Petitioner] had provided a report by Dr. Rush, detailing the bases for, and confirming [Student's], autism diagnosis, despite confirmation of receipt of the report and diagnosis, and assuring [Petitioner] that such a reconvene meeting would be held. Respondent's Exhibits 7 - 11; Tr. 125:18 – 132:2; 647:15 – 649:3; 825:9 – 827:15." [Pet. Brief, p. 3].

23-034010
Page 63

At the hearing, Petitioner provided credible, unrebutted testimony regarding Ms. Fountaine's representations at the September 2022 IEP meeting that Student would have an updated IEP once Respondent received Student's updated medical information. [Tr. Vol. II, p. 259]. Additionally, Petitioner credibly established that she had requested a reevaluation of Student at the September 2022 IEP. [Tr. Vol. II, p. 248].

On October 4, 2022, Petitioner emailed a request for an updated IEP. [Pet. Exh. 7]. Although Ms. Jobin asked Petitioner for her availability, Ms. Jobin did not schedule the IEP as requested. [Pet. Exh. 8; Tr. Vol. III, p. 648]. On October 11, 2022, Petitioner emailed Dr. Rush's report to Ms. Fountaine. [Pet. Exh. 10; Tr. Vol. I, p. 130]. Dr. Rush's report diagnosed Student with ASD and noted that Student's "deficits require very substantial support (Level 3) for communication and for restricted interests and repetitive behaviors." [Resp. Exh. K, Bates 0194]. Following receipt of this report, Respondent did not schedule either an IEP or REED meeting until March 2023. Indeed, Ms. Fountaine acknowledged she did not immediately review Dr. Rush's report and was unable to provide a date for when she first reviewed it. [Tr. Vol. III, p. 827]. Ms. Jobin also testified she did not know why she did not schedule an IEP update meeting until March 2023. [Pet. Exh. 8; Tr. Vol. III, pp. 648-649].

34 CFR 300.303(a) provides as follows:

(a) *General.* A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311—

(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.

The federal regulations do not explicitly state when a reevaluation must be conducted, other than stating it must occur at least once every 3 years. See 34 CFR 300.303(b)(2).

Given the fact that Petitioner had requested a reevaluation of Student at the September 2022 IEP coupled with their receipt of Dr. Rush's report which included a new diagnosis of ASD, Respondent should have asked for Petitioner's consent for a comprehensive reevaluation of Student in October 2022, to determine whether and how Student's needs may have changed in light of the new diagnosis. See 34 CFR § 300.303(a)(1) (requiring reevaluation when "the public agency determines that the educational or related services or needs, including improved academic achievement and functional performance, of the child warrant a reevaluation"). Instead, Respondent waited until March 2023 to update the IEP and to conduct a REED evaluation. As indicated above, Respondent offered no explanation for their delay. Thus, the remaining question is whether Respondent's failure

23-034010
**Page 64**

to follow through with an updated IEP and reevaluation of Student in a reasonable time frame resulted in a denial of FAPE for Student.

Petitioner seems to suggest that a change in Student's eligibility under the ASD category would have resulted in Student receiving more individualized care. Petitioner based this belief on Rush's report. [Tr. Vol. I, pp. 149-150; Tr. Vol. II, pp. 260-261]. It is noted, however, that Dr. Rush's report indicates that Student "needs intensive intervention" and thus "requires both school-based special education services and ABA therapy at a minimum"; however, the report does not state that Student needs placement in an ASD classroom or that Student should receive one-on-one support in the special education setting. [Resp. Exh. K, Bates 0194-0195].

Additionally, Respondent argues that "[s]chool personnel involved in developing and implementing [Student's] educational programming consistently testified that their educational decisions and strategies would not have changed if [Student's] IEP eligibility was ASD rather than ECDD. Tr 600 ll 4-11 (Jobin); Tr 782 ll 8-19, 784 ll 3-11, 824 ll 6-22 (Fountaine); Tr 501 ll 4-19 (Urena)." [Resp. Brief, p. 8]. Respondent notes that even if Student was offered a different program or service after being found eligible under the category of ASD, Respondent "would have violated the IDEA by failing to provide a FAPE tailored to his unique needs." [Resp. Brief, p. 7; citing *Bd of Educ v Rowley,* 458 US 176 (1982); *Letter to VanWart* (OSEP 1993)]. The undersigned agrees.

Local educational agencies are directed to evaluate students "in all areas related to the suspected disability." See 34 CFR § 300.304(c)(4). Because the provision of services is not tied to a student's eligibility category, a local educational agency's failure to consider a student for one category of eligibility where the student in question has already been deemed eligible for special education services as a disabled student is, at most, a procedural violation.

As noted above, to find a denial of a FAPE based on a procedural violation of the IDEA, Petitioner must show that the procedural violation (i) impeded the student's right to a FAPE, (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child or (iii) caused a deprivation of educational benefits. See 20 USC § 1415(f)(3)(E); 34 CFR § 300.513(a)(2). In this matter, Petitioner has offered no persuasive evidence that Student's programs, services, or accommodations would have been any different if he had been deemed eligible under the ASD category instead of ECDD. Even after Student was found to have met the criteria for eligibility under the ASD category, Student's identified areas of need and related services did not change. [See Resp. Exh. B, C, and D]. Therefore, Petitioner has not met her burden of establishing that these procedural violations amounted to a substantive denial of FAPE.

23-034010
**Page 65**

c.  Respondent's failure to provide an SGD until February 2023

Next, Petitioner asserts "there was a failure to provide [Student] with his own SGD for most of the school year (not until February 2023) and effectively communicate the potential availability of an SGD for use in the home. Tr. 122:4 – 122:18; 506:13 - 508:10; 547:13 - 550:3." [Pet. Brief, p. 3]. Petitioner goes on to argue that "[a]s a non-verbal student, the ability to access the curriculum, and communicate with his teachers and peers through a speech generating device ("SGD") tailored to his specific needs and abilities is of paramount importance to [Student]" and Respondent's failure to provide this resulted in a denial of FAPE. [Pet. Brief, p. 3]. The undersigned finds this argument to be persuasive.

