# EXHIBIT 2

Page 1

1              UNITED STATED DISTRICT COURT

2        WESTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

3    _____

4    L.G. O/B/O G.G.,

5              Plaintiff/Appellant/

6              Petitioner,

7        v.                              Case No.

8    KELLOGGSVILLE PUBLIC SCHOOLS and        1:24-CV-833

9    KENT INTERMEDIATE SCHOOL

10   DISTRICT,

11             Defendants/Appellees/

12             Respondents.

13   _____

14                  DEPOSITION OF L.G.

15   DATE:          Friday, July 25, 2025

16   TIME:          10:58 a.m.

17   LOCATION:      Kluczynski, Girtz & Vogelzang

18                  3033 Orchard Vista Drive Southeast,

19                  Suite 308

20                  Grand Rapids, MI 49546

21   REPORTED BY:   Todd Rasmussen

22   JOB NO.:       7443982

23

24

25

Page 2

1              A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFF/APPELLANT/PETITIONER L.G. O/B/O

3   G.G.:

4        MATTHEW CORRIGAN MCCANN, ESQUIRE

5        Foley, Baron, Metzger & Juip, PLLC

6        38777 Six Mile Road, Suite 300

7        Livonia, MI 48152

8        mmccann@fbmjlaw.com

9        (734) 742-1800

10

11       ELIZABETH KAMM ABDNOUR, ESQUIRE

12       Abdnour Weiker, LLP

13       325 East Grand River Avenue, Suite 250

14       Lansing, MI 48823

15       liz@education-rights.com

16       (517) 994-1776

17

18

19

20

21

22

23

24

25

1           A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANT/APPELLEE/RESPONDENT

3    KELLOGGSVILLE PUBLIC SCHOOLS:

4         MARK OSTROWSKI, ESQUIRE

5         Kluczynski, Girtz & Vogelzang

6         3033 Orchard Vista Drive Southeast, Suite 308

7         Grand Rapids, MI 49546

8         marko@kgvlaw.com

9         (616) 459-0556

10

11   ON BEHALF OF DEFENDANT/APPELLEE/RESPONDENT KENT

12   INTERMEDIATE SCHOOL DISTRICT:

13        TRAVIS M. COMSTOCK, ESQUIRE

14        Giarmarco Mullins & Horton, PC

15        101 West Big Beaver Road, Suite 1000

16        Troy, MI 48084

17        tcomstock@gmhlaw.com

18        (248) 457-7020

19

20   ALSO PRESENT:

21        Loren Safta, Law Clerk

22

23

24

25

```
                                             Page 4
 1                    I N D E X
 2    EXAMINATION:                              PAGE
 3         By Mr. Ostrowski                       7
 4         By Mr. Comstock                       60
 5         By Ms. Abdnour                        98
 6         By Mr. Ostrowski                      99
 7
 8                 E X H I B I T S
 9    NO.          DESCRIPTION                  PAGE
10    L.G.:
11    Exhibit 1     Annual Student Plan for GEG,
12                  2023-2024 School Year         47
13    Exhibit 2     Annual Student Plan, 2024-2025
14                  School Year                   49
15
16
17
18
19
20
21
22
23
24
25
```

1                P R O C E E D I N G S

2             THE REPORTER:  Good morning.  My name

3    is Todd Rasmussen; I am the reporter assigned by

4    Veritext to take the record of this proceeding.  We

5    are now on the record at 10:58 a.m.

6                This is the deposition of L.G. taken in

7    the matter of L.G. O/B/O G.G. vs. Kelloggsville Public

8    Schools, et al. on July 25, 2025.  We're at

9    Kluczynski, Girtz & Vogelzang, 3033 Orchard Vista

10   Drive Southeast, Suite 308, Grand Rapids, Michigan

11   49546.

12                I'm a notary authorized to take

13   acknowledgements and administer oaths in Michigan.

14                Additionally, absent an objection on

15   the record before the witness is sworn, all parties

16   and the witness understand and agree that any

17   certified transcript produced from the recording of

18   this proceeding:

19                         - is intended for all uses permitted

20                           under applicable procedural and

21                           evidentiary rules and laws in the

22                           same manner as a deposition recorded

23                           by stenographic means; and

24                      - shall constitute written stipulation

25                           of such.

Page 6

1              At this time, will everyone in

2    attendance please identify yourself for the record,

3    beginning from my right.

4              MR. OSTROWSKI:  Mark Ostrowski on

5    behalf of Kelloggsville Public Schools.

6              MR. COMSTOCK:  Travis Comstock on

7    behalf of Defendant Kent Intermediate School District.

8              MS. SAFTA:  Loren Safta, law clerk at

9    Abdnour Weiker.

10             MS. ABDNOUR:  Elizabeth Abdnour,

11   attorney for -- what are we -- Plaintiff L.G.

12             L.G.:  L.G., parent of G.G.

13             THE REPORTER:  Thank you.  Hearing no

14   objection, I will now swear in the witness.

15             If you could please raise your right

16   hand, L.G.?

17   WHEREUPON,

18                   L.G.,

19   called as a witness and having been first duly sworn

20   to tell the truth, the whole truth, and nothing but

21   the truth, was examined and testified as follows:

22             THE REPORTER:  Okay.

23             You may proceed.

24             MR. OSTROWSKI:  Liz, before we get

25   started, I'm thinking for purposes of the transcript

Page 7

1    that we'll just use initials for both -- I'm sorry,

2    L.G.?

3                    THE WITNESS:  Yes.

4                    MR. OSTROWSKI:  And for G.G.?

5                    MS. ABDNOUR:  Yep, that works for me.

6                    MR. OSTROWSKI:  Okay.  You're good with

7    this, Court Reporter?  Okay.  Great.  All right.

8    Thank you.

9                    EXAMINATION

10   BY MR. OSTROWSKI:

11       Q    L.G., I'm Mark Ostrowski; I introduced

12   myself before the deposition.  I am representing

13   Kelloggsville Public Schools regarding the lawsuit

14   that you filed through your counsel, and we're here to

15   take your deposition.  First of all, could you just

16   state your full name, please?

17       A    L.S.G.

18       Q    Okay.  And have you ever given a deposition

19   before?

20       A    No.

21       Q    Okay.  Couple rules to keep in mind.  Number

22   one: make sure you listen to my question; if you don't

23   understand it or don't hear it, be sure and say

24   something.

25                    If I ask a question and you don't let us

Page 8

1    know that you didn't understand it or didn't hear it,

2    you are under oath today and we're going to assume

3    that you gave the testimony that you intended.  Does

4    that seem fair?

5        A    Yes.

6        Q    All right.  You're doing a great job so far

7    saying "yes" or "no"; try to remember to do that as

8    opposed to "uh-huh" or "uh-uh" or just shaking your

9    head.  Try to wait until I finish my questions before

10   you answer so we get a clear transcript.

11            I often, kind of, hesitate in the middle of

12   a question, so I'll apologize for that right up front,

13   but so we'll just try not to speak at the same time.

14   All right?

15       A    Yes.

16       Q    The other thing is I'm not asking you to

17   guess at any answers; if you don't know the answer to

18   my questions, and attorneys often ask questions where

19   the witness just simply doesn't know the answer, don't

20   be afraid to say so.  That's perfectly fine, so long

21   as that's a true response.  All right?  Okay.

22            What's your date of birth?

23       A    12/28/1982.

24       Q    And how old does that make you?

25       A    I'm 42.

```
                                              Page 9

 1        Q    Are you currently married?

 2        A    I am not.

 3        Q    We know that you have a son, initials G.G.?

 4        A    Yes.

 5        Q    Do you have any other children?

 6        A    Yes.

 7        Q    Okay.  Who are your other children?

 8        A    Tavion Gibbs, age 22.  Birthday 1/20/03.

 9        Q    Is that it, the one other son?

10        A    Yes.

11        Q    Okay.  Where does Tavion live?

12        A    With -- in the home, with me.

13        Q    Okay.  I know G.G. is disabled.  Is Tavion

14   disabled, as well?

15        A    Yes, he has more -- he has Asperger's, so

16   more high-functioning autism.

17        Q    Yep.  Okay.  Is he currently working?

18        A    No.

19        Q    Did he complete high school?

20        A    Yes.

21        Q    Where did he go to high school?

22        A    Godwin.

23        Q    Godwin Heights?

24        A    Yes.

25        Q    All right.  G.G.'s father, is he still in
```

```
                                            Page 10

 1   the picture or --

 2       A    He chooses to -- not to be, but yeah, he --

 3   he -- I mean, I can't answer for him, but yeah, he --

 4   he is around.

 5       Q    Okay.  So he'll spend --

 6       A    But is he's not present with him, no.

 7       Q    Okay.  So --

 8       A    I have full legal custody.

 9       Q    Okay.  So he'll spend some time with him?

10       A    Yeah.

11       Q    Does he pay any child support?

12       A    Yes.

13       Q    Okay.  All right.  Are you currently

14   employed?

15       A    Yes.

16       Q    Where do you work?

17       A    Kendall Electric.

18       Q    And what do you do for Kendall?

19       A    I am a hi lo driver and receiver.

20       Q    How long have you been doing that?

21       A    Three years with them.

22       Q    And are you paid on an hourly basis?

23       A    Yes.

24       Q    Okay.  How much are you paid per hour?

25       A    Believe I just got a raise, 19.50.
```

Page 11

```
 1      Q    Okay.  Do you work 40 hours a week more or
 2   less?
 3      A    Yes.
 4      Q    Okay.  Forty?
 5      A    Yep.
 6      Q    Do you receive health benefits through your
 7   employer?
 8      A    Yes.
 9      Q    And who is the provider of those benefits?
10      A    Priority Health.
11      Q    And I should have followed up regarding --
12   well, I'm sorry, what's your current address?
13      A    4986 Marlette.  Do you want me to spell
14   Marlette or?
15      Q    Sure.
16      A    Okay.  M-A-R-L-E-T-T-E Avenue Southeast,
17   Grand Rapids 49548.
18      Q    And how long have you lived there?
19      A    Three years.
20      Q    And is it just you and your two sons in the
21   home?
22      A    It -- my mom comes and helps from time to
23   time.
24      Q    Okay.  Does she live with you?
25      A    She -- she's retired.  She floats back and
```

Page 12

1   forth between me and my brother.

2       Q    Okay.  All right.  Do you live in a single

3   family home?

4       A    I live in a three bedroom module home.

5       Q    Okay.  But that's not an apartment or kind

6   of new --

7       A    No.  I own my property.

8       Q    Okay.  Okay.  Do you have land in addition

9   to the three bedroom home?

10      A    I pay property tax.  I'm not sure; it's

11  different with owning a module home.  I'm not sure.

12      Q    Oh, okay.  I wasn't aware of that.  Do you

13  have just, like, a standard, typical lot?

14      A    I rent a lot.  So I have -- they have their

15  own property management.

16      Q    I see.  Okay.  All right.  So your address

17  on Marlette Avenue, what local school district is that

18  within, if you know?

19      A    Kelloggsville.

20      Q    It is?  Okay.  Where did you live prior to

21  being on Marlette Avenue?

22      A    2712 Riley, Wyoming, Michigan.

23      Q    Okay.  And G.G. was enrolled in Wyoming

24  Public Schools prior to going to Kellogg's school;

25  correct?

Page 13

```
1        A    Yes.
2        Q    Okay.  And it's my understanding he was dis-
3   enrolled in the spring of 2022; is that correct?
4        A    Yes.
5        Q    All right.  And as I understand it, that was
6   due to a change in your residence status; is that
7   correct?
8        A    Yes.  Yes.
9        Q    Okay.  What was the issue with G.G.
10  continuing to attend Wyoming?
11       A    They -- I wasn't given a reason.
12       Q    Okay.
13       A    It -- I was just -- I was told from the bus
14  driver as I got him from the last day, from before
15  spring break, that he would not be returning.
16       Q    Okay.  Did you follow up with someone else
17  at the school to ask what was going on?
18       A    I did, and I was told that he had aged out
19  or outgrew the -- the program.
20       Q    Okay.  Which program was he in at that time?
21       A    The KEC -- ECSC program, I believe.  I don't
22  know if that's how they say it.
23       Q    Early Childhood Special Education?
24       A    Yes.  Yeah.
25       Q    And I'm sorry, who did you speak to after
```

Page 14

1  the bus driver let you know that he wasn't going to be

2  going there anymore?

3       A    I contacted the teacher through the student

4  portal; it was a class dojo.

5       Q    Okay.

6       A    And she said that they would be setting up a

7  time for final IEP to discuss things.

8       Q    Okay.  And did they do that?

9       A    Yes.

10      Q    Okay.  And do you remember the teacher's

11  name?

12      A    I don't, but I have pictures of her.

13      Q    Okay.  All right.  Now, G.G.'s date of birth

14  is 9/10/2017; correct?

15      A    Yes.

16      Q    So as I understand it, he's currently 7

17  years old?

18      A    Mm-hm.

19      Q    All right?

20      A    Yes.

21      Q    And he's currently -- or I shouldn't say

22  "currently," because I don't know -- but during the

23  last school year, which would've been '24-2025, G.G.