Student's prior September 24, 2021 IEP indicates that the previous district's IEP team considered and found that Student required supports and/or services due to his communication needs and need for assistive technology devices and services. [Resp. Exh. A, Bates 0006]. As a result, Student started using an SGD with the LAMP program from the ISD in 2021. [Tr. Vol. I, p. 120]. Student was able to take the SGD back and forth to school. [Tr. Vol. II, p. 242]. When Student changed districts, Student was then required to return the SGD. [Tr. Vol. II, pp. 241-242]. It was also undisputed that Petitioner had informed Respondent of Student's use of his own SGD with the LAMP program at the September 2022 IEP meeting. [Tr. Vol. I, pp. 123-125; Tr. Vol. III, p. 644].

In spite of being aware that Student was non-verbal and that Student had previously been given a SGD device to take back and forth from home to school, Respondent's September 23, 2022 IEP stated that Student *did not* need supports and/or services for communication needs or for assistive technology devices and services. [Resp. Exh. B, Bates 0019]. The September 2022 IEP claimed that these services were "not selected" because Student's "offer of FAPE includes access to an ECSE program with embedded communication supports, therefore, no additional supports are needed." [Resp. Exh. B, Bates 0019, 0027; Tr. Vol. III, pp. 802-803]. Upon review of the plain language used in this section of the IEP, the question being asked of the IEP team is simply "does [Student] require supports and/or services due to . . .  communication needs and need for assistance technology devices and services." [Resp. Exh. B, Bates 0019]. The obvious answer to these questions should have been "yes", even if Respondent felt that the ECSE classroom would have provided the needed supports. Second, Respondent has not established that the ECSE classroom did provide Student with appropriate communication supports. For example, there were only three SGD's available for a total of 12 students and Student was not the only student in the ECSE classroom who could not communicate verbally. [Tr. Vol. III, pp. 594-595, 646]. Furthermore, Ms. Jobin acknowledged that Student was the only one who had to use a communication device full-time. [Tr. Vol. III, pp. 594-595, 646].

23-034010
**Page 66**

In addition to being aware that Student no longer had access to his own SGD device, Respondent was aware that Student "had not been seen for speech services since April 2022." [Resp. Exh. B, Bates 0017]. While Student's lack of services from April 2022 to September 2022 was through no fault of Respondent's, this fact still should have raised a concern by Respondent that Student may have regressed and therefore they needed to seek an evaluation with the AAC consultant at the ISD to determine what type of assistive technology device Student needed so that no further regression occurred.

Moreover, Dr. Rush's report provided to Respondent on October 11, 2022, clearly stated that Student "most certainly needs intensive intervention to address communication and to use an AAC device both at home and at school." [Pet. Exh. 10, pp. 1, 6-7; Resp. Exh. K, Bates 0194-0195]. Following receipt of this report, Respondent again had the opportunity to consult with the ISD's AAC consultant on what is the best mode and methodology for communication for this Student. [See Tr. Vol. III, p. 687]. There was no evidence presented to establish that Respondent made any attempts to contact the ISD about a device for Student until February 2023. Respondent's knowledge of what Student had received from the prior district combined with their knowledge that Student was non-verbal and their knowledge of Dr. Rush's report put Respondent on notice as of October 2022, that it needed to reach out to the ISD to obtain an appropriate AAC device for Student. Again, Respondent offered no reasonable explanation for their delay in seeking such a device for Student.

Respondent argues that Ms. Urena's "testimony established that [Respondent] . . . did not fail to consider and implement communication systems with [Student], as alleged." [Resp. Brief, p. 8]. The undersigned finds this argument to be unconvincing.

Ms. Urena testified that she began using low-tech options with Student rather than high-tech options. [Tr. Vol. II, pp. 452-453]. Other than alleging that Petitioner had expressed concern about the possibility of high-tech options losing power, Ms. Urena offered no reasonable explanation for why she would not have started out using the high-tech options in addition to the low-tech options, especially in light of the fact that Student had previously been given high-tech options to communicate in his prior school. [Tr. Vol. II, pp. 452-453].

Ms. Urena testified that she had "created a PECS-style system for [Student] in a binder with various category pages and core words and had him take that home to trial as well." [Tr. Vol. II, p. 454]. However, Ms. Urena acknowledged that Student did not show much interest in using that communication system. [Tr. Vol. II, pp. 454-456]. Ms. Urena also testified that Petitioner had reported to her that Student was adverse to the texture of the Velcro used on the PECS. [Tr. Vol. II, p. 454]. Additionally, Ms. Jobin testified that Student was only communicating with either the whiteboard or the classroom iPad. [Tr. Vol. III, pp. 594, 596]. Despite having this information, Ms. Urena testified that only "after a while" did they decide that this communication system "wasn't going to be super successful for

23-034010
**Page 67**

him" and "after talking with Parent, we decided to move forward with further exploration of the high-tech options, and we got him a trial with an iPad with a speech-generating app from the Kent ISD." [Tr. Vol. II, pp. 454-455]. Ms. Urena offered no explanation for why she continued to trial the PECS device for "a while" knowing that Student was not being successful with the device.

Based on the above analysis, the undersigned finds that Respondent's failure to provide the necessary assistive technology devices in Student's September 2022 IEP and subsequent failure to obtain any such device from October 2022 to February 2023 resulted in a denial of Student's right to a FAPE and cased a deprivation of educational benefits. The remedy to this violation will be addressed in further detail below under Issues 5 and 6.

d. LAMP Program vs. Snap Program

Finally, Petitioner argues that Respondent's failure to make the LAMP program available for Student was a violation of Student's FAPE because "his prior school district had determined that an SGD with the LAMP Words for Life software was the best option for [Student] as a learner, which a later second evaluation by a Speech Language Pathologist at Mary Free Bed also found, and . . . his familiarity with that program when he entered as a student". [Pet. Brief, pp. 3-4].