24  attended Thrive; is that correct?

25      A    Yes.

Page 15

1        Q    Okay.  And G.G. will turn 8 years old on
2    September 10th of this year?
3        A    Yes.
4        Q    So just in a couple weeks or about six
5    weeks, I guess?
6        A    Yes.
7        Q    All right.  And you first enrolled G.G. at
8    Thrive for the 2023-2024 school year; correct?
9        A    Yes.
10       Q    Okay.  What is your plan for this upcoming
11   school year?  Do you plan to re-enroll him at Thrive?
12       A    Yes.
13       Q    Okay.  Have you been happy with his
14   education at Thrive?
15       A    Yes.
16       Q    All right.  And Thrive is a private school;
17   correct?
18       A    Yes.
19       Q    All Is G.G. enrolled in any educational
20   program right now during the summer months between the
21   traditional school years?
22       A    Yes.
23       Q    Okay.  What is he doing currently in terms
24   of his education?
25       A    He goes to BAWMi, Behavioral Analyst of West

```
                                            Page 16

 1    Michigan, for twice a week from -- from 8 a.m. to 3

 2    p.m.

 3          Q     Okay.  And does he receive ABA services from

 4    BAWMi?

 5          A     Yes.  And one one-on-one, yes.

 6          Q     I'm sorry?

 7          A     And one-on-one.

 8          Q     Okay.  And ABA services stands for "applied

 9    behavioral analysis" is my understanding?

10          A     Yes.

11          Q     Okay.  And I know at one point, you had some

12    insurance coverage for ABA services; is that right?

13          A     Yes.

14          Q     Okay.  Is that the case today, as well?

15          A     Yes.

16          Q     Okay.  And is that provided through Priority

17    Health?

18          A     Yes.

19          Q     Do you have to pay anything out of pocket

20    for the ABA instruction?

21          A     No, unless I go over the -- a lot of

22    appointments.

23          Q     Okay.  Got it.  So as long as you don't ask

24    for more than two times a week?

25          A     Yes.
```

```
                                                Page 17

 1        Q    Okay.  And during the last school year, '24-
 2   '25, was BAWMi providing ABA services during the
 3   school year to G.G.?
 4        A    Yes.
 5        Q    Again, two times a week?
 6        A    No, five days a week during the school year.
 7        Q    Okay.  And would someone from BAWMi attend
 8   school with G.G. those five days?
 9        A    Yes.
10        Q    And is that fully paid for by Priority
11   Health?
12        A    Yes.
13        Q    Who from BAWMi would attend Thrive classes
14   with G.G.?
15        A    He -- he has three different rotating ABA;
16   depending on the day, they rotate, but they -- they
17   are there to accompany him through his whole session
18   through Thrive.
19        Q    Okay.  Now, is it true that if a ABA
20   representative was not available to attend school with
21   G.G., that you would keep him home?
22        A    Yes.
23        Q    And why is that?
24        A    Because there's no one there to provide the
25   specific needs that he -- he needs, like potty
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

```
                                              Page 18

 1    training and eating issues that he has.
 2         Q    Okay.  So no one at Thrive who could meet
 3    those needs; is that correct?
 4         A    That's not licensed to.
 5         Q    Okay.  And Thrive is a fairly small school;
 6    correct?
 7         A    Yes.
 8         Q    Thrive is located in Kentwood; is that
 9    right?
10         A    Yes.
11         Q    Is that close to your home?
12         A    Well, not too close.  What about -- less
13    than 15 miles.
14         Q    Okay.  Do you drive G.G. to thrive when he
15    attends?
16         A    Yes.
17         Q    For the last school year, how much did you
18    have to pay for him to attend Thrive?
19         A    He was on a scholarship for this year, so
20    it's $60 a month.
21         Q    Okay.  And what about '23-'24?  Do you know
22    how much he had to pay for that school unit?
23         A    400 a month.
24         Q    Now, I know G.G. had delayed developmental
25    issues; correct?
```

Page 19

1       A    Yes.

2       Q    And likely attributed to birth trauma; is

3   that correct?

4       A    Yes.

5       Q    All right.  And I know he was diagnosed with

6   being on the autism spectrum in October of 2022; is

7   that correct?

8       A    Yes.  No, I'm sorry.  I -- he -- he was -- I

9   was given diagnosis -- first diagnosis -- of October

10  2020, he was diagnosed, but actual -- Dr. Rush's

11  diagnosis was '22.

12      Q    Okay.  So you're saying before Dr. Rush's

13  diagnosis, you had a diagnosis of autism prior to

14  that?

15      A    Yes.

16      Q    Okay.  Who was that doctor that gave that

17  diagnosis?

18      A    Dr. -- I -- I can't remember his name at

19  this moment, like, right off the top of my head.  But

20  it's -- it's there's; it's documented.

21      Q    Okay.  Was 2020, at that time -- I guess

22  depends on the time of year -- but G.G. would've been

23  about 3 years old?

24      A    Yes.

25      Q    Okay.  Do you remember what facility

Page 20

1    provided the first autism diagnosis, as far as you

2    recall?

3         A    It was a doctor in Detroit.  At -- at that

4    time, I don't remember the actual doctor's office.  I

5    was sent from Blue Cross Blue Shield, so I just -- I

6    went where the insurance allotted the --

7         Q    Sure.

8         A    Yeah.

9         Q    So in 2020 was G.G. in the early special

10   education program at Wyoming schools?

11        A    Yes.

12        Q    Did Wyoming schools provide any special

13   instruction or behavioral assistance as a result of

14   the ASD diagnosis?

15        A    Yes.

16        Q    And what did they do for him as related to

17   an ASD diagnosis, if you recall?

18        A    They placed him at Godwin South, the ECSE

19   program.

20        Q    Godwin South.  Is that in the Wyoming School

21   District?

22        A    Yes.

23        Q    Okay.  Is Godwin Heights separate from

24   Wyoming, if you know, school districts?

25        A    I -- I don't think so.  I'm not sure.

Page 21

1        Q    Okay.  All right.  The name "Godwin" kind of
2    threw me, because I was thinking that would've been a
3    separate school district, but okay.  It was part of
4    Wyoming?
5        A    Yeah.
6        Q    Okay.  All right.  So G.G., currently 7
7    years old, and we know that he has difficulty
8    communicating verbally; correct?
9        A    Yes.
10       Q    Okay.  At the current time, is he able to
11   form any words or?
12       A    Yes.
13       Q    Okay.  Approximately how large is his
14   speaking vocabulary at the current time?
15       A    Single-syllable words.
16       Q    Okay.
17       A    Not -- not -- I believe not -- the last time
18   I got a report, it's, like, over 25 single-syllable
19   words.
20       Q    Okay.  And would that report have come from
21   Thrive?
22       A    Thrive and BAWMi.
23       Q    Okay.  And as I understand it -- correct me
24   if I'm wrong -- but during the 2022-2023 school year,
25   I'm thinking G.G. was not able to verbalize any words.

Page 22

1   Am I wrong about that?

2        A    Very little.  Maybe one to five single-
3   syllable words.

4        Q    Okay.

5        A    And then --

6        Q    So he's increased fairly significantly in
7   terms of his spoken vocabulary.  Do you agree with
8   that?

9        A    Yes.

10       Q    All right.  All right.  Okay.  And then, I
11  know he had some issues with incontinence and was
12  wearing Pull-Ups.  Is that still the same?

13       A    He's still incontinent.

14       Q    Okay.

15       A    He is still -- we're still working with ABA
16  with it.  Yeah.  It's still a work in progress.

17       Q    Okay.  Has that condition improved since he
18  was at Kelloggsville or same or how would you describe
19  it?

20       A    It's -- it has not improved.  It's pretty
21  much stagnant.  He holds it, and they believe it is
22  sensory-related.

23       Q    Okay.  So there's a physical component to it
24  or -- is that what you're saying or?

25       A    They -- from what it was explained from the

Page 23

1    specialist is that he -- he hold -- he chooses to hold
2    it instead of going on the potty.  And so it's kind of
3    working against us potty training.  And it goes in --
4    hand-in-hand with eating issues and drinking issues.
5         Q    Okay.  And what eating issues does he have
6    at the current time?  Is that the same as when he was
7    at Kellyville?
8         A    Yes.  Yes.  He will not eat certain foods;
9    he eats really small amounts of certain things.
10   There's, like, five things on the list of things that
11   he will eat right now.  He will not eat meat at this
12   moment.  He only eats fries and fruit, potato chips,
13   and that's about it, yes.
14        Q    Sounds like my kids when they were
15   teenagers.  So he eats five things, basically, at the
16   current time?
17        A    Yes.
18        Q    Okay.  Was that the same when he was at
19   Kelloggsville?
20        A    No.  He -- he ate less when he was at
21   Kelloggsville.
22        Q    Okay.  Is there a choking hazard for G.G.?
23        A    Yes, he has dysphagia.  He has -- it's a
24   condition where acid -- a lot of acid buildup in his
25   tummy as well as he -- with his autism, he -- he tends

Page 24

1    to not know how to portion properly.

2        Q    Right.  Has that issue improved since he's

3    been at Kelloggsville or the same or how would you --

4        A    It's the same.

5        Q    Okay.  All right.  I know that G.G. was

6    described as being somewhat delayed regarding his

7    motor skills; is that fair?

8        A    Yes.

9        Q    Okay.  Has his ability in terms of his motor

10   skills improved since he was at Kelloggsville?

11       A    Yes.

12       Q    Okay.  And how so?

13       A    Yes, he -- he -- he's a lot more calm --

14   not -- I wouldn't say "calm," but he -- I -- we

15   noticed that there's a -- that he is eager to learn

16   right now, and so he's doing a lot more reading.

17            He's a lot more less stimmy.  He used to

18   be -- he was really stimmy and now they're -- we got

19   pockets of time where he's actually learning more and

20   they're less focused on the behavioral aspect of

21   things giving a little bit more time to -- to teach

22   him things and -- and really work on his speech issues

23   and such.

24       Q    Okay.  So his behavioral issues overall have

25   improved, you're saying?

Page 25

```
1         A    A little, yes.

2         Q    Okay.  And would you attribute that to the

3    services being offered by BAWMi, Thrive, or both, or

4    someone else?

5         A    Both working hand-in- hand with each other,

6    the one-on-one plus the --

7         Q    Right.  Do you know how many students attend

8    Thrive?

9         A    No.

10        Q    Okay.  So we got some records in response to

11   the subpoena from Thrive and it looks like last year,

12   they had two teachers working with G.G.  Does that

13   sound accurate?

14        A    Yes.

15        Q    Okay.  And that would be -- probably going

16   to butcher her last name, but -- Julie Louwerse?

17        A    Yes.

18        Q    And Sierrah Bromley.  Is that correct?

19        A    Yes.

20        Q    All right.  Is Julie Louwerse a teacher, as

21   far as you know?

22        A    I don't know.

23        Q    Okay.  Because Thrive's website describes

24   her as a support person.  So you don't know if she has

25   a teaching certificate or if she has a certificate in
```

Page 26

1    special education.  Is that fair?

2        A    I do not know.

3        Q    Okay.  All right.  What about Sierrah

4    Bromley?  Do you know if she's certified in special

5    education?

6        A    I do not know.

7        Q    Okay.  All right.  Do you know if there are

8    other students attending Thrive?  Well, let's -- I'm

9    sorry, let's take the last school year.  So '24-'25.

10   Do you know if there are other students attending

11   Thrive who have been diagnosed with ASD or being on

12   the spectrum?

13       A    Yes.

14       Q    Okay.  Do you know how many?

15       A    No, I don't know how many.

16       Q    Okay.  But you know there are some other

17   students?

18       A    Yes.

19       Q    Okay.  Who would've told you that?

20       A    I see them.

21       Q    Oh, you see them?

22       A    Yes.

23       Q    Okay.  And what about the students let you

24   know that they have ASD?

25       A    They present signs of autism.

Page 27

1      Q    Okay.  And what are you referring to

2    specifically?  What does that mean to you?

3      A    Stimming, agonal noises, nonverbal.

4      Q    All right.  Does Thrive instruct students

5    from K through 12 or do you know exactly what grades

6    they --

7      A    I -- they -- I believe K through 12.  Yeah.

8      Q    Okay.  And is G.G. successfully advancing,

9    grade-wise, comparable to his age?

10     A    No.

11     Q    Okay.  Why do you say "no"?  Has he been

12   held back, or is it a situation where he is not really

13   given a grade assignment?

14     A    It's work in progress due to pretty much

15   catching up, so we're -- he's catching up and -- all,

16   as well as they're working with his behavioral issues.

17   So but he is progressing, but it's a work in progress.

18     Q    Okay.  So as I understand it, with him going

19   to be 8 years old in a couple of weeks, traditionally

20   he'd be in the third grade.  Is that where you think

21   he should be at if you were advancing successfully?

22     A    I -- I would think so, yes.

23     Q    Okay.

24     A    I would think so.  I -- I really, depending

25   on how special ed, you know -- you know, right now,

Page 28

1    with him being in private school, yes.  He would be --
2    I would assume he'd be just going on to third grade.
3         Q    Okay.  Is it your understanding -- I'm
4    sorry, I don't think I asked you this or maybe I did.
5    You are planning to enroll G.G. in Thrive again this
6    coming school year; is that right?
7         A    That's the only option, yes, that -- yeah.
8    So yes.
9         Q    That's your only option, is what you're
10   saying?
11        A    Yes.
12        Q    Okay.  Did you look into school of choice
13   with any other school districts other than
14   Kelloggsville?
15        A    I was told due to G.G.'s disability that I
16   had to go under what Kent ISD, where he was placed,
17   and that was Kelloggsville.
18        Q    Okay.  And I don't want you to reveal any
19   communications with your attorney, but who would've
20   told you that?  That he had to go to Kelloggsville, if
21   he was going to go a public school?
22        A    Kim Fontaine.
23        Q    Okay.  And when would she have told you
24   that?
25        A    During an IEP.

Page 29