It is first noted that there was no evidence presented that Student's prior school district had deterred that the LAMP program was the best option. In fact, Petitioner testified that the prior district had only trialed the LAMP program because it corresponded through her insurance. [Tr. Vol. II, p. 242]. With respect to the evaluation from Mary Free Bed, this evaluation was not completed until September 28, 2023, which was after the completion of the 2022-2023 school year. [Pet. Exh. 21]. Thus, Respondent could not have had access to this report during the time period in question.

As to Student's familiarity with the LAMP program, Petitioner cited to no authority to show that there was an obligation on the part of Respondent to agree to provide the prior LAMP program just because it was being requested by Petitioner. It is also noted that Student's iPad with the Snap program was later updated with the motor planning setup that was similar to the LAMP application. [Tr. Vol. II, pp. 458-459]. As such, the undersigned does not find that Respondent violated Student's right to a FAPE by providing a different SGD application than Student has been provided by the prior district.

e. March 8, 2023 IEP

During the March 8, 2023 IEP meeting, Petitioner expressed concerns about Student being placed in an ASD setting, concerns for safety in the classroom, and wanting

23-034010
Page 68

Respondent to work more with Student on comprehension. [Resp. Exh. C, Bates 0031-0032].

Petitioner also testified that the March 8, 2023 IEP was still not reflecting Student's diagnoses of ASD and ADHD or his incontinence. [Tr. Vol. I, pp. 134-135; Resp. Exh. C, Bates 0031-0032]. While it is true that the March 8, 2023 IEP did not address Student's diagnoses, as already indicated above, this failure did not result in a change to Student's areas of need or needed services. Additionally, as to Student's incontinence issues, again Petitioner did not dispute that Respondent was still assisting Student with his toileting needs even though it was not included in the March 2023 IEP. [Tr. Vol. II, p. 251; Resp. Exh. A, Bates, 0004; Resp. Exh. B]. Therefore, Respondent's failure to include this information on the IEP was a procedural violation, but not a substantive violation such that Student's right to a FAPE was impeded or that it caused a deprivation of educational benefit. See 34 CFR § 300.513(a)(2).

Unlike the September 2022 IEP, the March 2023 IEP did indicate that Student required supports and services for communication and a need for assistive technology devices and services. [Resp. Exh. B, Bates 0019; Resp. Exh. C, Bates 0036]. As noted above, Student had received his own SGD from the ISD in February 2023. Furthermore, the frequency and number of minutes in Student's Speech and Language services increased in the March 2023 IEP. Starting in March 2023, Student was to receive five to seven direct monthly sessions for 20-25 minutes. [Resp. Exh. B, Bates 0024; Resp. Exh. C, Bates 0041].

Again, Petitioner testified that she did not agree with the monthly sessions and believed it should have been weekly. [Tr. Vol. I, pp. 151-152]. Although the March IEP indicates the frequency of these sessions as "monthly", Student's receipt of five to seven sessions per month meant that Student was actually going to receive on average more than one session per week. It is also noted that upon review of Ms. Urena's service record, Ms. Urena was providing the high number of service minutes at 25 minutes per session. [Resp. Exh. J, Bates 0129-0148]. Of further note, for the period of October 2022 through February 2023, Student had missed six (6) speech therapy sessions due to his own absences and approximately five (5) sessions due to school closures for breaks or weather. [Resp. Exh. J, Bates 0136-0148]. Thus, without further evidence, Petitioner's arguments that Student's March 2023 IEP did not provide sufficient speech therapy are not adequately supported by the record.

As to Student's abilities with Expressive Language, the March 2023 IEP states that Student "is making 1-2 word comments to request in ~46% of opportunities." [Resp. Exh. C, Bates 0033]. However, Petitioner indicated that Student was not making any two-word requests at home. [Tr. Vol. II, pp. 267-268]. Contrary to Petitioner's testimony, Student's ABA behavior technician, Ms. Call, testified that Student was making progress towards using one to two words to make a request using the whiteboard. [Tr. Vol. II, pp. 403-404].

23-034010
Page 69

Ms. Call testified that Student was able to "write one to two words to request assistance such as "help", "want", "open" on the whiteboard for things he wanted." [Tr. Vol. II, p. 404]. While it may be true that Petitioner had not personally observed Student making two-word requests at home, there was no evidence to establish that these types of requests were not being used by Student in the school setting or to establish that Respondent's staff had misrepresented Student's abilities in the classroom.

With respect to Petitioner's concern about Student's placement in the ECSE classroom versus an ASD setting, the question is whether the ECSE classroom in Respondent district is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" as required by *Endrew F.* The evidence presented establishes that the ECSE classroom was reasonably calculated to enable Student to make progress in light of his circumstances during the 2022-2023 school year.

First, it is undisputed that Student has serious speech and language deficits which are negatively impacting his ability to communicate with others. As noted in Respondent's brief, the ECSE classroom "has students with a variety of eligibilities including ECDD and autism" and "included students who were nonverbal and who utilized communication systems". [Resp. Brief, p. 2]. The ECSE classroom also had a full-time paraprofessional as well as speech therapists, occupational therapists, and social workers that rotated into the room to provide related services. [Tr. Vol. III, pp. 593, 600]. Student also attended the ECSE program on a more limited basis at three hours a day for four days a week. The evidence presented by Respondent also establishes that Student was able to benefit from enrollment in the ECSE classroom because he was able to be make some progress on his speech goals included in his IEP. [See Resp. Exh. B; Resp. Exh. C; Resp. Exh. J; Resp. Exh. L].

The only evidence Petitioner presented that Student should be in an ASD setting in the 2022-2023 school year was from Dr. Wolff's testimony that a "more specialized categorical program that would provide more consistent and routine continuous oversight would be more appropriate." [Tr. Vol. III, p. 560]. However, Dr. Wolff acknowledged that he was not familiar with Respondent's ECSE program. [Tr. Vol. III, pp. 561-562, 581]. Dr. Wolff's lack of familiarity with how the ECSE program operated calls into question the reliability of his testimony in this regard. At the hearing, Petitioner did not allege that the ECSE classroom was not able to work on Student's goals or objectives nor did she allege that the ECSE classroom was unable to provide the same services that would be provided in an ASD setting. Although Petitioner asserted that Respondent was teaching Student the same thing as last year, Petitioner failed to establish that an ASD classroom would have provided more academic instruction than was being provided in the ECSE classroom. Petitioner's post-hearing brief also failed to make reference to any specific failures related to the March 2023 IEP. Therefore, the undersigned does find that Student's placement in the ECSE classroom during the 2022-2023 school year was the appropriate placement in light of Student's circumstances.