```
 1        Q     Okay.  So would that have been in the fall
 2   of 2022?
 3        A     Yes.
 4        Q     Other than the statement made you by Ms.
 5   Fontaine, have you looked into whether or not you
 6   might use School of Choice to send him to a different
 7   school if you wanted to?
 8        A     I called Kent ISD and was told that I had to
 9   go through the proper protocol.  I believe it was Ms.
10   Goff -- Goff?  From Kent ISD and I did ; I went
11   through the proper protocol, which was the IEP.  And
12   they said that that was our only choice.
13        Q     Do you know how to spell Ms. Goff's name?
14   Is it like the sport?
15        A     G-O-F-F?  I remember, I think it was G-O --
16   it might be G-O-E-F-F, but.
17        Q     Okay.  Have you communicated with Ms. Goff
18   in any way other than the telephone?  Have you
19   exchanged emails?
20        A     Email, yes.
21        Q     Okay.  And when would that have been?
22        A     I don't remember.
23        Q     Okay.  Would it have been after G.G. was no
24   longer attending Kelloggsville?
25        A     After he was no longer -- no.
```

```
                                                    Page 30
 1         Q     You would've communicated with her before he
 2    left Kelloggsville?
 3         A     Yes, yes.
 4         Q     Okay.  So during the last two years that
 5    he's attended Thrive, is it fair to say you have not
 6    looked into other possible placements under a School
 7    of Choice program?  Is that true?
 8         A     I -- I was given no other option.
 9         Q     Okay.  But you haven't explored it further
10    since speaking to Ms. Goff; is that correct?
11         A     No.
12         Q     Okay.  And of course, you would have the
13    option of sending him back to Kelloggsville, but you
14    don't want to do that; correct?
15         A     Yes.
16         Q     Are you aware that Kelloggsville now has
17    designated ASD classrooms for students between grades
18    K through 5?
19         A     Yes.
20         Q     Okay.  How did you learn about that?
21         A     They told me while -- it didn't exist at the
22    time.
23         Q     Right.  When G.G. was attending
24    Kelloggsville, they told you they were going to
25    establish an ASD program.  It's my understanding they
```

```
                                              Page 31
 1    currently have two classrooms that have ASD focus,

 2    with eight students in one classroom and twelve in the

 3    other.  Would you be interested in exploring that at

 4    all?

 5         A    No.

 6         Q    Okay.  And why not?

 7         A    Because they ignored his -- his

 8    disabilities.

 9         Q    Okay.  Okay.  Does Thrive employ any speech

10    pathologists?

11         A    Yes.

12         Q    How many?

13         A    Do -- do they employ?  I'm sorry.

14         Q    Yes, yes.

15         A    No.

16         Q    Okay.  Does G.G. receive services from a

17    speech pathologist at Thrive?

18         A    Yes.

19         Q    Okay.  And who provides that?

20         A    Kentwood -- Kentwood and BAWMi provides

21    speech.

22         Q    So Kentwood Public Schools?

23         A    Yes.

24         Q    Who from Kentwood Public Schools works with

25    G.G., if you know?
```

Page 32

```
 1        A     I don't know her name.
 2        Q     Do you have to pay anything extra for that?
 3        A     No.
 4        Q     Okay.  Are you aware if Thrive has any
 5   special education teachers?
 6        A     No.
 7        Q     When you said you've observed other students
 8   attending Thrive that you believe are on the autism
 9   spectrum, how many students are you thinking that
10   you've seen that you believe were on the spectrum as
11   well?
12        A     I've seen for myself at least four.
13        Q     Okay.  Do you know if those are peers of
14   G.G.?  I mean the same age groups?
15        A     No.  They're all different age groups.
16        Q     Okay.  They're all different age groups.
17   All right.  Does G.G. have access to an AAC device at
18   home currently?
19        A     Yes.
20        Q     Okay.  What type of device?
21        A     ACC device.
22        Q     Okay.  AAC to me means "augmentative and
23   alternative communication" device.  But it's also, my
24   understanding is there's different kinds.  Does he
25   have an iPad?
```

```
                                                      Page 33
 1        A    Not, it's not an iPad.  Yeah, it's a -- it's
 2    a iPad, but it's -- it's a black one.  I know that
 3    there's different kinds, I'm not familiar exactly.
 4    I'm not too big on electronics.
 5        Q    Okay.  So the communication device that G.G.
 6    has at home, where did you obtain that from?
 7        A    From insurance -- from my insurance.
 8        Q    Through Priority Health?
 9        A    Yes.  It was Blue Cross Blue Shield, and
10    then my job switched to Priority Health just at the
11    beginning of this year.
12        Q    When was the first time that G.G. had access
13    to a communication device at home?
14        A    In 2020, 2021.
15        Q    Okay.
16        A    And that was through Blue Cross Blue Shield.
17        Q    Okay.  And has he always had access to a
18    communication device at home since 2021?
19        A    Until '22.
20        Q    Okay.
21        A    And then I -- an insurance issue and they
22    took -- they took the device.
23        Q    Okay.  But he does have access to a
24    communication device now?
25        A    Yes.
```

Page 34

1    Q    Okay.  How long a gap was there between when

2    he no longer had the device at home in 2022 until he

3    obtained a new device?

4    A    I believe it was -- I believe it was ten

5    months.

6    Q    Okay.  So in about 2023, he then has a

7    communication device at home?

8    A    Yes.

9    Q    Okay.  And you're saying you think it's an

10   iPad device; is that right?

11   A    Yes.  I know it's Apple; it's one of the

12   newer devices.

13   Q    Okay.  And do you know what program it uses

14   for communication?

15   A    Lamp for Life.

16   Q    And is that a device where G.G. can touch an

17   icon and it'll produce a word?  Or how does that work?

18   A    Yes, it -- it will say words for him, speak

19   for him.

20   Q    Okay.  How would you describe his ability to

21   communicate with that device?

22   A    Great.

23   Q    Okay.  So he can let you know what he needs

24   with that device?

25   A    Short syllables, yes.

Page 35

1      Q     Okay.  How long would you say it's been that

2   G.G.'s been able to communicate on a great level with

3   the device?

4      A     Just probably within this last year; we've

5   seen a huge boost with him using the device more.

6      Q     Okay.  And would you attribute that progress

7   to BAWMi, Thrive, both, someone else?

8      A     Both.

9      Q     Okay.

10     A     Both, yeah.

11     Q     Does G.G. take that same device from home to

12   the school with him?

13     A     Everywhere, yes.

14     Q     Okay.  And has that been true for both

15   school years he was at Thrive?

16     A     Yes.

17     Q     Okay.  Now you indicated that BAWMi provides

18   support in terms of his toileting when he's at the

19   school; correct?

20     A     Yes.

21     Q     All right.  And then they provide support

22   regarding his behavioral issues; correct?

23     A     Yes.

24     Q     All right.  Any other supports that he

25   receives when he's attending Thrive, other than what

Page 36

1   we've described?

2        A    Yes.

3        Q    Okay.  Go ahead.

4        A    Speech.

5        Q    Speech.  Okay.  And you mentioned he gets

6   speech pathology services from Kentwood and I'm sorry,

7   what was the other providers, Thrive?

8        A    Well, Kentwood comes over to Thrive, and

9   they give him speech services through the public

10  school system.

11       Q    Okay.  How often does someone from Kentwood

12  come over to Thrive to provide speech services to

13  G.G.?

14       A    It -- speech and occupational therapy, I

15  believe it's twice a week.

16       Q    Okay.  Same person do both or is there a

17  different instructor?

18       A    Different -- different instructions --

19  instructors.

20       Q    Okay.  So it seems like you're pretty happy

21  with the progress G.G. has made since he's left

22  Kelloggsville.  Is that fair?

23       A    Yes.

24       Q    Okay.  Now, in the lawsuit, there's a

25  mention of wanting to have G.G. placed at the Pine

Page 37

1   Grove facility with Kentwood ISD?

2       A    Yes.

3       Q    Is that still the case?  Would that be your

4   preference?

5       A    Yes.

6       Q    Okay.  Why do you say that?

7       A    If -- if it actually exists -- if it

8   actually was to exist from the program that we -- I

9   thought it was, it would be a great fit for him to

10  really highlight his behavioral and give him, you

11  know, a -- a restrictive, more efficient education

12  that he needs.  He -- he would -- he would benefit

13  more from more structure, I believe.

14      Q    Okay.  Well, what do you base your

15  understanding of the Pine Grove program on?  Where do

16  you get your information?

17      A    I -- I got the information from a website

18  and from a colleague that used to have a family member

19  that worked there and spoke great things about it.  I

20  called and asked questions and spoke to somebody in

21  the office, and they said great things about it.

22      Q    Okay.  So this colleague who had a family

23  member who worked at Pine Grove, who was that person?

24      A    Colleen Schneider.  She was my receptionist

25  at Kendall Electric.

Page 38

1      Q    Okay.  And you said you called Pine Grove;
2  is that --
3      A    I did.
4      Q    Okay.  And when did you do that?
5      A    In '22, while he was at Kelloggsville.
6      Q    Okay.  Now as I understand it, Pine Grove is
7  a facility dedicated solely to special education
8  students; correct?
9      A    I don't know.
10     Q    Okay.  Do you know how many students were in
11  the Pine Grove program the last school year?
12     A    I don't know.
13     Q    Do you know what G.G.'s peers would be like
14  in terms of their behavior or developmental levels if
15  he were to attend Pine Grove?
16     A    I -- I was told that things are not as to
17  what the website says, so now, I know that it's not
18  what the website says it is.  It's -- it wouldn't be a
19  great fit for G.G.  But I don't -- I -- we don't
20  have -- I don't have any other options than what was
21  presented from -- for me, from Kent ISD, so.
22     Q    Oh, okay.  So as I understand your
23  testimony, you're saying you no longer think Pine
24  Grove would be a good fit for G.G.?
25     A    Yes.

Page 39

```
 1        Q     Okay.  And is that due to the progress he's
 2   made since attending Kelloggsville or some other
 3   reason?  Or is it just because you learned more about
 4   Pine Grove?
 5        A     Just 'cause I learned more about Pine Grove;
 6   I think he's doing great at Thrive.
 7        Q     Okay.  So as part of this lawsuit, are you
 8   seeking compensation to reimburse you for the amounts
 9   you've had to spend to send G.G. to Thrive?
10        A     Yes.
11        Q     Okay.  And what is that amount you're
12   seeking?
13        A     I don't know.
14        Q     Okay.  So far, he has attended there for two
15   full school years?
16        A     Yes.
17        Q     And I believe you said the first year it
18   would've cost about $4,000; is that right?
19        A     It's 400 a month.
20        Q     I'm sorry, 400.  Would that be for nine
21   months?
22        A     Yes.
23        Q     And then, this most recent school year, he
24   was on a scholarship and you paid $60 per month?
25        A     Yes.
```

Page 40

1      Q    Okay.  Hypothetically, if you wanted to keep

2   G.G. at Thrive for the remainder of his public -- I'm

3   sorry, the remainder of his elementary, middle school

4   and primary school education, you'd be able to do

5   that?  Is that right?

6      A    No.

7           MS. ABDNOUR:  I'm sorry to interrupt.

8   Can we clarify: you said elementary, middle, and

9   primary.  So "primary" is elementary.  Is that what

10  you meant to ask, Mark?

11          MR. OSTROWSKI:  Oh, no.  What I meant

12  to say was secondary, meaning high school.  Thank you

13  for the correction.

14  BY MR. OSTROWSKI:

15     Q    So if you wanted to keep G.G. at Thrive all

16  the way through what would typically be a senior year

17  in high school, would you be able to do that?

18     A    No.

19     Q    Why not?

20     A    Because Thrive goes to 8th grade, I think.

21     Q    Okay.  All right.  Now as I understand it,

22  G.G.'s never been evaluated in terms of the

23  possibility of him attending Pine Grove; correct?

24     A    I don't know -- I -- I don't understand your

25  question.

Page 41

1      Q    Okay.  It's my understanding that in order

2   for a student to be enrolled in Pine Grove, that the

3   ISD would've to do an evaluation of the students

4   before that would be something that could be done.  Is

5   that your understanding?

6      A    He -- he did have an evaluation.

7      Q    Oh, he did?  Okay.  I'm sorry.  And when was

8   that?

9      A    I'm not sure of a date.

10      Q    Okay.  Do you know who would've done that

11   evaluation?

12      A    Kelloggsville.

13      Q    Okay.  Okay.  So that would've been during

14   the 2022-2023 school year?

15      A    Yes.

16      Q    All right.  Now, when G.G. attended

17   Kelloggsville for the 2022 school year, it's my

18   understanding he started there in September of 2022;

19   is that right?

20      A    Yes.

21      Q    Do you know if that was after regular

22   classes had already started at Kelloggsville?

23      A    No.  I'm not -- I don't remember.

24      Q    Okay.  Because typically, Kelloggsville

25   starts school last week of August, but you're certain

Page 42

```
 1   that G.G. did not start attending classes there until

 2   September.  Is that fair?

 3        A    I don't remember.

 4        Q    Okay.  Do you remember if he started

 5   attending Kelloggsville before or after his birthday

 6   on September 10th?