23-034010
Page 70

f. <u>May 22, 2023 IEP</u>

At the May 2023 IEP meeting, Petitioner raised several concerns including, but not limited to, Student's failure to make progress with the AAC device; embellished reports of Student's progress; not agreeing with school's target for transitions; concerns with Student's feeding; concerns with Student not being challenged academically in the classroom; and concerns about behaviors that he is exhibiting at home that she believes will impact the academic setting. [Resp. Exh. D, Bates 0045-0046].

Petitioner's concern about the differences in what was being reported by Respondent and what she was seeing at home was related to the May 2023 IEP's reference to Student demonstrating "understanding of pronouns 'my' and 'your' when following directions (though not consistently)". [Resp. Exh. D, Bates 0048]. Petitioner testified that Student was "not there yet". [Tr. Vol. II, pp. 519-520]. Ms. Call also testified that Student had at times struggled with comprehension, but acknowledged that the May 2023 IEP did indicate that Student was not able to understand these pronouns consistently. [Tr. Vol. II, pp. 402-403].

Ms. Call also testified that while the May 2023 IEP stated Student was progressing using basic 1- step routine commands, Student was actually showing an ability to follow 2-3 step directions at home. [Resp. Exh. D, Bates 0048; Tr. Vol. II, pp. 402, 404-405]. Student's speech pathologist at Mary Free Bed also testified that in her opinion, Student was "not that impaired in receptive language" and that she never had to say anything to Student more than once. [Tr. Vol. I, p. 96]. Both Petitioner and Ms. Call also acknowledged that Student might be demonstrating different skills or deficits in the school setting versus the home setting. [Tr. Vol. II, pp. 401-402, 524]. As such, the undersigned cannot conclude that the evidence establishes that Respondent was embellishing on Student's progress as alleged by Petitioner.

Regarding Petitioner's concerns related to Student's target for transitions, the annual goal for Student was to "transition between classroom activities by himself with no more than 2 verbal, visual or physical prompts 60% of the time or 3 out of 5 observable opportunities, by May 2024 . . . ". [Resp. Exh. D, Bates 0058]. Petitioner stated a concern that Student would be transitioning on his own because he was at risk for elopement. [Tr. Vol. I, pp. 149-150]. However, the transition being referenced here is a transition between classroom activities, not a transition that would involve moving out of the classroom. Petitioner did not explain how she believed transitioning during activities on his own would have resulted in Student eloping from the classroom. It is further noted that the record does not reflect that Student ever eloped outside of the ECSE classroom.

Next, the May 22, 2023 IEP did add a section under "Area of Need" for Student's Medical/Health/Physical with the subarea of Personal Care. This section indicated that Student would need "classroom staff assistance in the following personal care skills:

23-034010
Page 71

assistance with dressing and toileting." [Resp. Exh. D, Bates 0050-0051]. Thus, the May 2023 IEP did address Petitioner's concerns about Student's incontinence. However, the May 2023 IEP still did not include anything in relation to Petitioner's concerns about Student's issues with food or any accommodations for the dispensing of his medication for the upcoming 2023-2024 school year. [Tr. Vol. II, pp. 530, 546]. While Petitioner acknowledged she did not have a concern about Respondent's ability to dispense medication or keep Student safe when consuming food, these accommodations still should have been provided for in the May 2023 IEP, as this was the IEP that would have been in effect for the majority of Student's 2023-2024 school year. [See Tr. Vol. II, pp. 545-546].

To remedy this procedural violation, Respondent must update Student's IEP to include provisions related to Student's eating related needs as well as his medication related needs. The update should either occur at Student's annual IEP update in May 2024 or within 30 days of the issuance of this Decision and Order.

3. <u>Whether Respondent failed to provide Student a FAPE for the 2023- 2024 school year when it denied Student a placement at Respondent's Pine Grove Learning Center.</u>

34 CFR § 300.114 provides in pertinent part:

(a) General.

(1) Except as provided in § 300.324(d)(2) (regarding children with disabilities in adult prisons), the State must have in effect policies and procedures to ensure that public agencies in the State meet the LRE requirements of this section and §§ 300.115 through 300.120.

(2) Each public agency must ensure that—

(i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

(ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Petitioner argues that Student's placement in the ASD classroom at Southeast Kelloggsville School for the 2023-2024 school year was substantively flawed because the

23-034010
Page 72

"placement offered was not an offer of FAPE in the LRE." [Pet. Brief, p. 4]. Petitioner requests that Student be placed at the center based ISD program, Pine Grove. [Id.].

To support this placement, Petitioner relies on the testimony of various witnesses including Dr. Wolff, Dr. Inwald, Petitioner, Ms. Metcalf, Mr. Dymowski, and Ms. Fountaine. [Pet. Brief, pp. 5-10].

With respect to Dr. Wolff's testimony, Petitioner maintains that Dr. Wolff "had the opportunity to meet with [Student], as well as review Dr. Rush's report and other analyses of [Student]." [Pet. Brief, p. 5]. Petitioner maintains that in Dr. Wolff's[5] opinion, Student "is severely developmentally delayed." [Id.]. However, this is an incorrect characterization of Dr. Wolff's testimony. Dr. Wolff testified that the "Mullen scale that Dr. Rush had completed had [Student] at a standard score of 49, which places [Student] closer to moderate to severely intellectually disabled range." [Tr. Vol. III, pp. 570-571]. Dr. Wolff then stated, "that the *consideration for moderate intellectually disabled would be appropriate.*" (Emphasis added). [Tr. Vol. III, p. 571]. Dr. Wolff did testify that he disagreed with Dr. Rush's categorization of Student having a "mild intellectual disability", although he also testified that he found Dr. Rush's evaluation to be "very prudent and effectively done, which is why [he] had made the decision, to repeat the evaluation . . . wouldn't be appropriate". [Tr. Vol. I, p. 37; Tr. Vol. II, p. 570]. It is also noted that unlike Dr. Rush, Dr. Wolff did not conduct a formal evaluation of Student. [Tr. Vol. III, pp. 558-559; Pet. Exh. 42].