 7        A    It was after his birthday.

 8        Q    Okay.  And the first IEP meeting done at

 9   Kelloggsville would've been September 23, 2022;

10   correct?

11        A    Don't remember the dates exactly.

12        Q    Okay.  Couple weeks after he enrolled, does

13   that seem about right?

14        A    I don't remember exactly.

15        Q    All right.  That's fine.  G.G. currently

16   takes medication; correct?

17        A    Yes.

18        Q    Do you know what medications he takes at the

19   current time?

20        A    Yes.  He takes Quillivant, and he also takes

21   clonidine.  It's a mood stabilizer.  I'm not -- I'm

22   not exactly saying it right.

23        Q    Clonodine?

24        A    I believe so; it's -- I -- I might not be

25   saying it right, but --
```

Page 43

1          Q     Sure, sure.  Yeah.  Names of medications can

2     often be difficult, for sure.

3          A     Yes, yes.  And he also takes -- my head is

4     stuck on the -- the other one -- the other med.  He

5     also takes a med for his stomach.

6          Q     Okay.

7          A     I can't think of the name right now.

8          Q     All right.  The first medication you

9     mentioned begins with a "Q," I don't remember what you

10    said, but what is that for?

11         A     That is for his autism; that's, I believe,

12    for overactive.

13         Q     Okay.  Is that similar to Ritalin or do you

14    know?

15         A     Yes, that's what I was told, it's similar

16    to -- to Ritalin.

17         Q     And then the, what we think is probably

18    pronounced "clonidine," do you know what that's for?

19         A     I'm not -- I -- that is for his crying

20    spells.  He -- he has cry spells and he just cries,

21    and he has emotional issues.  I don't know what to

22    call -- how to --

23         Q     Yeah, like a meltdown?  Is that --

24         A     It's not a meltdown.  It's just -- he just,

25    typically, just cries out of nowhere and you -- I -- I

Page 44

1    investigate him, makes sure he's okay.  But it's just

2    him crying.  It's something that he does.

3         Q    At the current time, how frequently does

4    that happen?

5         A    That happens once a week now with the med.

6         Q    Okay.

7         A    It was happening more frequent before.

8         Q    Okay.  Prior to him starting to take the

9    medication for that condition, how often would he have

10   these crying spells?

11        A    Like, three times a week.

12        Q    Okay.

13        A    Sometimes, almost every -- every day of the

14   week.

15        Q    Okay.  Do you remember when he first started

16   taking that medication for crying spells?

17        A    He's only been on it for, I believe, six

18   months.

19        Q    Okay.  So fairly recent?

20        A    Yes, very recent.

21        Q    So when he was at Kelloggsville, he'd be

22   having these crying spells three times a week, if not

23   more?

24        A    Yes.

25        Q    The medication that you said is for autism

Page 45

```
 1   similar to Ritalin, when did he start taking that?
 2        A    He started taking that '21 -- '21; he
 3   started taking that while -- while at Godwin South.
 4        Q    Okay.  And then the medication used to treat
 5   his stomach condition.  When did he start taking that?
 6        A    Since birth.
 7        Q    Okay.  And we've covered all the medications
 8   he takes on a regular basis?
 9        A    Allergy medicine; he has really bad
10   allergies.  He -- nasal spray, as well as a Zyrtec or
11   ceterizine.
12        Q    Who is G.G.'s primary physician?
13        A    Dr. Jeremy Veenema.
14        Q    And where does he practice out of?
15        A    Alger Pediatrics.
16        Q    In Alger Heights?
17        A    Yes.
18        Q    And how long has G.G. been going to Dr. --
19   I'm sorry -- Dr. Veenema, is that what you said?
20        A    Yes.  Veenema.
21        Q    Veenema.  Okay.
22        A    2020 -- 21.  2020 -- 21.
23        Q    Okay.  All right.  And are you happy with
24   the services Dr. Veeenma has been providing to your
25   son?
```

Page 46

1        A    Yes.

2                    MR. OSTROWSKI:  Okay.  All right.  I

3    want to have a couple exhibits marked.  Let's see

4    here.

5                    MS. ABDNOUR:  Can we just go off the

6    record for one second?

7                    MR. OSTROWSKI:  Sure.

8                    MS. ABDNOUR:  We haven't got any --

9                    THE REPORTER:  We are off the record.

10   It is 11:55 a.m.

11                    (Off the record.)

12                    THE REPORTER:  We are on the record.

13   It is now 11:56 a.m.

14   BY MR. OSTROWSKI:

15        Q    All right.  L.G., I'm sorry.

16                    MR. OSTROWSKI:  Can we mark that as, I

17   guess, LG Exhibit 1?

18                    Here's a copy for you.  Copy for you,

19   Travis.

20   BY MR. OSTROWSKI:

21        Q    All right.  L.G., I'm presenting you what we

22   had marked as Exhibit 1.  It's my understanding that

23   this is the annual student plan for GEG put together

24   by Thrive for the 2023-2024 school year.  First of

25   all, have you seen this document before?

Page 47

1                    (L.G. Exhibit 1 was marked for
2                    identification.)
3        A    I don't think so.
4        Q    Okay.
5        A    No.
6        Q    So this was never shared with you?
7        A    It's something like this, but not presented
8    like this.
9        Q    Okay.  Would you have copies of documents at
10   home that would've been provided to you from Thrive
11   regarding G.G.?
12       A    It's -- yes.  Yes.
13       Q    Okay.  All right.  Okay.  I still want to
14   ask you just a couple questions about Exhibit 1.  Do
15   you see toward the top -- well, first of all, on the
16   left side it's got G.G.'s name; correct?
17       A    Yes.
18       Q    It's got your first name; correct?
19       A    Yes.
20       Q    And to the right it lists teachers.  Do you
21   see that?
22       A    Yes.
23       Q    All right.  Does that seem to be an accurate
24   list of teachers that would've worked with G.G. at
25   Thrive during the 2023-2024 school year?

Page 48

1        A     Yes.

2        Q     We look down the next paragraph or box says

3    "Strengths: numbers/math, communicating in writing and

4    with his Lamp device, funny and joyful."  First of

5    all, did I read that correctly?

6        A     Yes.

7        Q     Would you agree those were some of G.G.'s

8    strengths?

9        A     Yes.

10       Q     Any other strengths that you think should

11   have been listed there?

12       A     No.

13       Q     Okay.  To the right of that box, there's a

14   column called "Concerns."  Do you see that?

15       A     Yes.

16       Q     It says "Speech/language, including further

17   training for ABA staff, family and G.G., in use of the

18   Lamp.  Number 2: eloping within the building.  Number

19   3: toilet training.  Number 4: eating habits."

20             Did I read that correctly?

21       A     Yes.

22       Q     And are those concerns that you believe

23   should have been listed on this document for that

24   school year?

25       A     Yes.

Page 49

1      Q     All right.  Nothing that you would add as

2  far as concerns?

3      A     No.

4      Q     Okay.  When it says "Training for ABA staff

5  and family and G.G. in use of the Lamp," is that

6  something that took place, as far as you know?

7      A     I don't know.

8      Q     Okay.  So you don't know if there was an

9  effort to address that concern during the 2324 school

10 year?

11     A     I -- I know that a -- the staff did some

12 classes to have Kentwood come to the school.

13     Q     Regarding the use of the ACC [sic] device?

14     A     Regarding their services -- the public

15 school systems services within the private school.

16     Q     Okay.  All right.  I'm going to show you, we

17 have marked as our next exhibit.

18               (L.G. Exhibit 2 was marked for

19                identification.)

20               MS. ABDNOUR:  And just for the record,

21 this is L.G. 2?

22               MR. OSTROWSKI:  Yes.

23 BY MR. OSTROWSKI:

24     Q     I'm showing you what we've had marked as

25 Exhibit 2.  I'm going to ask you the same question; I

Page 50

1   suspect this answer's going to be the same, but have
2   you seen that document before?
3           And I'm sorry, I should have backed up.  Let
4   me start over.  Exhibit 2, it's my understanding it's
5   an annual student plan for the most recent school year
6   at Thrive, 2024-2025.  Have you seen this document
7   before?
8       A    Yes.
9       Q    Okay.  And do you think you would've signed
10  a copy of this agreement or do you remember doing that
11  or not?
12      A    I don't remember signing -- signing is
13  digital with --
14      Q    Okay.  All right.  So you would've received
15  this document by email; is that correct?
16      A    I would -- I received this document just,
17  like, they gave me like this, but yes --
18      Q    They gave you a hard copy?
19      A    A hard copy.
20      Q    Okay.  And your copy you received would not
21  have had any signatures either; is that correct?
22      A    I would get a later copy with everybody's
23  name signed.
24      Q    Okay.  All right.  Now, would Thrive have,
25  essentially, IEP meetings with you?

```
                                               Page 51

 1        A    No.
 2        Q    Okay.  Would they have a meeting with you to
 3   go over the annual student plan that you're looking
 4   at?
 5        A    Yes.
 6        Q    Okay.  So the annual student plan for 2024-
 7   2025, when would you have met with Thrive employees to
 8   go over that?
 9        A    That was two months ago.
10        Q    Okay.  So you go over it at the end of the
11   school year?
12        A    Yes.  Well --
13        Q    Okay.  Do they -- go ahead.
14        A    We have annual meetings every -- for Thrive
15   every three months, and then BAWMi meetings every
16   month.
17        Q    Okay.  So at Thrive during the last school
18   year, you would have a meeting with Thrive personnel
19   every three months?
20        A    I'm -- I'm not exactly sure, but yeah.  It
21   was more we -- it was more than just once -- one time
22   to discuss the plan.
23        Q    Okay.  So do you think you had four meetings
24   with Thrive personnel in the 2024-2025 school year?
25   Or how many meetings do you think you had to discuss
```