Petitioner also maintains that "Dr. Wolff opined that Pine Grove would be an appropriate placement for [Student]." [Pet. Brief, p. 5]. However, Dr. Wolff acknowledged that he relied upon Petitioner's report and an online description of Pine Grove to come to this determination. [Tr. Vol. III, p. 581].  Dr. Wolff admitted that he has not observed Student in any environment outside of the clinical setting and that he last met with Student on September 12, 2022. [Tr. Vol. III, pp. 577-578; Pet. Exh. 42]. Dr. Wolff further acknowledged that he had no knowledge of Respondent's ASD classroom, did not know the student to teacher ratio in the ASD classroom, and did not review the staff credentials for the ASD classroom. [Tr. Vol. III, pp. 582, 584]. These admissions by Dr. Wolff call into question the reliability of Dr. Wolff's opinion as to the appropriate placement for Student, especially in light of the fact that Dr. Wolff has not observed or met with Student since September 12, 2022. [Tr. Vol. III, pp. 577-578; Pet. Exh. 42].

With respect to Dr. Inwald's opinion, Petitioner argues that Dr. Inwald met with Student and "had an opportunity to review the analyses by others in the field with respect to [Student] and his needs and abilities." [Pet. Brief, p. 5]. When Dr. Inwald met with Student in September 2021, Dr. Inwald's report stated that, "[g]iven his age, the degree of intellectual disability is difficult; however, it appears to be severe in nature. Therefore, a

---

[5] Petitioner's Brief states that "In Dr. Rush's opinion, [Student] is severely developmentally delayed. Tr. 570:18 – 571:16." This was a typographical error and should have read "In Dr. Wolff's opinion . . .".

Global Developmental Delay diagnosis (F88) is appropriate given his many delays." [Pet. Exh. 27]. Dr. Inwald testified he did not diagnose Student with autism because he did not spend much time with Student and did not think there were enough data points to draw that conclusion. [Tr. Vol. I, pp. 209-210, 212]. Given that Dr. Inwald admits that he did not spend much time with Student and that the last evaluation he conducted was in September 2021, the reliability of Dr. Inwald's opinion is limited.

Dr. Inwald also testified as to the letter he authored on April 3, 2023. [Pet. Exh. 28]. In his letter, Dr. Inwald stated that he "had the opportunity to review records from the Kelloggsville Public School System (IEP). However, there does not appear to be a recent evaluation. The last one was conducted on 09/29/2020." [Pet. Exh. 28, p. 1]. At the hearing, however, Dr. Inwald testified that at the time he wrote this letter, he had not reviewed Student's September 23, 2022 IEP or the March 8, 2023 IEP performed by Respondent district. [Tr. Vol. I, pp. 215, 217-219]. Dr. Inwald's letter further stated that he received reports from EnCourage Institute for Teaching and Learning and from PBS Corporation, which he found to be consistent with his own findings in 2021. [Pet. Exh. 28]. Dr. Inwald's letter does not provide the dates of the outside reports that he reviewed and as such it is impossible to ascertain whether these reports were based on Student's abilities at the time the April 3, 2023 letter was written. Based on the fact that Dr. Inwald apparently only reviewed the prior school district's IEP and that he was unaware that Respondent had conducted a REED in March 2023, this calls into serious question the reliability of his statements in the letter dated April 3, 2023.

As noted in Petitioner's post-hearing brief, "Dr. Inwald thought that a placement at Pine Grove for [Student] "sounds great" and that it would be "very appropriate for [Student]." [Pet. Brief, p. 5]. Dr. Inwald based this belief on a review of Pine Grove's mission statement and description. [Tr. Vol. I, pp. 203-205, 225-226]. However, similar to Dr. Wolff, Dr. Inwald did not have any knowledge of the ASD classrooms or programs offered by Respondent district and thus he had nothing to compare to the Pine Grove setting. [Tr. Vol. I, pp. 228, 230]. These admissions by Dr. Inwald also calls into question the reliability of Dr. Inwald's opinion as to the appropriate placement for Student, especially in light of the fact that Dr. Inwald has not observed or met with Student since September 2021. [Tr. Vol. I, pp. 193, 216].

Without having any information about Respondent's offered placement in the ASD program, the undersigned does not find Dr. Wolff's or Dr. Inwald's testimony to be persuasive in establishing that Student's placement at Pine Grove would meet the LRE requirements under the IDEA. It is also important to note that Petitioner's witness, Dr. Veenema, testified that based on his knowledge and experiences with Student, Student's best type of learning environment would be a special education setting with peers who have a similar severity of autism, such as an ASD classroom. [Tr. Vol. I, pp. 61, 67, 73].

23-034010
**Page 74**

Next, Petitioner also expressed concerns that at the March 2023 IEP meeting, the ASD classroom was described as a "model ASD classroom" that did yet not have a teacher or "ASD accreditation". [Tr. Vol. I, p. 154]. Petitioner argues that she "did not receive any information formally or otherwise about this possible placement or its existence until she was told it was to be [Student's] placement." [Pet. Brief, p. 6]. Respondent does not dispute that it did not have more information about the ASD program as of the March 2023 meeting; however, this is reasonable considering that the program was being newly implemented for the upcoming 2023-2024 school year. The evidence further establishes that Respondent was preparing for the opening of the ASD classroom by requesting an ASD coach from the ISD to assist with building the classroom structure and schedule. [Tr. Vol. III, pp. 732, 798-799]. Thus, this information could not have been made available to Petitioner at the time of the March 2023 IEP meeting. Furthermore Ms. Fountaine's credible, unrebutted testimony also establishes that there is no accreditation procedure for the ASD classroom as asserted by Petitioner. [Tr. Vol. III, p. 799].