```
                                            Page 52
 1    G.G.'s progress and -- go ahead.
 2         A    So far, I believe four this year.
 3         Q    Okay.  Okay.  So for the most recent school
 4    year, you had four meetings?
 5         A    Yes.
 6         Q    Okay.  Were there documents prepared for
 7    each of those meetings, if you know?
 8         A    Yes.
 9         Q    Okay.  Would you have copies of those
10    documents at home?
11         A    Yes.  Yes and no.  Some -- some of the
12    documents were just behavioral; right?  Like sheets
13    of -- of situations or instances.
14         Q    Okay.  So I'm looking at Exhibit 2.  The
15    teachers listed for G.G. for the most recent school
16    year are Julie Louwerse and Sierrah Bromley; correct?
17         A    Yes.
18         Q    And I believe you already testified that
19    that's correct, those are the two Thrive instructors
20    that you recall working with G.G. during the most
21    recent school year; correct?
22         A    Yes.
23         Q    All right.  And then, you mentioned there
24    would've been personnel from Kentwood providing speech
25    services and --
```

Page 53

1        A     Occupational.

2        Q     Occupational.  So that would've happened

3     both school years at Thrive or just the most recent

4     one?

5        A     Just the most recent.

6        Q     Okay.  So that was something new for the

7     '24-'25 school year?

8        A     Yes.

9        Q     All right.  Any other persons who would've

10    worked with G.G. at Thrive during the most recent

11    school year that we have not discussed?

12       A     This most recent school year?  No.

13       Q     Okay.  All right.  All right.  Does G.G.

14    currently treat with a psychiatrist or psychologist?

15       A     No.

16       Q     Okay.  So the only medical provider he sees

17    on a regular basis is Dr. -- I'm sorry -- Veenema?

18       A     Yes.

19       Q     Okay.  So no other physician he sees on a

20    regular basis?

21       A     No.

22       Q     Okay.  I think I'm getting close to being

23    done with my questions.  I just want to look through

24    my notes fairly quickly.

25             There's reference in the documentation from

Page 54

1    the due process hearing that talks about ABA services

2    being provided by PBS Corporation.  Has that always

3    been the facility that's provided ABA services?

4         A    Yes, yes.

5         Q    Is that different than BAWMi?

6         A    Yes.

7         Q    Okay.  What's the difference?

8         A    BAWMi is center-based.

9         Q    Okay.

10        A    And PBS is in-home.

11        Q    Oh, I see.

12        A    And as well as one-on -- they provided one-

13   on-one.

14        Q    Okay.  Is G.G. still receiving services from

15   PBS?

16        A    It's -- his case is still -- oh, it's

17   active, but no, not through the summer, no, right now.

18        Q    Okay.  Will it renew when the school year

19   starts?

20        A    Yes.

21        Q    Okay.  Now, there's discussion of elopement

22   issues with G.G., but as I understand that the

23   elopement was always within a school building.  Is

24   that fair?

25        A    Are you talking at Thrive or?

Page 55

1      Q    Well, okay.  Let's start with Thrive.  It

2  was reported that he had some elopement issues at

3  Thrive; correct?

4      A    Yes.

5      Q    And was he always contained within the

6  building as far as you know?  Or did he elope out

7  outside the building?

8      A    Inside the building?

9      Q    Oh, he's inside?

10      A    Inside.  There's been a -- a couple of

11  occasions where he's gotten outside.

12      Q    At Thrive?

13      A    Yes.

14      Q    Okay.  Did he leave the school grounds, if

15  you know?

16      A    Well, no, I'm sorry.  Not at Thrive; at

17  BAWMi, he was on BAWMi-side when he walked out of the

18  building.

19      Q    Okay.  Did he leave the BAWMi grounds, if

20  you know?

21      A    No.

22      Q    Okay.  Did he suffer any sort of injury or

23  anything?

24      A    No.

25      Q    Now, regarding the elopement issues at

Page 56

1    Kelloggsville, did he ever leave the building?

2        A    No.  No -- yes -- I'm -- I'm not sure.

3    I'm -- I'm not sure if he had -- if left the building

4    or -- no, I don't -- I don't recall any.  I know that

5    it -- it was a risk for him.  I -- I was told that he

6    walked while on recess outside far away, but I'm --

7        Q    Okay.  Sure.  Sounds like you can't remember

8    if he would've left the property or not.  Is that what

9    you're saying?

10       A    I don't -- I don't know exactly what you're

11   asking me, if -- are you asking me a specific time?

12   If I'm -- if I remember a specific time, or?

13       Q    So we know G.G. attended Kelloggsville for

14   only one school year; correct?

15       A    Yes.

16       Q    And that was a 2022-'23 school year?

17       A    Yes.

18       Q    I saw a report saying that he would elope

19   from the classroom; essentially, going to the bathroom

20   if he didn't want to be in the classroom.  That's the

21   only issue I saw with elopement.  But you're

22   describing something different?

23       A    Yes.

24       Q    Okay.

25       A    The -- the only instance that I was told

Page 57

1   about was him eloping from the classroom from a back

2   door to the recess area.

3       Q    Okay.  Was that while recess was going on

4   or?

5       A    No.

6       Q    Okay.  Were there personnel in the recess

7   area -- school personnel, if you know?

8       A    I don't know.

9       Q    Okay.

10      A    I don't remember.

11      Q    All right.  Who would've reported that to

12  you?

13      A    I -- I don't remember at this moment

14  which --

15      Q    Is there a fence around the recess area?

16      A    Yes.

17      Q    Okay.  But as far as you know, he never left

18  the recess area, is that fair?

19      A    Yes.

20      Q    Okay.  All right.  And you can only recall

21  the one occasion where he may have eloped outside the

22  building while he was at Kelloggsville?

23      A    Outside the building, I was told numerous

24  times of him leaving the classroom and going to the

25  bathroom.

Page 58

1    Q    Okay.  Was there a bathroom connected to the

2    classroom he was in at Kelloggsville, or was it in the

3    hall?

4    A    I -- I don't remember for sure; I believe it

5    was down the hallway.

6    Q    Okay.  All right.  Has G.G.'s elopement

7    issues, have those improved?

8    A    No.  We're working on them.

9    Q    Okay.  But the frequency of some type of

10   movement --

11   A    Is better.

12   Q    It is better?

13   A    Yeah.  It is better.

14   Q    Okay.  What types of things does G.G. enjoy

15   doing at home?

16   A    He likes bouncing on his yoga ball, and he

17   likes listening to different sirens and cell phone

18   noises.

19   Q    Okay.

20   A    He -- he likes stimming.  That's pretty

21   much -- pretty much his thing, yoga ball.

22   Q    Okay.  These noises he likes to listen to,

23   is that something he generates with his iPad?

24   A    Yes.

25   Q    Okay.  The -- and I'm sorry, did you say he

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

```
                                            Page 59

 1    likes stimming?

 2        A     Yes.

 3        Q     Okay.  And stimming, as I understand it, is

 4    kind of when a child will, kind of, flail with their

 5    arms or make noises or is that --

 6        A     Yes.

 7        Q     Okay.  So almost like a kid humming -- or

 8    would that be considered stimming behavior?

 9        A     His behavior is he -- he has his own

10    language.  He -- he kind of says little things and you

11    can make -- you can make some of it sometimes; most of

12    the times, it's just little things that he's just

13    saying.  And noises, sounds.

14        Q     Okay.  All right.

15        A     Swaying of the hands, writing.

16        Q     Okay.  So during the summer, when

17    traditional classes are not in session, what is G.G.

18    doing?  Well -- and I'm sorry, I'm assuming you need

19    childcare for him when you're at work; is that fair?

20        A     No.

21        Q     You don't?

22        A     No.

23        Q     Okay.  Does someone watch G.G.?

24        A     My mom.

25        Q     Okay.  So during the summer, your mom is
```

```
                                              Page 60
 1    always with him when you are working?

 2        A    Yes.

 3        Q    Okay.  Sounds like she's a good grandma?

 4        A    Yes.

 5              MR. OSTROWSKI:  All right.  Okay.  All

 6    right.  Those are all the questions I have at the

 7    current time.

 8              MR. COMSTOCK:  Why don't we take a

 9    break; it's been about an hour and 15.  Just give

10    people a chance to --

11              MR. OSTROWSKI:  Fifteen-minute break?

12    Is that what you said?

13              MR. COMSTOCK:  It's been about an hour

14    and 15.  We just have, like, a five-minute break?

15              MR. OSTROWSKI:  Yeah, sure.  Chance to

16    stretch.

17              THE REPORTER:  We are off the record.

18    It is now 12:16 p.m.

19                   (Off the record.)

20              THE REPORTER:  We are on the record.

21    It is now 12:29 p.m.

22                    EXAMINATION

23    BY MR. COMSTOCK:

24        Q    Good afternoon.  Or now that it's after

25    twelve o'clock.  Again, my name is Travis Comstock;
```

Page 61

1    I'm counsel for the Kent ISD.  I just have, hopefully,

2    a short amount of questions for you.

3              When you were participating in special

4    education meetings, IEP meetings, at Wyoming and

5    Kelloggsville, did you receive the parents' handbook

6    with procedural safeguards?

7         A    Yes.

8         Q    Okay.  So that helped you understand what

9    your rights were with respect to the IDEA in terms of

10   parental rights for appeals and other things?

11        A    Yes.

12        Q    Okay.  And when you were participating in

13   IEPs with Wyoming and Kelloggsville, you understood

14   you could bring people that you wanted to be

15   participate at those meetings; correct?

16        A    Yes.

17        Q    You testified earlier today that you had

18   called the Kent ISD and spoke with a Mrs. Goff.  Do

19   you recall that testimony?

20        A    Yes.

21        Q    Okay.  Do you recall when you called her?

22        A    Year, but not, like, date.

23        Q    Sure.

24        A    Okay.  I called in 2021.

25        Q    And when you spoke to her, was that just,

Page 62

```
 1  like, a random call or did you purposefully reach out
 2  to her specifically?
 3       A    I reached out to her twice in '21 on
 4  concerns of G.G. being released from Godwin South and
 5  to speak about Pine Grove.
 6       Q    Okay.  So I'm sorry, "released from Godwin
 7  South."  What do you mean by that?  I'm not sure.
 8       A    He -- I was told that on spring break, that
 9  when the bus driver dropped him off, that that was his
10  last day.  I sent her an email, I believe, it was an
11  email and I got -- received a call to set up for the
12  final IEP.  Yeah.  That's all I remember pretty much.
13       Q    So I looked online.  It looks like Godwin
14  South isn't a specific name of a particular school.
15  Was that within the Godwin Heights Public School
16  District?  Are you aware?
17       A    I -- I don't know.  It -- it -- that's where
18  he was placed from Wyoming's Huntington Woods ISD to
19  Godwin South.
20       Q    Okay.  Okay.  So you think you may have
21  emailed Kim Goff about your being released from Godwin
22  South?
23       A    Yes.
24       Q    Okay.  And you think that was sometime in
25  2021?
```

Page 63

1      A    Yes.

2      Q    Okay.  And then you also called Ms. Goff a

3  couple times in that -- around that same timeframe?

4      A    I -- I called Pine Grove to get information

5  and was told what, when I was transferred over that

6  Ms. Goff was the person that I'd be speaking to.  So

7  that's how.

8      Q    So perhaps I'm misunderstanding you or

9  something.  I thought you testified that you called

10 Pine Grove in 2022?

11     A    I -- I did.  I did call in 2022.

12     Q    So that was that call in 2022, in addition

13 to your call in 2021?

14     A    I did, yes, but I was told -- I -- I was --

15 I had to go through the proper protocol.

16     Q    And was that in 2021 you were told to go

17 through the proper protocol?

18     A    Yes.

19     Q    Okay.  And when you called Pine Grove in

20 2021, you were referred to Kim Goff?

21     A    I was referred, yes, to Kim Goff, who

22 explained the proper protocol through IEP.

23     Q    What was the proper protocol as you

24 understood it from Kim Goff?

25     A    She said that the placement had to be done

Page 64

1    from the ISD standpoint of where he was placed at at

2    that time.

3         Q    Okay.  Help me understand that a little bit

4    better.  The placement had to be done through the

5    ISD's perspective?

6         A    The -- she just -- I had to go ask

7    Kelloggsville for him to be placed there.  It had --

8         Q    Okay.  Okay.  And you got that information

9    in 2021 to the best of your recollection?

10        A    Yes.  Yes.

11        Q    Okay.  Again, this isn't a memory test;

12   we're four years past.  So I understand.  Okay.  And

13   what prompted your call again in 2022, the next year?

14        A    What prompted my call?  I -- I needed more

15   information on -- on the school itself.  I was trying

16   to set up a time to do a tour; at that time, that

17   wasn't applicable 'cause of Corona.

18             But just trying to get more information on,

19   basically, if what -- what they provided -- what the

20   website -- I had questions about the website said.

21        Q    Okay.  And I think you testified that when

22   you called in 2022 you spoke to a secretary at Pine

23   Grove.  Did I misunderstand you or is that accurate?

24        A    Yes.  I -- I was -- first -- I first spoke

25   to a secretary.  I explained to her why I was calling,

Page 65

1    and then I was transferred.

2         Q    So you were transferred to Kim?

3         A    I -- I was transferred to -- I -- I thought

4    it was Ms. Goff I was transferred to, who explained --

5    are we talking about '21 or '22?  I'm sorry.

6         Q    No, that's fine.  I was under the same

7    confusion, so I wanted -- it's okay.  We'll get there.

8    I'm not trying to confuse you.  I thought you

9    testified that in 2022 you called Pine Grove and you

10   spoke to a secretary.  Is that accurate?

11        A    Yes, yes.

12        Q    Okay.  And do you know the secretary's name,

13   do you recall?

14        A    I don't.

15        Q    Okay.  And did that secretary provide you

16   information in 2022?

17        A    She transferred me.

18        Q    Okay.  So she transferred you, again, to Kim

19   Goff?

20        A    Yes.

21        Q    Who you had spoken to in 2021?

22        A    Yes.

23        Q    Okay.  So you spoke to Kim Goff in 2022?

24        A    2022 at Pine Grove -- I didn't know she was

25   at Pine Grove.

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 66

```
 1        Q    Okay.

 2        A    I -- when I spoke to her in '21, she was at

 3   Godman South.

 4        Q    Okay.  Okay.  Was she some sort of case

 5   manager or service provider for G.G.?

 6        A    I -- yeah, she was his case manager.

 7   It's -- it's on -- I'm not -- I'm not exactly sure,

 8   but it's -- it's on paper.

 9        Q    Okay.  All right.  Sure.  So I think you

10   testified during the due process hearing that you

11   found out about Pine Grove through its website?

12        A    Yes.

13        Q    Okay.  And do you recall, roughly, year when

14   you first looked at the website?

15        A    '21, '22.

16        Q    Okay.  And your preference -- you testified

17   during the due process hearing -- that your preference

18   for Pine Grove was derived from what you read on the

19   website.  Is that correct?

20        A    Yes, yes.

21        Q    Okay.  So when you looked on the website,

22   had you talked to Kim Goff before that?