Petitioner notes that Ms. Metcalf testified "that there were no students with significant cognitive impairment in the classroom. Tr. 768:18 – 768:20." [Pet. Brief, p. 7]. Again, this slightly mischaracterizes Ms. Metcalf's testimony. Ms. Metcalf actually testified that, to her knowledge, there were no students in the ASD classroom with a significant cognitive impairment. [Tr. Vol. III, p. 750]. Ms. Fountaine offered contradictory testimony stating that in her opinion, there were at least two students with significant cognitive impairment in the ASD classroom. [Tr. Vol. III, p. 831]. Regardless, when it comes to Student, there was some disagreement as to Student's level of cognitive impairment, i.e. Dr. Rush concluded that Student had a mild intellectual disability while Dr. Wolff concluded that Student had a moderate intellectual disability. Thus, the evidence presented does not conclusively prove that Student had a "significant cognitive impairment" such that the ASD classroom was not an appropriate placement. It is also noted that Ms. Metcalf has her endorsement in cognitive impairment. Petitioner has made no assertions that Ms. Metcalf would be unable to manage any students with cognitive impairments in Respondent's ASD classroom.

Petitioner further argues that the Director of Special Education Center Programs for the ISD, Mr. Dymowski, "recognized that all of [Student's] needs, diagnoses, and challenges as a learning would weigh in favor a placement at Pine Grove. Tr. 693:18 – 694:11; 710:5 – 711:15." [Pet. Brief, p. 7]. While Pine Grove may be able to meet Student's needs, Mr. Dymowski also testified that the local districts can create their own programs to meet the same needs as addressed by the programs operated by the ISD. [Tr. Vol. III, pp. 674-675, 693, 716]. More specifically, Mr. Dymowski testified that just because Pine Grove could be appropriate for Student's needs, he indicated those needs could also be addressed at a local regional program. [Tr. Vol. III, pp. 720-721]. Mr. Dymowski further agreed that the local school district must try supplementary aids and services in a less restrictive setting before jumping to a center-based program. [Tr. Vol. III, p. 720].

23-034010
**Page 75**

Petitioner does not argue that the ASD classroom would be inappropriate for Student or that the ASD classroom would not allow Student to make progress or receive a FAPE. Rather, Petitioner argues that Pine Grove would provide Student a FAPE in the LRE. [Pet. Brief, p. 10]. On the other hand, Respondent maintains that it has an "obligation to educate [Student] in the least restrictive environment that is appropriate for him, and the ASD classroom offered to him for the 2023-2024 school year is less restrictive and appropriate." [Resp. Brief, p. 1]. Respondent cites to 34 CFR § 300.114(a)(2), indicating that "to comply with the least restrictive environment (LRE) mandate, a student's placement should be as close to home as possible, located in the school that s/he would attend if not disabled, with access to non-disabled peers to the greatest extent possible." [Resp. Brief, p. 5]. Respondent argues that "Petitioner failed to establish by a preponderance of the evidence that [Student] required the very restrictive placement at Kent ISD's Pine Grove Academy." [Resp. Brief, p. 5].

The evidence shows that Student's current difficulties and needs include communication, language development, and engagement with peers. His behavioral concerns include overstimulation, difficulty concentrating on tasks, and safety concerns.

The Pine Grove classroom for students with autism has an intense focus on core skills like basic functional communication, adaptive behavior, independent living skills, and functional academics. [Tr. Vol. III, pp. 686, 709-710]. This classroom is located in a separate facility from general education peers. [Tr. Vol. III, p. 673]. Pine Grove's classroom for kindergartners has a teacher and two instructional support specialists in the classroom. There are also other providers located in the building including a speech pathologist, BCBA, social worker, and additional support staff. [Tr. Vol. III, pp. 709-710, 714-715]. Currently, there is only one student in the Pine Grove elementary school classroom.

The ASD classroom is operated by Respondent district. Respondent district's local ASD classroom is a low ratio classroom for kindergarten through second grade that allows for up to eight students. The ratio for the ASD classroom is three adults, consisting of the teacher and two paraprofessionals, to seven kindergarten students. [Tr. Vol. III, pp. 729-730, 745, 761]. There is also one student in the ASD classroom with an ADHD diagnosis. [Tr. Vol. III, pp. 767-768]. There are five students in the ASD classroom who do not use speech, but instead communicate through a combination of sign language, PECS, or a classroom iPad with the Snap Core program. [Tr. Vol. III, pp. 734-735, 763]. The two students who are verbal do interact with the students who are non-verbal. [Tr. Vol. III, p. 736]. Unlike the Pine Grove classroom, students in the ASD classroom have morning recess with nondisabled peers and some of the students in the ASD classroom attend specials with nondisabled peers, such as gym, art, and music. [Tr. Vol. III, pp. 730-731].

Based on the totality of the hearing record, Student's appropriate placement in the LRE is in Respondent's local ASD classroom based on his current needs and abilities.

23-034010
Page 76

As it relates to Petitioner's concerns about Student's safe consumption of food, the students in the ASD class eat their lunch in the classroom with the two paraprofessionals providing support during lunchtime. [Tr. Vol. III, pp. 731-732]. As it relates to Petitioner's concerns about Student's incontinence, the ASD classroom has a restroom located in the classroom and the paraprofessionals assist all students with their toileting needs throughout the day. [Tr. Vol. III, pp. 744-745]. Thus, the availability of these two paraprofessionals to address feeding and toileting needs should adequately address Petitioner's concerns related to Student's incontinence and feeding.

Student's IEP's and evaluations have also indicated that Student needs support and encouragement with interacting with peers. Additionally, as testified to by Ms. Hoffman, Student would benefit from seeing speech and language modeled in a classroom group setting. [Tr. Vol. I, pp. 98-99]. In contrast, Mr. Dymowski testified that the ISD programs such as Pine Grove do not have appropriate peer models for students. [Tr. Vol. III, pp. 688-689].