23        A    I -- yes.  I -- I called and that's in --

24   I -- I asked questions about what -- what the program

25   offered; I spoke about what I had seen on the website.
```

Page 67

1    They spoke nicely about, you know, what they offered,

2    but told me I had to go through the property channels.

3        Q    Okay.  Now, you also testified here today

4    that you learned about Pine Grove from a colleague who

5    had a family member who worked at Pine Grove?

6        A    Yes.

7        Q    Do I understand that correctly?

8        A    Yes.

9        Q    Okay.  Who was the family member of Colleen

10   Schneider that worked at Pine Grove?

11       A    I don't remember.

12       Q    Okay.  And I understood your testimony here

13   today that you were looking to Pine Grove because you

14   believed it would have a restrictive educational

15   environment?

16       A    Yes.  More structure; what -- what he needed

17   and what was suggested by the doctor was provided --

18   everything that was listed from the doctor's

19   suggestions was -- was on the website.  So I was

20   excited about -- yeah, him going there.

21       Q    What do you mean by "restricted"?  What was

22   missing at Kelloggsville that you wanted from Pine

23   Grove?

24       A    When he -- okay.  So when he was at Godwin

25   South, he was in the ECSE program.  There was only

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 68

1  four children in that classroom and they had two to

2  three teachers.  It was very hands-on and very

3  structured, and he excelled.  And that's what I mean

4  by "restrict" -- more restrictive: more hands-on, one-

5  on-one care.

6      Q    Okay.  When he was at Godwin South, did G.G.

7  have a one-to-one adult assigned to him at all times?

8      A    No.

9      Q    When he was at Kellogg, did he have a one-

10  to-one adult assigned to him specifically at all

11  times?

12      A    He -- no.

13      Q    Okay.  So going from Godwin South to

14  Kellogg, was it the number of kids in the classroom or

15  the number of teachers in the classroom that you were

16  dissatisfied with?

17      A    Both.

18      Q    Okay.  How many kids were in this -- the

19  program -- at Kelloggsville?

20      A    I believe it was 12, 11 to 12 children.

21      Q    Okay.  And how many teachers were in the

22  classroom?

23      A    Two.

24      Q    Two, okay.  So there's a higher student-

25  teacher ratio?

Page 69

1        A     Yes.

2        Q     Okay.  And you found that that was -- how

3    did G.G. respond in that environment based on your

4    personal observation?

5        A     Very hyperactive, stimmed for -- it was

6    reported "stimmed for hours before decompression,"

7    just to start.

8        Q     Okay.  You testified that if Pine Grove's

9    program exists -- and you talked about what you

10   thought it was -- can you elaborate on what you

11   thought Pine Grove had that you found desirable,

12   beyond just the structure that you read on the

13   website?

14       A     Just the level of -- of time that -- and on

15   the website, it -- it explained that there was -- that

16   they went from the age of K-12 to the age of 26.  So

17   that -- that was refreshing to know that I would have

18   help with adult, when he -- as he -- as he

19   transitioned.

20             The -- the layout of what was presented on

21   the website seemed -- it -- it seemed like he had more

22   options with growth, pretty much.  I looked at it like

23   it could blossom into other things and I could get

24   more support for him.

25       Q     When you say "layout," do you mean the

Page 70

1  physical layout of the building or the layout of the

2  programs as they progressed in age?

3      A    The layout of the program as it progressed

4  and what the website presented.

5      Q    Did you learn on the website anything about

6  the student-teacher ratio in any program?

7      A    No, not on the website.

8      Q    So if your preference was for a lower ratio

9  than was occurring at Kelloggsville, what indicated to

10 you via the website that you could achieve that at

11 Pine Grove?

12     A    Because they -- it listed on the website

13 that it was an option for one-on-one care and for

14 specific -- a little more -- there was more options.

15 They seem very guided and behavioral -- the aspect

16 of -- of things.

17     Q    When you say "more options," can you be more

18 specific on that?  I just don't know what the word

19 "options" in your mind is.  It's just --

20     A    More -- more options on -- on-site with

21 care.  So -- and they had an AB -- a BCBA and ABAs on

22 staff there.  So that -- I noticed that was, like,

23 a -- a big difference with different -- different

24 sites and --

25     Q    Okay.  Thank you.  I just wanted to know

Page 71

```
 1   what "options" meant in your mind.  We all have

 2   different ideas of what things we -- so at

 3   Kelloggsville, was there not a BCBA or ABA services

 4   available to G.G.?

 5        A    No.

 6        Q    Okay.  That wasn't part of his IEP at that

 7   time?

 8        A    It was not an option.

 9        Q    Not an option how?  What do you mean "not an

10   option"?

11        A    Kelloggsville said that was not an option.

12        Q    Okay.  So they decided he didn't need those

13   services?

14        A    Yes.

15        Q    Okay.  Do you know if they had a BCBA or an

16   ABA on its staff within its district?

17        A    I do not know.

18        Q    Okay.  Do you know if Kelloggsville -- do

19   you know whether -- let me re-say that, because

20   otherwise I have a big, huge, long sentence.  Do you

21   know that if Kelloggsville -- do you know whether

22   Kelloggsville would've been able to provide those

23   services if it found that G.G. needed them?

24        A    I do not.  I do not know.

25        Q    Okay.  So let's take a hypothetical.
```

Page 72

1   Kelloggsville says, "We think G.G. needs BCBA and ABA

2   services."  Would they have been able to provide that

3   to him if they reached that determination?

4               MS. ABDNOUR:  Objection.  Calls for

5   speculation.

6               You can answer if you know the answer.

7               THE WITNESS:  It -- it was not given an

8   option from Kelloggsville.  Kim Fontaine said that was

9   not an option.

10  BY MR. COMSTOCK:

11      Q    Okay.  Thank you.  I think you also

12  testified that, at some point, you were told that

13  things were not as the Pine Groves website says.  Do

14  you remember that?

15      A    Yes.

16      Q    Okay.  What did you find out that was not

17  like what the website said?

18      A    During court with the district, I found out

19  that -- that it wasn't for what the website referred

20  to.  It was for behavioral children -- older children

21  with behavioral issues.

22      Q    It wasn't for older children with behavioral

23  issues?

24      A    It was for children, older children, with

25  behavioral issues.

Page 73

1      Q    And you learned that through testimony at
2    the due process hearing?
3      A    Yes.
4      Q    Okay.  And so to you, that meant Pine
5    Grove -- after you heard that testimony, if I
6    understood you correctly -- Pine Grove was not a great
7    fit for G.G. in your mind?
8      A    They said that it was too dangerous for him
9    to go.
10      Q    Who's "they"?
11      A    Kim Fontaine.
12      Q    Oh, okay.  That's from Kelloggsville?
13      A    Yes.
14      Q    Okay.  And she said that at the due process
15    hearing?
16      A    Yes.
17      Q    Did anyone from Pine Grove who testified at
18    the hearing say that?
19      A    I -- I don't remember.
20      Q    Okay.  So after the due process hearing, did
21    you learn more about Pine Grove?
22      A    Yes.
23      Q    Okay.  When did you do that?
24      A    I just -- on my personal time.
25      Q    Through the website?

Page 74

1       A    Yes, through -- through the website; through
2   talking to -- to people.
3       Q    Who did you talk to?
4       A    I didn't -- I really didn't talk to -- I --
5   I called my -- my friend, spoke -- spoke to them about
6   it.  They gave me suggestions.  I just talked to -- I
7   talked to Colleen about what, you know, I was told
8   that it was now; she -- she was unaware, as well.
9       Q    Okay.  So you just used the word "friend"
10  and then Colleen.  Is Colleen the same as your friend?
11      A    Colleen is the -- is -- is my -- she is my
12  friend.  She is the receptionist at my job, and her
13  family member worked for Pine Grove, so.
14      Q    Okay.  So when you just said you "talked to
15  a friend" and you "talked to Colleen," is the friend
16  the family member of Colleen?
17      A    No, it is Colleen.  I'm sorry.
18      Q    Okay.  So friend and Colleen are the same
19  thing?
20      A    Yes.  I'm referring to her as a friend.  I'm
21  sorry.
22      Q    No, no.  You don't have to be sorry at all.
23  That's why we're here.  Just ask some questions, make
24  sure we're all clear.  You're doing great; no problem
25  at all.  Either before or after speaking with Kim

Page 75

1    Goff, did you send any documents related to G.G. to
2    anyone at Pine Grove?
3         A    No.  I -- I, after -- no, she told me to go
4    through the proper channels, so.
5         Q    Okay.  So you've never taken the initiative
6    to send, like, an IEP or anything like that to Pine
7    Grove?
8         A    I -- I may have sent it -- I may have sent
9    his information through email, but after being told
10    that's not the proper way to do it, I --
11        Q    Besides an email to Kim Goff, do you have
12    any other emails to anyone at Pine Grove?
13        A    No.
14        Q    Do you have any emails to anyone else at
15    Kent ISD?
16        A    No.  No, I don't remember.
17        Q    You testified at the due process hearing
18    that you didn't think Pine Grove could offer anything
19    academically that was greater than what G.G. was
20    receiving at Kelloggsville.  Is that accurate?
21        A    I don't understand.
22        Q    Sure.  You testified at the due process
23    hearing that you didn't -- and I'm asking for
24    clarification -- my understanding is your testimony
25    was that you did think Pine Grove could help G.G.

Page 76

1    academically?

2         A    I did or didn't?

3         Q    You did not.  Is that accurate?

4         A    I -- I did think that they could help him

5    academically.

6         Q    Okay.

7         A    But I thought the website showed promise.

8         Q    I want to switch gears to just a couple

9    questions about Thrive.  When G.G. has been enrolled

10   at Thrive, did he have a one-to-one adult assigned

11   specifically for him?

12        A    Yes.

13        Q    Okay.  And when did that get assigned?

14        A    From -- from the beginning of school year.

15   When he started with Thrive, things were set up

16   with -- through PBS at the time, 'cause that's who I

17   had as ABA, and he was unable to get into BAWMi

18   because of short notice.

19        Q    Okay.  I'm going to break that down.

20        A    I'm sorry.

21        Q    No, no, you don't -- never be sorry.  You're

22   doing fine.  We've never met each other, and so part

23   of the process is just understanding each other.  So I

24   just want break that down a little bit.

25             So my question was, did he have a one-to-one

Page 77

1   adult?  And I want make sure you're clear on what I'm

2   saying.  Did Thrive assign an adult to be within arm's

3   reach of G.G. at all times during the day while he was

4   in attendance at school?

5        A    Did -- did "they" assign?

6        Q    Thrive.

7        A    Yes.

8        Q    Okay.  Do you know that person's name?

9        A    Well, they didn't -- okay.  We -- they had

10  an outside -- we had PBS.  They had PBS come in and do

11  the one-on-one for Thrive, so they had an agreement

12  with PBS.

13       Q    Okay.  Now again, this is just making sure

14  we're on the same wavelength.  When you say "one-to-

15  one," do you mean that PBS contracted with Thrive to

16  have an adult be always present next to G.G. during

17  the day when he was in attendance at school?

18       A    Yes.

19       Q    And it wasn't just to provide ABA services?

20       A    No.

21       Q    Okay.  When I was looking at the annual

22  student plan for Thrive for that school year '23-'24,

23  I didn't see that as a service.  Is that something

24  else?  Was that just the service they gave you just

25  because, or was it not part of this annual plan?

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                     586-468-2411
                                                                     www.veritext.com

Page 78

1        A    I'm not --

2                MS. ABDNOUR:  I'm going to object.

3    Objection.  Calls for speculation.

4                Answer if you can.

5                THE WITNESS:  I'm not -- I'm not sure I

6    understand.

7    BY MR. COMSTOCK:

8        Q    Sure.  If you want to look at the Exhibit

9    Number 1, if you go to the bottom of page 1 into page

10   2, it says "Current services," and then you flip it

11   over and then at the top has some services there.  I'm

12   not seeing one-to-one aid or one-to-one assignment.

13   That's why I'm asking.

14       A    The other, it says the -- the ABA

15   positive -- PBS, positive behavioral support.  That

16   was the ABA that they provided the one-on-one.  I'm

17   not sure if like, if -- if I'm understanding your

18   "one-on-one," what --

19       Q    Sure.  Let me try and give you some

20   background.  As I understand it -- and I'm not in the

21   schools on a day-to-day basis -- a one-to-one that is

22   provided as a support or service through an IEP or a

23   504 plan or some other support plan would be, for

24   example, if you were one-to-one to me, you would

25   always be near me during the day in class.

Page 79

1          You would always be next to me; you'd be

2     assisting me with all the needs I have.  That's what I

3     mean by one-to-one.

4          A    Okay.

5          Q    With that explanation, did PBIS provide a

6     one-to-one aide to G.G. while he was enrolled at

7     Thrive?

8          A    Yes.

9          Q    Okay.  But you don't know the name of that

10    person

11         A    For PBS?  Yes, I do know.

12         Q    Oh, who's that?

13         A    Her -- my brain has gone totally blank.  Oh,

14    my goodness.  I know Stephanie Call was his ABA, and

15    his VCBA, I can't remember her name.  This is crazy.

16    I don't remember.

17         Q    Okay.

18         A    If it comes to me, I'm --

19         Q    Yeah, that's fine.  We can ask questions

20    later through written questions.  That's fine.  At

21    Thrive, in his classroom, do you know what the adult-

22    student ratio was?

23         A    Thrive?

24         Q    The first year he was enrolled there?

25         A    I -- I don't remember.

Page 80

1      Q    Okay.  This past school year, do you recall

2  what the student-teacher ratio was?

3      A    I don't remember.  I know that it's --

4      Q    Okay.

5      A    Cool.

6      Q    Okay.  And during this past school year --

7  well, let me strike that.  I'll look here at the

8  document to see.  If we go to the Exhibit Number 2.

9  And again, if you look on page 2 in the box that's

10  labeled "Current services," and if we look at "Other,"

11  I don't see that same positive behavior supports

12  there.  Did G.G. have a one-to-one person assigned to

13  him through PBIS?

14      A    Yes.  Not through PBS; at that time, we were

15  able to get BAWMi to do it.

16      Q    Okay.

17      A    So PBS does in-home.

18      Q    Okay.  "PBS does in-home."  What does that

19  mean?

20      A    PBS will come to the home twice a week,

21  short periods, to do ABA with G.G.  So they just do it

22  in the home.  So it was, like, two hours a day.

23      Q    And so, is that what they did in the '23-'24

24  school year, as well or did they --

25      A    No, they went -- the '23 -- '23, they were

Page 81