Petitioner testified that she disagreed with Student's placement in an ASD classroom because Student's lack of safety awareness and risk of elopement means that a more restrictive environment would be in Student's best interests. [Tr. Vol. I, pp. 152-153; Pet. Brief, p. 6]. In Respondent's ASD classroom, Ms. Metcalf testified that there are four other students with elopement concerns. [Tr. Vol. III, pp. 741-742]. Ms. Metcalf credibly established that both she and Respondent's staff have always been able to appropriately address these issues without having any students eloping beyond the hallway and further indicated that the ASD classroom has installed childproof handles to assist with those concerns. [Tr. Vol. III, pp. 742-744].

While the evidence establishes that the ASD classroom has been able to successfully handle any elopements from the classroom, there was no evidence presented at the hearing regarding how Respondent addresses these elopement concerns during recess. Given that Petitioner has valid concerns about Student eloping from the premises, Respondent should address this concern by having a one-to-one aide or paraprofessional present on the playground during recess to ensure that Student does not attempt to elope from the school premises.

Related to any other behavioral concerns of Student, Pine Grove does have students who generally exhibit unsafe behaviors such as kicking, hitting, or biting. [Tr. Vol. III, pp. 685-686]. It was undisputed by the parties that Student does not engage in these types of behaviors. Ms. Fountaine expressed concern about placing Student in a classroom when Student did not exhibit these types of behaviors that would warrant a setting such as Pine Grove. [Tr. Vol. III, pp. 814, 843]. Petitioner's witness, Dr. Wolff, also acknowledged that Student has not demonstrated any behavioral issues such as physical aggression or willful defiance and stated that Student is a "fairly contented individual". [Tr. Vol. III, pp. 571-573].

23-034010
Page 77

Mr. Dymowski testified that there is one individual in the ISD program that engages in climbing behaviors, is unaware of his environment, and is an elopement risk. [Tr. Vol. III, p. 686]. While this is similar to the type of behaviors at times exhibited by Student, the evidence presented was insufficient to establish that these behaviors were the only reason that particular student was placed in an ISD program. In this matter, Student's behaviors are also distinguishable as Ms. Call credibly testified that Student's unsafe behaviors decreased "quite a bit" in the last six months that she worked with Student. [Tr. Vol. II, pp. 383-384]. Ms. Call further testified that she did not see behaviors in the school environment during the 2023-2024 school year at Thrive Learning Center. [Tr. Vol. II, pp. 385-386]. Ms. Jobin also testified that she never observed any safety concerns for Student in the ECSE classroom during the 2022-2023 school year. [Tr. Vol. III, p. 638]. If Student were to engage in unsafe climbing behaviors, as he has been known to do in the past, Ms. Metcalf testified that these behaviors are addressed in the ASD classroom through positive reinforcement, by obtaining a preferred item for the student, or redirecting the student to climb on the plastic jungle gym located in the classroom. [Tr. Vol. III, pp. 765-766].  Based on the evidence presented, the ASD classroom would be able to appropriately address any concerns related to Student's engaging in any unsafe climbing behaviors.

Regarding Student's needs related to speech and language services, the ASD classroom has a 45-minute daily segment where the speech pathologist comes in to provide services to the students based on their IEPs. The speech pathologist works with the students either one-on-one or in a small group setting. [Tr. Vol. III, pp. 736-737].

In this matter, the evidence has established that Student showed some progress with his speech language skills in the school setting by the end of the 2022-2023 school year. [See Resp. Exh. D]. Additionally, Student has shown progress in his outside ABA therapy. For example, Ms. Call testified that Student was using up to six words and making more complex sounds on a consistent basis. [Tr. Vol. II, pp. 366, 397]. Ms. Eyk testified that Student has "come incredibly far with his communication" and that Student can now imitate two to three sounds consistently. [Tr. Vol. II, pp. 282, 304]. Likewise, Petitioner and Student's outside providers have acknowledged that Student has shown success in using the SGD with the LAMP application. [Tr. Vol. I, pp. 84, 121; Tr. Vol. II, p. 305]. In contrast to the type of progress exhibited by Student, Mr. Dymowski testified that students in the ISD center-based program are still developing basic functional communication. [Tr. Vol. III, pp. 685-686]. Therefore, the evidence establishes that Student would be ahead of the "basic functional communication skills" being taught at the ISD and thus his speech and language needs would be more appropriately addressed in the ASD setting where he can also obtain peer modeling.

Finally, Petitioner acknowledged that she did not believe Pine Grove would challenge Student to a greater extent than he would be challenged in the ASD classroom. [Tr. Vol. II, pp. 526-527]. The evidence presented establishes that Student was ahead of some

students during the 2022-2023 school year because Student knew his letters, numbers, and how to write his name. [Tr. Vol. III, p. 594]. Ms. Metcalf credibly established that she is able to differentiate instruction based on the individual student's academic need to accommodate any student who can perform greater academic skills in the ASD classroom. [Tr. Vol. III, pp. 752-753].

As stated in *Endrew F*, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F*, 137 S. Ct. at 999.  In other words, it must be asked whether the May 2023 IEP that placed Student in the ASD classroom is reasonably calculated to enable the Student to make progress in light of his circumstances.  The undersigned finds that it does.

In conclusion, the Pine Grove placement is too restrictive for Student. The ASD classroom is the LRE that would best provide Student the opportunity to make meaningful progress in light of his circumstances.  Most students in the ASD classroom are nonverbal, like Student. Student would benefit from this program by working in structured group activities that would build on his social skills while also focusing on his individual goals. Student would also benefit from seeing speech and language skills modeled in a classroom group setting, which is something that cannot be provided for at Pine Grove.

Accordingly, based on Student's current abilities and levels of functionality, Petitioner did not establish, by a preponderance of evidence, that the most appropriate LRE placement for Student is in the Pine Grove classroom.

4. <u>Whether compensatory education or services should be awarded and if so, of what type and/or amount and what other remedies are appropriate in the event Respondent is found to have committed FAPE violations?</u>

As noted above, the undersigned found that Respondent's failure to provide for the necessary assistive technology device for Student in the September 2022 IEP, specifically an SGD for Student to take back and forth from home to school, and their subsequent failure to obtain any such device until February 2023, resulted in a denial of Student's right to a FAPE. The result of this denial was Student not being able to make appropriate progress on his speech and language goals. Thus, Student is owed compensatory education in speech and language services.