```
 1    on -- at Thrive.  This is something new that -- yes.
 2         Q    Okay.  So this past school year, '24-'25,
 3    BAWMi, which is Behavior Analyst of West Michigan, had
 4    a one-to-one aide or person adult assigned to be with
 5    G.G.?
 6         A    Yes.
 7         Q    At all times, in his classroom?
 8         A    Yes.
 9         Q    Okay.  Also looking at Exhibit 2, the first
10    box on page 1 -- or actually the biggest box on page
11    1, do you see towards the bottom of it, it says
12    "Initial testing date"?
13         A    Yes.
14         Q    Okay.  And it says "9/26/24"?
15         A    Yes.
16         Q    Okay.  Who did that testing?
17         A    I -- I believe that was done by BAWMi.
18         Q    Okay.  Okay.  You're not sure as you sit
19    here today?
20         A    BAWMi did -- we -- I was not able to get
21    one-on-one from BAWMi, but I was still able to use
22    BAWMi services through insurance.
23         Q    Okay.
24         A    So BAWMi helped, did the mental health
25    aspect, the autism aspect.
```

Page 82

1      Q    Okay.  So you're thinking in September of

2   last year, BAWMi did some mental health testing?

3      A    Evaluations and such was done, I believe.

4      Q    Okay.  Okay.  And then, it also shows there

5   at the bottom that you're going to have an evaluation

6   done in a couple months here in September.  Is that

7   correct?

8      A    Yes.

9      Q    Okay.  And who's going to be doing that?  Is

10  that NPSP?

11     A    Yes.

12     Q    Do you know what NPSP stands for?

13     A    I do not know.  I was told that it will

14  include Thrive, BAWMI, and Kentwood Public schools.

15     Q    Okay.  And just to confirm your testimony,

16  you have not personally toured Pine Grove?

17     A    No.

18     Q    Okay.  Going back a little bit in time, do

19  you recall an IEP meeting with Kelloggsville around

20  May 10, 2023?

21     A    Yes.

22     Q    Okay.  And based on records that I've seen,

23  one of your attorneys, Mr. Matthew McCann, was in

24  attendance with you?

25     A    Yes.

Page 83

```
 1        Q    Okay.  Given that you had information that
 2   you needed Kelloggsville to refer G.G. to Pine Grove,
 3   did you ask your attorney to invite anyone from Pine
 4   Grove to be at that IEP meeting?
 5        A    Yes.
 6        Q    You did?
 7        A    Yes.
 8        Q    Okay.  And did he do that?
 9        A    He tried.
10        Q    Okay.  Do you know who he talked to?
11        A    Kim Fontaine.
12        Q    Okay.  But he didn't talk to any person
13   employed by Pine Grove or Kent ISD?
14        A    No.
15        Q    Okay.  While G.G. has been at Thrive, have
16   you asked Thrive to refer G.G. to Pine Grove?
17        A    No.
18        Q    Have you asked Kentwood to refer G.G. to
19   Pine Grove?
20        A    No.
21        Q    Why not?
22        A    Just, basically, 'cause they said it was
23   unsafe.
24        Q    An employee of Kentwood told you it was
25   unsafe?
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 84

1        A    No.  Kim Fontaine, after her -- her
2    statement and what was found in -- in court.
3        Q    So based on Kim Fontaine's testimony during
4    the due process hearing you still, today, believe that
5    Pine Grove is unsafe for your son, G.G.?
6        A    Yes.
7        Q    Okay.  Are you currently asking, through
8    this lawsuit, to have your son become enrolled at Pine
9    Grove?
10               MS. ABDNOUR:  Objection.  Calls for
11    speculation as to what's stated in the lawsuit.
12               If you can answer, if you can.
13               MR. COMSTOCK:  Well, let me ask a
14    different question.
15               MS. ABDNOUR:  I get what you're
16    getting, yeah.
17    BY MR. COMSTOCK:
18        Q    Are you asking for G.G. to be enrolled in
19    Pine Grove as a remedy for your current lawsuit?
20        A    No.
21        Q    Okay.  Do you want G.G. to attend Pine Grove
22    at any point in the future?
23        A    If it's safe.
24        Q    Okay.  What do you mean by "safe"?
25        A    From -- from the district court, and being

Page 85

1   told that it was unsafe, and the ISD person backing up

2   her statement saying it was unsafe, it made me change

3   my view on.  So if -- if I knew it was -- if it -- if

4   I knew it was -- if it was safe, it would be a great

5   place for him, if it was actually what was presented.

6        Q    So I just want to break down that response

7   just for a second.  You said "case on the district

8   court," which I think you mean the due process

9   hearing?

10       A    Yes.

11       Q    Okay.  And you said "what the ISD person

12   said"?

13       A    Yes.

14       Q    Can you tell me who that ISD person is?

15       A    I don't remember his name.

16       Q    Oh, someone who testified?

17       A    Yes.

18       Q    Okay.  All right.  Since you believe that at

19   the time, in '22-'23 up until now, that Pine Grove is

20   unsafe for your son, G.G., what harm has Kent ISD

21   caused you?

22       A    A lot of emotional -- a lot of emotional

23   stress, and I -- I have a stomach disorder.  When I

24   get stressed, I -- it gets bad.  So a lot of -- a lot

25   of worry, a lot of anxiety.

Page 86

1      Q    Well, let me switch gears then.  Is G.G.
2  progressing at Thrive?  Are you happy with what he's
3  doing at Thrive?

4      A    Yes.

5      Q    Okay.  So that doesn't lead to any stress?

6      A    No.

7      Q    Okay.  And he's advancing in his skills in
8  your estimation?

9      A    Yes.

10     Q    Okay.  And he's making progress in his
11 behaviors while he he's at Thrive?

12     A    Yes.

13     Q    And he's safe at Thrive?

14     A    Yes.

15     Q    Okay.  So going back to my earlier question,
16 if all those things are true at Thrive, what harm has
17 Kent ISD caused you by not having him enrolled at Pine
18 Grove?

19     A    What harm have they caused me?

20     Q    Yeah.

21     A    Stress of -- of worrying about if he was
22 going to be there at Kelloggsville.  I -- like,
23 myself -- just, like, mental -- mental stress and
24 frustration of not -- of -- of not knowing and not
25 really getting any clear answers from --

Page 87

 1          Q    Okay.  And do you believe that lack of clear
 2    answers was Kent ISD's fault or Kelloggsville's fault
 3    in terms of what information Kelloggsville was giving
 4    you?
 5          A    Both.
 6          Q    Okay.  How did Kent ISD not give you answers
 7    if you never reached out to them?
 8          A    About -- "reached out"?  I'm -- I'm not sure
 9    what you mean.
10          Q    Sure.  So your lawsuit basically says that
11    Kent ISD has harmed you in some way.
12          A    Yes.
13          Q    And from your testimony, what I understand
14    is that you're asserting that you spoke with one
15    person, a Kim Goff, who said you needed to go through
16    the proper protocols of having Kelloggsville refer
17    G.G. to Kent ISD's Pine Grove program.  Is that
18    correct?
19          A    Yes.
20          Q    Okay.  So given that that's what your
21    understanding was, when Kelloggsville decided to
22    assign and place your son at their ASD program, that
23    wasn't Kent ISD'S decision; was it?
24          A    No, it -- it was Kent ISD'S decision.
25          Q    Okay.  Was Kent ISD at that IEP meeting in

Page 88

1    May of 2023?
2         A    No.
3         Q    Okay.  So if they weren't at the meeting,
4    how could they make a decision?
5              MS. ABDNOUR:  Objection.  Calls for
6    speculation.
7              You can answer if you know the answer.
8              THE WITNESS:  They said during court
9    that they had agreed with Kelloggsville's decision,
10   so.
11   BY MR. COMSTOCK:
12        Q    You think there's testimony at the due
13   process hearing that they agreed with Kelloggsville's
14   decision at the May 2023 IEP?
15        A    Yes.
16        Q    Okay.  So based on that, are you asking Kent
17   ISD -- what are you asking Kent ISD to do as a remedy
18   to your lawsuit?
19        A    If there's -- give more options to other
20   placements; I understand that after a certain age, I'm
21   going to have to find a proper placement for -- for
22   G.G.  I'm asking for more options other than what was
23   presented to me.
24        Q    By Kelloggsville?
25        A    And Kent ISD.

Page 89

```
 1      Q    Okay.  And I just want to make sure we're
 2  clear.  At the May 2023 IEP, was there a
 3  representative from Kent ISD in that meeting?
 4      A    No.
 5      Q    Okay.  So they didn't offer you any options
 6  because they weren't present; correct?
 7      A    Yes.
 8      Q    Okay.  And they weren't present because you
 9  didn't invite them?
10      A    No.
11      Q    No, you did invite them; or no, they weren't
12  present?
13      A    They were asked if they would want to be
14  present and they chose not to be present.
15      Q    Okay.  Who asked them to be present?
16      A    My attorney, Matt McCann.
17      Q    Okay.  I thought you just testified that
18  Matt asked Kim?
19      A    Yes.  If they would like to be present and
20  Kim said that they chose not to be present.
21      Q    Okay.  So were you present for that
22  conversation?
23      A    Yes.
24      Q    Okay.  Kim said something to the effect that
25  Kent ISD told her that they would not be present?
```

Page 90

1      A    I don't remember exactly what -- how it was

2  said, but it was said the offer was extended, or the

3  invitation was extended, but they chose not to.

4      Q    And so, what you'd like to see from Pine

5  Grove, through Kent ISD's Pine Grove program, is more

6  options for G.G. when he ages out of Thrive?

7              MS. ABDNOUR:  Objection.

8  Mischaracterizes testimony.

9              You can answer if you can.

10             THE WITNESS:  No, I -- it's not just

11 leading up to the age.  If -- if there was another

12 option -- if there was a much better option for G.G.

13 through Kent ISD -- which we were not given -- I -- I

14 would consider.

15 BY MR. COMSTOCK:

16     Q    So I think I'm confused -- and it's just

17 probably me -- by your use of the word "option."  So I

18 just want to make sure I understand.

19     A    Other placement -- other placement for

20 what -- what his needs -- where his needs could be

21 met.

22     Q    Are his needs being met at Thrive?

23     A    Yes.

24     Q    Okay.  So even though his needs are being

25 met at Thrive through your lawsuit, you're asking Kent

Page 91

1    ISD to consider other placements for G.G.?

2         A    Yes.

3         Q    And what placement is it that you prefer or

4    want Kent ISD to offer you?

5         A    More options of -- of restricted -- more

6    restrictive care -- or how they refer to it at LRE,

7    more -- more of this center-based that's based on his

8    specific needs.  That's what I mean by that.

9              So more structure; right now he's at private

10   school and they are accommodating to him.  Have he --

11   if he was in a more of a setting that was catering to

12   his specific needs, would I choose that over private

13   school and what they can get?  Absolutely.

14        Q    What are the specific needs that Thrive is

15   not meeting that you believe Pine Grove can meet?

16                  MS. ABDNOUR:  Objection.

17   Mischaracterizes testimony.

18                  You can answer if you can.

19                  Can we go off the record for a minute?

20   I'm not trying to mess with you.

21                  MR. COMSTOCK:  Mischaracterization

22   of --

23                  THE REPORTER:  You want me go off

24   record?  We're off the record at 1:13 p.m.

25                  (Off the record.)

Page 92

1                    THE REPORTER:  We are on the record.

2        It is now 1:15 p.m.

3        BY MR. COMSTOCK:

4            Q    So L.G., is there anything that Thrive is

5        not providing to G.G. that you want Pine Grove to

6        provide?