Petitioner requests that Respondent fund a bank of 36 one-hour sessions at Mary Free Bed or similar provider trained in SGD and LAMP. [Pet. Brief, p. 4]. In support, Petitioner indicates that "Mary Free Bed has determined that 1 hour per week is a meaningful amount of time for [Student] to receive instruction on SGD and Lamp Words for Life software. *See e.g.*, Petitioner's Exhibit 19 at p. 25/55." [Pet. Brief, p. 4].

**23-034010**
**Page 79**

The undersigned finds it appropriate for Student to receive additional one-hour speech therapy sessions; however, the amount of 36 hour sessions should be reduced.

First, the amount needs to be reduced as the undersigned did not find that Respondent failed to provide Student a FAPE for the entire 2022-2023 school year. Ms. Fountaine credibly established that Respondent district's standard practice is to wait 30 days to get to know the student before deciding whether to implement services or accommodations. [Tr. Vol. III, p. 781]. Thus, after the initial 30 days of "getting to know" the Student, Respondent should have sought out an SGD device for Student to take back and forth between school and home, which in this case would have been the week beginning October 30, 2022. Next, Respondent's failure to obtain an SGD device for Student until February 2023, resulted in a loss of necessary communication assistance to Student during that period of time and caused Student not to be able to make appropriate progress in light of his circumstances. Thus, the proper period for compensatory education is the period of October 30, 2022 through the last full week of February 2023, which amounts to a total of 17 weeks. Subtracting out the two weeks for the winter break for the 2022-2023 school year, Student is entitled to 15 hours of compensatory education speech therapy services in the use of the SGD device.

As it relates to Petitioner's argument that the compensatory education hours should be paid to a bank to fund sessions at Mary Free Bed, there is no evidence that Petitioner presented to establish that Respondent's speech pathologist is unable to provide this instruction to Student. Therefore, Respondent may provide the 15 hours of compensatory education through their own qualified speech pathologist. If Respondent's speech pathologist has not received training in the use of an SGD with the LAMP program, Respondent shall seek training from the ISD's AAC consultant. Respondent shall complete this compensatory education within the next eight months. Additionally, as noted above, Respondent shall convene Student's IEP team within the next 30 days to add provisions to the IEP for Student's eating and medical related needs.

## <u>ORDER</u>

**NOW, THEREFORE, IT IS ORDERED** that Respondent shall provide 15 hours of compensatory education to Student in the area of speech and language services within eight months. The compensatory education should be in the form of one-on-one, direct speech therapy services with Respondent's speech language pathologist, unless the parties mutually agree to use an outside speech language provider.

**IT IS FURTHER ORDERED** that Respondent shall ensure that a one-to-one aide or paraprofessional is present on the playground during recess to ensure that Student does not attempt to elope from the school premises.

23-034010
Page 80

**IT IS FURTHER ORDERED** that no later than 30 days after the date of this Decision and Order, Respondent shall convene Student's IEP team to add provisions to Student's IEP to address Student's needs related to his eating and dysphagia diagnosis as well as provisions to address the administration of Student's medication, unless these provisions have already been added to Student's IEP at an IEP team meeting.

**IT IS FURTHER ORDERED** that Petitioner's remaining claims and any other claims or defenses not specifically addressed herein are dismissed with prejudice.

A party aggrieved by this decision may seek judicial review by filing an action in a court of competent jurisdiction within 90 days of the date of this order.


_____
**Lindsay Wilson**
**Administrative Law Judge**


**Notice to Agency to Provide MOAHR with Subsequent Agency or Court Orders**

The state agency that is a party to this matter, and/or referred this matter to MOAHR, shall serve MOAHR with any subsequent orders entered as a result of this ALJ's decision or proposed decision, including but not limited to the agency's final order, order to remand the matter to MOAHR for further proceedings, or order on appeal, as soon as practicable following entry of the order to:

Michigan Office of Administrative Hearings and Rules, General Adjudication, by **email (preferred)** to: MOAHR-GA@michigan.gov; **or by regular mail** to: MOAHR-GA, P.O. Box 30695, Lansing, Michigan 48909-8195.

See: Mich Admin Code, R 792.10120(2)(i).

**23-034010**
**Page 81**

## <u>PROOF OF SERVICE</u>

I certify that I served a copy of the foregoing document upon all parties and/or attorneys, to their last-known addresses in the manner specified below, this 15th day of May 2024.

*Verna Curtis*

**Verna Curtis**
**Michigan Office of Administrative**
**Hearings and Rules**

**<u>Via Electronic Mail</u>**



MATTHEW C. McCANN
MOSS & COLELLA, P.C.
28411 NORTHWESTERN HWY, STE 1150
SOUTHFIELD, MI 48034
**MMCCANN@MOSSCOLELLA.COM**

KELLOGGSVILLE PUBLIC SCHOOLS
KIMBERLEE FOUNTAINE
SPECIAL EDUCATION CONTACT
977 44TH STREET SW
WYOMING, MI 49509
**KFOUNTAINE@KVILLEPS.ORG**

CATHLEEN M. DOOLEY
THRUN LAW FIRM, P.C.
PO Box 2575
EAST LANSING, MI 48826-2575
**CDOOLEY@THRUNLAW.COM**

MICHELE R. EADDY
THRUN LAW FIRM, P.C.
PO BOX 2575
EAST LANSING, MI 48826-2575
**MEADDY@THRUNLAW.COM**

**23-034010**
**Page 82**

BETHANIE EGGLESTON, DUE PROCESS COORDINATOR
MDE-OFFICE OF SPECIAL EDUCATION
PO BOX 30008
LANSING, MI 48933
**EGGLESTONB1@MICHIGAN.GOV**

PRECIOUS BOONE
MDE-OFFICE OF ADMINISTRATIVE LAW
PO BOX 30008
LANSING, MI 48909
**MDE-ADMINLAW@MICHIGAN.GOV**