7            A    No.

8            Q    Okay.  So if Thrive is giving you everything

9        you need, why do you want Pine Grove to accept G.G.

10       into its program?

11                    MS. ABDNOUR:  Objection.

12       Mischaracterizes testimony.

13                    MR. COMSTOCK:  Does not.

14       BY MR. COMSTOCK:

15           Q    Please proceed.

16                    MS. ABDNOUR:  It does, but answer if

17       you can.

18                    THE WITNESS:  Can you ask me the

19       question again?  I'm not sure.

20       BY MR. COMSTOCK:

21           Q    Okay.  Your testimony, as we just read back,

22       is that if Pine Grove could offer a more restrictive

23       LRE for G.G., tailored to his specific needs, you

24       would consider that.  Do you agree with that summary?

25           A    Yes.

Page 93

1      Q    Okay.  So I'm asking on the phrase "specific
2    needs," what exactly are you referring to that you
3    would consider at Pine Grove?
4      A    Everything that was on the website that was
5    supposed to be there.  The -- the more focus on -- on
6    the -- the autism as much as focusing on his
7    education; the elements of what I thought was supposed
8    to be there at Pine Grove.
9      Q    Okay.  And what you just testified to, is
10   that not available at Thrive?
11     A    No, there's different program.  The --
12   Thrive is a different program than --
13     Q    So is your testimony that Thrive is
14   deficient in its provision of services, programs, or
15   academics to G.G.?
16     A    No.
17     Q    Okay.  Well, I'm confused now.  You want
18   Pine Grove because it offers something that's not
19   available at Thrive.  Is that your testimony?
20     A    Specializes more -- more in, like -- more
21   special -- the -- the point that Pine Grove
22   specializes in autism and what the website offers
23   would be a better -- would be more likely an option if
24   available for G.G.'s specific needs.
25     Q    Okay.  Does Thrive offer services and

Page 94

1    programs for autism?

2         A    Yes.

3         Q    Okay.  What about Thrive's Autism program is

4    deficient?

5         A    Nothing.

6         Q    Okay.  So if nothing is deficient about

7    Thrive's autism program, what does Pine Grove offer

8    you that's more specialized or catering to G.G.'s

9    needs?

10        A    The difference would be that I wouldn't have

11   to move him after -- after a certain age group; it

12   would be just a straight, cohesive education versus

13   me, I'm trying to avoid having to figure things out as

14   he ages out.

15        Q    Okay.  And when would he age out of Thrive's

16   programs?

17        A    In 8th grade.

18        Q    Okay.  And so you're concerned about where

19   he might go after 8th grade?

20        A    Yes.

21        Q    And you see the K through 26 age range at

22   Pine Grove as helping with those decisions?

23        A    I don't know anything about Pine Grove right

24   now.

25        Q    But based on its website that it provides

Page 95

```
 1   services to someone up to age 26, that is attractive
 2   to you?
 3       A    And the other things that are listed on the
 4   website, yes.
 5       Q    Correct.  Granted, we talked about that.
 6       A    Yes.  Yes.
 7       Q    So you're looking for a continuity where
 8   G.G. can stay from 8th grade to 9th grade to 10th
 9   grade, all the way up to age 26?
10       A    Yes.
11       Q    If that was appropriate for him?
12       A    Yes.
13       Q    Okay.  Thank you.  I think I understand your
14   interest in Pine Grove now.  Thank you.  And so
15   returning to one of my prior questions, can you
16   articulate what the harm is that Kent ISD caused you
17   and G.G.?
18       A    The harm that they caused me and G.G. was
19   the delay of his care by ignoring his diagnosis and
20   delaying testing and proper protocol that has had --
21   have things happen from that, you know, setbacks that,
22   you know, we're still -- still working on.
23       Q    Are you referring to setbacks in G.G.'s
24   skill growth and progression?
25       A    In skill growth, in -- in progression and --
```

Page 96

1   yes.

2        Q    Okay.  So you believe that if G.G. had been

3   enrolled in and participated in Pine Grove at the

4   start of the '23-'24 school year till now, he would've

5   advanced further in his skills?

6        A    Yes.

7        Q    And you're speculating on that that would be

8   accurate?

9        A    Yeah, I mean if -- if -- yeah.

10       Q    Okay.  Are you seeking any monetary damages,

11  any amount of money that you want Pine Grove, Kent ISD

12  to pay you through this lawsuit?

13       A    Yes.

14       Q    How much is that?

15       A    I don't know.

16       Q    Okay.  Are you looking for Kent ISD to

17  reimburse you for any costs associated with G.G.'s

18  attendance at Thrive?

19       A    What, his attendance?

20       Q    Yeah.  My understanding was you have to pay

21  a certain amount of money last school year in this

22  school year for G.G. to attend?

23       A    Yes.

24       Q    Are you asking Kent ISD to reimburse you for

25  those funds expended?

Page 97

1      A      Yes.

2                  MR. COMSTOCK:  Okay.  I think I'm done

3      with my questions.  Thank you.

4                  MS. ABDNOUR:  Okay.  We need, like,

5      five minutes.

6                  MR. COMSTOCK:  Yeah.

7                  MS. ABDNOUR:  Is there a place we can

8      go or do you guys mind going and we can use this

9      phone?

10                  MR. OSTROWSKI:  Yeah, we'll have to

11      leave the room.  Well, actually, there is a open

12      office right next door.

13                  MS. ABDNOUR:  Okay.  We can go over

14      there, and then -- yeah.  Just give us, like, five

15      minutes and then --

16                  MR. OSTROWSKI:  And then you're going

17      to ask a few questions?

18                  MS. ABDNOUR:  I'm going to talk with

19      her about whether I'm going to ask a few questions.

20                  MR. OSTROWSKI:  Okay.  I do have a

21      couple follow-ups after you're done.

22                  MS. ABDNOUR:  Okay.

23                  THE REPORTER:  We're off the record at

24      1:23 p.m.

25                  (Off the record.)

Page 98

1            THE REPORTER:  We are on the record.
2    It is now 1:33 p.m.
3                    EXAMINATION
4    BY MS. ABDNOUR:
5        Q    Okay.  I'm just going to refer to you as
6    "mom," so we don't use your name, if that works?
7        A    Yes.
8        Q    Okay.  You just had some questions from Mr.
9    Comstock about, you know, what you wanted from Pine
10   Grove.  What I want to ask you is -- and I know you
11   had given some testimony earlier, saying that you were
12   no longer seeking to place G.G. in Pine Grove.  What
13   do you want for G.G.?  I'm sorry, I misspoke.
14       A    I -- I want a -- a clear transition plan for
15   G.G. for when he ages out of from Thrive.  I -- I want
16   to have the options more than what I've been given
17   that's available to us right now.  I'm open to -- to
18   anything other than Kelloggsville.
19       Q    So are you open -- Mr. Ostrowski had asked
20   you some questions earlier about schools of choice.
21   If you thought schools of choice were an option,
22   another district, would you be open to that?
23       A    Yes.
24       Q    Okay.  And what about if there were other
25   options available through Kent ISD?  Would you be open

Page 99

1    to hearing about that?

2         A    Yes.

3         Q    And would you be open to maintaining him in

4    Thrive until 8th grade if that were an option?

5         A    Yes.

6         Q    But let's say other options were presented.

7    Would you be open to considering those, as well?

8         A    Yes.

9         Q    Okay.  And would you be open to having a

10   meeting with folks from Kent ISD and Kelloggsville to

11   talk through options if they were willing to do that?

12        A    Yes.

13        Q    Okay.  Do you feel like you're aware of what

14   your options are for G.G.?

15        A    No.

16             MS. ABDNOUR:  Okay.  Okay.  I don't

17   have any more questions.

18             MR. OSTROWSKI:  Okay.  I have just a

19   couple follow-ups.

20                       EXAMINATION

21   BY MR. OSTROWSKI:

22        Q    So I forgot to ask you about a special

23   education advocate.  It's my understanding you did

24   have a special education advocate?

25        A    Yes.

Page 100

1       Q    Okay.  And who was that person?

2       A    I -- I don't remember her -- her name

3   exactly.

4       Q    Okay.  So you no longer have a special

5   education advocate; is that correct?

6       A    Yes.

7       Q    Okay.  And are you seeking compensation for

8   payments made to that special education advocate?

9       A    Yes.

10      Q    Okay.  And is that person separate from your

11  attorneys, I assume?

12      A    Yes.

13      Q    Okay.  All right.  Do you know how much

14  you're seeking as compensation for the payments to the

15  advocate?

16      A    I believe I paid her for receipt for $225.

17      Q    A total of $225?

18      A    Yes.

19      Q    Okay.  And did this special education

20  advocate, did she provide services during the due

21  process hearing?

22      A    No.

23      Q    Okay.  So when did this person provide

24  services?

25      A    During IEP.

Page 101

1    Q    At?

2    A    At Kelloggsville.

3    Q    Okay.  So it was just on the one occasion?

4    A    Yes.

5    Q    All right.  So I was a little confused about

6    your testimony about autism specific programs at

7    Thrive.  So I thought, during my questioning, you said

8    that they did not offer specific autism programs, but

9    maybe I was wrong.  But then, during Mr. Comstock's

10   questions, you said that they did.

11         Does Thrive provide G.G. with specific

12   programs related to his autism?

13   A    I -- I'm not sure I understand what your --

14   what your question is.  Thrive partners with Kentwood

15   to provide the special education part of -- of -- so

16   occupational therapy and the speech therapy is done by

17   Kentwood.  The 504 plan is -- is something that is an

18   agreeance between all: BAWMi, Kentwood, and Thrive.

19   Q    Okay.

20   A    Sorry, I'm -- I'm not sure what your -- your

21   question; I'm trying to answer your question.

22   Q    Well, so there is a 504 plan currently, or

23   during the last school year at Thrive, there was a 504

24   plan in place for G.G., is that what you're saying?

25   A    For both years there was a 504.

Page 102

1        Q    Okay.  And that 504 was with Kentwood?

2        A    For the first year, it was -- the 504 was

3    just with PBS and Thrive.

4        Q    Okay.

5        A    And BAWMi was just -- I just -- I was able

6    to get him center services once or twice a week; that

7    time they had no availability.

8        Q    Okay.  Now --

9        A    The -- the second year, I'm sorry.

10       Q    Okay.  If G.G. were attending Kelloggsville,

11   would BAWMi services be available at Kelloggsville?

12              MS. ABDNOUR:  Objection.  Calls for

13   speculation.

14              Answer if you can.

15              THE WITNESS:  I don't know.

16   BY MR. OSTROWSKI:

17       Q    You don't know?  Okay.  All right.  All

18   right.  And then, when I was asking questions about

19   autism-specific programs at Thrive, you talked about

20   Kentwood providing the speech pathologist and BAWMi --

21   I'm sorry -- and an occupational therapist.  Is that

22   what you mean by "autism-specific programs"?

23       A    Yes.

24       Q    Okay.  So speech pathology and occupational

25   therapy?

Page 103

1       A    Yes.  The -- his -- the -- the special
2    therapy areas, yes.
3       Q    All right.  And, then do you consider what
4    BAWMi provides as being autism-based programs as well?
5       A    Yes.
6       Q    Okay.  And as I understand it, BAWMi is
7    providing ABA services?
8       A    Yes.
9       Q    And then they provide, I'm sorry, what other
10   services does BAWMi provide?
11      A    One-on -- one-on-one.
12               MR. OSTROWSKI:  Okay.  Okay.  I think I
13   understand now.  Those are all the follow-ups I have.
14               MR. COMSTOCK:  Nothing prompted for me.
15               MS. ABDNOUR:  I'm all good.
16               MR. OSTROWSKI:  Are we good?  All
17   right.  Thank you, L.G.  It was a pleasure meeting
18   you.
19               THE REPORTER:  We are off the record.
20   It is now 1:41 p.m.
21               (Whereupon, at 1:41 p.m., the
22               proceeding was concluded.)
23
24
25

Page 104

1              CERTIFICATE OF DEPOSITION OFFICER

2              I, TODD RASMUSSEN, the officer before whom

3      the foregoing proceedings were taken, do hereby

4      certify that any witness(es) in the foregoing

5      proceedings, prior to testifying, were duly sworn;

6      that the proceedings were recorded by me and

7      thereafter reduced to typewriting by a qualified

8      transcriptionist; that said digital audio recording of

9      said proceedings are a true and accurate record to the

10     best of my knowledge, skills, and ability; that I am

11     neither counsel for, related to, nor employed by any

12     of the parties to the action in which this was taken;

13     and, further, that I am not a relative or employee of

14     any counsel or attorney employed by the parties

15     hereto, nor financially or otherwise interested in the

16     outcome of this action.

17

18                              TODD RASMUSSEN
                        Notary Public in and for the
19                          State of Michigan

20

21

22

23

24

25

Page 105

1              CERTIFICATE OF TRANSCRIBER

2         I, PAIGE SCHWEIM, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                   PAIGE SCHWEIM

16

17

18

19

20

21

22

23

24

25