# EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D.L., et al.,

        Plaintiffs,

                                        Case No. 1:22-cv-838

v.

                                        HON. ROBERT J. JONKER

MICHIGAN DEPARTMENT
OF EDUCATION,

        Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is an action against the Michigan Department of Education (the "Department") for alleged violations of the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act (ADA).  Plaintiffs are former public-school students who were eligible for special education services, but say they were deprived of a Free Appropriate Public Education ("FAPE").  According to Plaintiffs, that deprivation was due in part to the Department's deficient complaint and enforcement procedure, which led Plaintiffs' local school district to provide them with a less-than-appropriate education. Plaintiffs therefore ask the Court to declare that the Department's procedures violate the law, award compensatory education, and issue a permanent injunction requiring the Department to amend its state-wide procedures.

The Department now moves for summary judgment, arguing that Plaintiffs' claims fail as a matter of law. For the following reasons, the Court agrees and grants the Department's motion for summary judgment.

## BACKGROUND

Plaintiffs are former students at Kalamazoo Public Schools ("KPS"). After receiving what they believed to be inadequate education, Plaintiffs filed state complaints and requests for due process hearings against their school district to provide them with a FAPE. Each of the individual plaintiffs say they encountered unique obstacles and received varied services from their educational providers. But all proceedings ultimately concluded with plaintiffs entering into settlement agreements with their school district, under which they received compensatory education or a compensatory education fund. The following sections detail each individual Plaintiff's story.

### I. PLAINTIFF BUSH

Plaintiff Bush began experiencing behavioral issues in 2017, while enrolled at a KPS middle school. (ECF No. 86-48, PageID.2223 (H.B. Dep. 21:2–21:8)). These issues led to Bush's placement in KPS's Alternative Learning Program ("ALP") for her sixth, seventh, and eighth grade years. (*Id.* at 17:20–17:23). Despite her placement in ALP, and despite numerous behavior-related suspensions, KPS did not evaluate or identify Bush as a student with a potential disability. (ECF No. 86-35, PageID.2156). In July of 2019, Bush was diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD). (ECF No. 80-41, PageID.823). In September of the same year, an advocate filed a complaint against KPS on Bush's behalf, alleging that KPS failed to provide Bush with a FAPE. (ECF No. 80-44, PageID.854).

Two months later, the Department issued a written decision finding that KPS had reason to suspect that Bush was a student with a disability and was therefore obligated to evaluate Bush's eligibility for special education services. (ECF No. 86-35, PageID.2156). The Department issued Corrective Action Plans ("CAPs") requiring KPS to evaluate Bush's special education needs and develop an Individualized Education Program (IEP), if necessary. (*Id.*, PageID.2159–2160). If eligible for special education services, the Department further ordered KPS to provide 32 hours of compensatory services addressing Bush's "social-emotional/behavioral and academic needs." (*Id.*, PageAID.2160). Beyond fulfilling its obligations to Bush, KPS was ordered by the Department to revise its procedures for identifying, locating, and evaluating students suspected of having a disability—otherwise known as its "Child Find" procedures. (*Id.*) And KPS was required to provide professional development regarding the revised procedures. (*Id.*)

In October of 2019, while the state complaint process was underway and prior to the Department issuing the above-described decision, KPS evaluated Bush's eligibility for special education services. (ECF No. 80-45, PageID.857). The Multidisciplinary Evaluation Team ("MET") determined that Bush did not suffer from a specific learning disability or cognitive impairment under the Michigan Administrative Rules for Special Education ("MARSE"). (*Id.*, PageID.871–873); *see also* MICH. ADMIN. CODE R. 340.1701–340.1717. Although Bush had been diagnosed with ADHD, the team determined that she did not qualify for an "other health impairment" under the Rules because her behavioral issues were consistent with her ODD diagnosis, not with a lack of impulse control or hyperactivity. (*Id.*, PageID.874). Similarly, the team determined that Bush's behavioral incidents were not the result of an emotional impairment under the Rules because they were intentional, and therefore consistent with social maladjustment instead. (*Id.*, PageID.875–876). In light of these determinations, the MET ultimately

3

recommended "that an Individualized Educational Planning Committee be held to share [the team's] report and make an appropriate plan" for Bush, but that Bush "does not qualify for special education services." (*Id.*, PageID.876–877). When Bush's mother submitted a request for a special education evaluation in January of 2020, KPS relied on this report in denying her request. (ECF No. 86-49, PageID.2230). Bush's behavioral issues continued.

In January of 2021, Bush's advocate filed yet another state complaint on Bush's behalf, this time against her intermediate school district, the Kalamazoo Regional Educational Service Agency (KRESA). (ECF No. 80-49, PageID.887). At the time of that complaint, Bush was attending KRESA's juvenile onsite day school after having been expelled from her local school. (ECF No. 80-43, PageID.839). Two months later, the Department issued a written decision finding that KRESA had reason to suspect that Bush was a student with a disability and was therefore obligated to evaluate Bush's eligibility for special education services. (*Id.*, PageID.848). The Department noted that guidance developed after KPS's 2019 evaluation of Bush prohibited "use of tools which purport to differentiate between social maladjustment and emotional impairment . . . to rule out eligibility in special education determinations." (*Id.*, PageID.847). And it remarked that KRESA's failure to conduct the requisite evaluation was due in large part to "inconsistency of staff training and understanding regarding who was 'allowed' to request an evaluation of special education services and the lack of organization of the IEP Process for [Bush]." (*Id.*, PageID.848). The Department therefore issued CAPs requiring KRESA to evaluate Bush's special education needs and develop an Individualized Education Program (IEP), if necessary. (*Id.*, PageID.850). If eligible for special education services, the Department further ordered KPS to provide 45 hours of compensatory education addressing Bush's "social, emotional, behavioral, and academic

needs." (*Id.*). As with KPS, the Department finally ordered KRESA to revise its Child Find procedures. (*Id.*)

In May of 2021, KRESA's MET recommended that Bush "become Eligible [sic] for special education services under Other Health Impartment (OHI) . . . ." (ECF No. 80-52, PageID.920). On the same date, Bush received an IEP. (ECF No. 80-53). Nevertheless, Bush filed a complaint and request for due process hearing against KPS, KRESA, the Department, and State Superintendent Michael Rice in February of 2022. (ECF No. 80-55). The Administrative Law Judge (ALJ) assigned to the complaint dismissed Bush's claims against the Department, Rice, and KRESA on the grounds that, "[t]here is nothing in IDEA or the implementing regulations that provide authority for [the ALJ] to hear disputes regarding the manner in which [the Department] conducts a State Complaint investigation, the results of any such investigation, or the manner in which [the Department] or a county intermediate school district supervises [local education agencies]." (ECF No. 86-50). And on August 10, 2022, Bush entered into a settlement agreement with KPS, under which KPS agreed to provide Bush with: (1) a $6,000 compensatory education fund to pay for privately-obtained services by an individual certified with the Department, (2) a comprehensive evaluation followed by an IEP Team meeting, (3) a Functional Behavior Assessment and review of Bush's Behavioral Intervention Plan (BIP), and (4) $30,000 in attorneys' fees and costs. (ECF No. 81-2, PageID.1103–1104).

## II.   PLAINTIFF SHEPHERD-FRIDAY

Plaintiff Shepherd-Friday suffers from sickle cell disease, a painful, chronic illness that requires frequent hospitalization. (ECF Nos. 86-53, 86-54, 86-55). In May of 2017, KPS issued Shepherd-Friday a Section 504 plan, providing her with numerous accommodations in relation to her illness. (ECF No. 80-18, PageID.641–643). But though Shepherd-Friday failed the substantial

majority of her classes during the 2016-27 school year, (ECF No. 86-56, PageID.2291), and though she also had a history of behavioral incidents resulting in suspension, (ECF No. 86-57, PageID.2294), KPS did not evaluate Shepherd-Friday's eligibility for special education services, (ECF No. 80-19, PageID.652). Plaintiff Shepherd-Friday continued to receive poor marks in the 2017-18 and 2018-19 academic years. (ECF No. 86-56, 2291). For each of these academic years, Shepherd-Friday was enrolled as a ninth-grade student. (*Id.*) For the 2018-19 academic year, she was enrolled in KPS's ALP. (ECF No. 80-19, PageID.649).

On September 18, 2019, Shepherd-Friday enrolled in Comstock Public Schools (CPS). (ECF No. 80-26, PageID.691). Less than one month later, an advocate filed a complaint against KPS on Shepherd-Friday's behalf, alleging that KPS failed to provide Bush with a FAPE in the least restrictive environment. (ECF No. 80-22, PageID.669). The Department issued its written decision in April of 2020, finding that KPS "overlooked clear signs of a disability that may have resulted in a need for special education services." (ECF No. 80-29, PageID.652). However, because Shepherd-Friday was no longer enrolled in KPS, the Department did not issue a CAP specific to Shepherd-Friday. (*Id.*, PageID.654). Instead, it issued a district-level CAP requiring KPS to "take affirmative action" with respect to identifying and evaluating students who may require special education. (*Id.*)

In February of 2020, while the state complaint process was underway but before the Department issued the above-described decision with respect to KPS, CPS evaluated Shepherd-Friday's eligibility for special education services and found that she was indeed eligible. (ECF No. 80-25, PageID.688). Shepherd-Friday's IEP team meeting occurred seven months later, in September of 2020. (ECF No. 80-30, PageID.708). The resulting IEP provided for supplementary aids and services such as modified examinations and extensions of time on assignments. (*Id.*,

PageID.716). It then identified various benchmarks for Shepherd-Friday to meet in pursuit of her long-term goal of attending post-secondary school and becoming a respiratory therapist. (*Id.*, PageID.718–720). But despite Shepherd-Friday's eligibility for special education services, and despite the creation of her IEP, she made little educational progress at CPS, prompting her advocate to file a state complaint against CPS in January of 2021. (ECF No. 80-32, PageID.731–732).

Two months later, the Department issued its written decision finding that CPS failed to "develop, review, or revise the IEP to address the [Shepherd-Friday]'s unique educational needs." (ECF No. 80-33, PageID.747). The Department therefore issued CAPs requiring CPS to provide Shepherd-Friday with 15 hours of compensatory education, and to create a comprehensive IEP that clearly described the supplementary aids and services that Shepherd-Friday was to receive. (*Id.*, PageID.748). It also required CPS to revise or create procedures to ensure that its IEPs are based on "comprehensive present levels of academic achievement and functional performance information to address each student's unique educational needs" and to provide professional development regarding those procedures (*Id.*)

Despite the Department's CAPs, Shepherd-Friday continued to feel neglected by CPS, ultimately resulting in her decision to leave school. (ECF No. 86-53, PageID.2266 (Shepherd-Friday Dep. 41:12–42:12)). But not before filing a complaint and request for due process hearing against KPS, CPS, KRESA, the Department, and State Superintendent Michael Rice. (ECF No. 80-35). Once again, the ALJ dismissed the Department, Rice, and KRESA on the grounds that challenges to the supervision of local educational agencies fall outside of scope of the ALJ's jurisdiction. (ECF No. 86-66, PageID.2349; ECF No. 86-67, PageID.2358). The ALJ also dismissed KPS on the grounds that any claims against KPS were barred by the statute of

limitations. (ECF No. 86-67, PageID.2358). On June 21, 2022, Shepherd-Friday and CPS entered into a settlement agreement under which CPS agreed to provide Shepherd-Friday with: (1) a $5,000 compensatory education fund to pay for privately-obtained services by an individual certified with the Department, (2) assistance applying to and accessing one or more summer educational programs, (3) various assessments followed by an IEP Team meeting, (4) a $4,400.00 reimbursement for educational evaluations, and (5) $4,000.00 in attorneys' fees and costs. (ECF No. 81-1, PageID.1097−1098).

### III.   PLAINTIFF LEWIS

Plaintiff Lewis graduated from KPS in June of 2021. Like his co-plaintiffs, Lewis has mental health diagnoses including ADHD and Post-Traumatic Stress Disorder (PTSD). (ECF No. 86-69, PageID.2376). But Lewis has also been diagnosed with specific learning disabilities including a severe specific reading disorder and a severe specific mathematics disorder. (*Id.*) In 2012, while Lewis was in the third grade, KPS assembled a MET that found Lewis eligible for special education, (ECF No. 80-3, PageID.488), leading to the creation of an IEP. (ECF No. 80-4). Even so, Lewis continued testing well-below his grade level in math and reading. (ECF No. 80-6, PageID.507−510; ECF No. 80-8, PageID.524). And Lewis's behavioral difficulties, which resulted in upwards of fifty incidents between fall of 2011 and spring of 2019, further impeded his academic progress.[1] (ECF No. 86-74, PageID.2403−2405).

In January of 2021, an advocate filed a state complaint against KPS on Lewis's behalf, alleging that KPS failed to provide Lewis with a FAPE, and that Lewis was "scheduled to graduate functionally illiterate." (ECF No. 80-13, PageID.556−557). Indeed, according to an IEP Team

---

[1]    KPS did not believe these behavioral issues to be a result of Lewis's disability. (*See, e.g.*, ECF No. 86-75, PageID.2408).

Report Lewis's most recent assessments indicated that he read at a third-grade level. (ECF No. 80-10, PageID.535). Two months later, the Department issued its written decision, this time finding that KPS had developed an IEP to address Lewis's unique educational needs, "result[ing] in [Lewis] receiving an educational benefit." (ECF No. 80-14, PageID.559). In other words, the Department found that KPS had in fact provided Lewis with a FAPE. (*Id.*) Lewis graduated from high school shortly thereafter, declining KPS's offer to provide him with another year of classes. (ECF No. 80-9, PageID.532 (Lewis Dep. 62:12–64:23)).

In October of 2021, Lewis filed a complaint and request for due process hearing against KPS, KRESA, the Department, and State Superintendent Michael Rice. (ECF No. 80-15). As with Bush and Shepherd-Friday, the ALJ dismissed the Department, Rice, and KRESA on the grounds that challenges to the supervision of local educational agencies fall outside of scope of the ALJ's jurisdiction. (ECF No. 86-77, PageID.2416). At the same time, the ALJ dismissed some of Lewis's claims against KPS on the grounds that they were time-barred. (ECF No. 86-77, PageID.2417). Then, in October of 2022, the ALJ dismissed the remaining claims against KPS. (ECF No. 80-16, PageID.636). In his decision and order, the ALJ determined that Lewis's lack of academic progress and behavioral difficulties were not indicative of KPS's failure to provide him with a FAPE, and that KPS was not required to insist on additional instruction when Lewis decided to graduate in 2021. (*Id.*, PageID.628–634). Lewis appealed the ALJ's decision this Court. *See D.L. v. Kalamazoo Pub. Schs.*, W.D. Mich. Case No. 1:22-cv-1208. On March 27, 2024, Lewis entered into a settlement agreement with KPS, under which KPS agreed to provide Lewis with: (1) 1,080 hours of compensatory education, and (2) $100,000 in attorneys' fees and costs. (ECF No. 81-3, PageID.1111–1112). In addition, KPS agreed to pay Lewis's chosen expert to: (1) conduct an initial evaluation of Lewis, (2) provide KPS's speech language pathologists with ten

hours of training, (3) meet with Lewis every other week for up to thirty minutes, and (4) check-in with Lewis every other month for up to thirty minutes.  (*Id.*, PageID.1112).

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Material facts are facts those defined by substantive law and necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Although Plaintiffs individually entered into settlement agreements under which they received compensatory education or a compensatory education fund from their school district, as well as thousands of dollars in attorneys' fees and costs, Plaintiffs maintain that the claims they advance against the Department here are separate and distinct from the claims that they settled and entitle them to additional relief.  Specifically, Plaintiffs say that deficiencies in the Department's complaint and enforcement procedures enabled their school district to deny them FAPEs, in violation of Title II of the ADA, Section 504 of the RA, and the IDEA.

## I.    TITLE II AND SECTION 504

Title II of the ADA and Section 504 of the RA broadly prohibit disability discrimination.

*Knox Cnty v. M.Q.*, 62 F.4th 978, 999–1000 (6th Cir. 2023) (noting that Congress modeled Title

II of the ADA off of Section 504 of the RA).  Title II provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  And Section 504 provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her
> or his disability, be excluded from the participation in, be denied the benefits of, or
> be subjected to discrimination under any program or activity receiving Federal
> financial assistance.

29 U.S.C. § 794.

As reflected above, the only distinctions between the statutes are Section 504's "limitation

to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as

opposed to 'public'—entities."  *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) (quoting

*Weixel v. Bd. of Educ. of N.Y.,* 287 F.3d 138, 146 n. 6 (2d Cir. 2002)).   As such, Title II and

Section 504 claims generally require the same showings: (1) that Plaintiffs are disabled under the

law; (2) that Plaintiffs are "otherwise qualified" to participate in the program; and (3) that Plaintiffs

are being excluded from participation in, or being denied the benefits of, or being subjected to

discrimination under the program solely by reason of their disability.  *G.C. v. Owensboro Pub.*

*Schs.*, 711 F.3d 623, 635 (6th Cir. 2013).  Courts therefore analyze the claims together.

Throughout their briefing, the parties focused primarily on the third element identified

above—whether the Department in fact discriminated against Plaintiffs under a theory of

intentional discrimination or failure to accommodate.  (*See, e.g.*, ECF No. 84, PageID.1177–1178;

ECF No. 92, PageID.2494).  But within a week of the parties' submissions, the Sixth Circuit

rendered an opinion that homed in on the dispositive issue for Plaintiffs' Title II and Section 504 claims: that is, whether a state educational agency may be held liable for disability discrimination in public schools run by local school districts under a theory of *respondeat superior*. The Sixth Circuit answered in the negative.

In *Y.A. by Alzandani v. Hamtramck Public Schools*, 137 F.4th 862, 865 (6th Cir. 2025), the district court initially denied the Department's bid for sovereign immunity in relation to the plaintiffs' Title II claims against it. As here, those claims arose out of the Department's alleged failure to ensure school district compliance with special education laws. Indeed, two of the plaintiffs complained that the Department had issued CAPs but had failed to ensure district compliance with those plans, *id.* at 866–867, much as Plaintiffs contend here, (ECF No. 84, PageID.1171–1172). On appeal, the Sixth Circuit evaluated the Department's assertion of sovereign immunity under the framework provided in *United States v. Georgia*, 546 U.S. 151, 154 (2006), beginning with the question of whether the Department in fact violated Title II. In addressing the merits of the claim, the court looked to the structure of the State of Michigan's school system, summarizing its analysis in just four sentences:

> At issue in this case are Michigan's schools. Are they a "service," "program," or "activity" of the State? They are not. Under Michigan law, school districts undertake general responsibility for public education, making them separate public entities suable under Title II.

*Hamtramck Pub. Schs.*, 137 F.4th at 870 (citing *Durant v. State Bd. of Educ.*, 424 Mich. 364, 381 N.W.2d 662, 671 (1985)). Although the court acknowledged that "a State could be held liable if it seized authority over the public schools or used its regulatory power to instruct a school district to violate Title II," the plaintiffs advanced no such allegations. *Id.* at 872. And the court *explicitly* rejected the premise that the Department's oversight obligations under the IDEA somehow transformed local schools to state schools for the purposes of Title II. *Id.* at 872–73. Accordingly,

the court found that the Department had not violated Title II, and that it was entitled to sovereign immunity in accordance with *United States v. Georgia*. *Id.* at 874.

In a supplemental brief, Plaintiffs attempt to distinguish their claims from those advanced in *Hamtramck*. They assert that their Title II and Section 504 claims do not sound in supervisory liability for the school districts' failures but rather concern services and activities that are indisputably provided by the Department—namely, the state complaint procedure. (ECF No. 99, PageID.2704, 2708–2709). But the *Hamtramck* court addressed this argument as well, explaining that actions like "collecting data, allocating funds, resolving complaints, and so on" in accordance the IDEA do not amount to services that are capable of excluding individuals with disabilities or subjecting them to discrimination. 137 F.4th at 873; *but cf. I.D. v. N.H. Dep't of Educ.*, 878 F. Supp. 318 (D.N.H. 1994) (concerning a Section 504 claim against a state educational agency for failing to provide parents with reasonable accommodations for their own disabilities during due process complaint hearings for their child).

In the end, it is clear that the Plaintiffs' alleged receipt of inadequate education lies at the core of their claims. (ECF No. 99, PageID.2704 (complaining that but-for the deficiencies in the Department's procedures, they "would have [been] shielded . . . from the exclusion and discrimination that they endured during their educational careers")). That education was provided by the local school district, not by the Department—Plaintiffs do not contend otherwise. Plaintiffs Title II and Section 504 claims against the Department therefore fail. And for that reason, the Department is entitled to sovereign immunity as to Plaintiffs' claim under Title II. The Court therefore grants the Department's motion for summary judgment as to these claims.

13

## II. IDEA

In contrast to the broad prohibitions set forth in Title II and Section 504, the IDEA narrowly concerns the "core guarantee of a 'free appropriate public education' to children in public schools with certain physical or intellectual disabilities." *A. J. T. by & through A. T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339–40 (2025) (first citing 20 U.S.C. § 1400 *et seq.*; and then quoting *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 169 (2017)).  In exchange for funding under the act, educational agencies agree to identify, locate, and evaluate children with disabilities who may require special education, and to provide those students with an individualized education program.  § 1412(a)(1),(3)–(5).  And state educational agencies specifically agree to supervise educational programs run by other state and local agencies.  § 1412(a)(11).  They also agree to establish certain procedural safeguards for children with disabilities and their parents to ensure the provision of a FAPE.  § 1412(a)(6)(A); § 1415.  These procedures are sometimes referred to as the "IDEA grievance procedure" and include three steps: (1) a state complaint, (2) an opportunity for mediation, and (3) a due process hearing.  § 1415(b), (e)-(f).  A party may "present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  § 1415(b)(6)(A).[2] If a party pursues a due process hearing and is ultimately aggrieved by the findings and conclusion thereof, they may file suit in federal court in accordance with  § 1415(i).  Subsection 1415(i) is home to the sole cause of action expressly created by the IDEA.  As set forth above, Plaintiffs sue the Department on the grounds that its complaint process was "broken."

---

[2]      In Michigan, the state complaint process is governed by Part 8 of MARSE.  MICH. ADMIN. CODE R. 340.1851–340.1855.

14

As an initial matter, and as alluded to during oral argument, the Court is not convinced that § 1415(i) creates an express cause of action against state education agencies for deficiencies in their state complaint process.[3]   At least one court in this circuit has determined that it does not. *See I.L. through Taylor v. Knox Cnty. Bd. of Educ.*, 257 F. Supp. 3d 946 (E.D. Tenn. 2017), *aff'd on other grounds sub nom. I.L. ex rel. Taylor v. Tenn. Dep't of Educ.*, 739 F. App'x 319 (6th Cir. 2018).   In *I.L. through Taylor*, a plaintiff sued her state educational agency under the IDEA after it improperly asserted that her IEP-related grievance was outside of the scope of the state complaint procedure and she must go directly to the (more costly) due process hearing.  *Id.* at 956.  The court dismissed the claim after determining that the availability of the state complaint process was not "a matter related to the denial of a FAPE" such that it fell within the scope of § 1415(i).  *Id.* at 961. Although the court acknowledged contrary decisions interpreting issues with the state complaint process to constitute "matter[s] relating to the identification, evaluation, or educational placement of the child," such that they fell within the IDEA's express cause of action, the court reasoned that such an interpretation was undermined by the Supreme Court's decision in *Fry*.  *Id.* at 960–61 (first citing *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 85–88 (3d Cir. 1996); and then citing *Fry*, 580 U.S. at 166).  There, the Supreme Court held that "[t]he only relief that an IDEA officer can give . . . is relief for the denial of a FAPE."  *Fry*, 580 U.S. at 166.  So, the court reasoned, "any matter relating to the identification, evaluation, or educational placement of the child," must necessarily concern the denial of a FAPE to fall within the scope of § 1415(b)(6)(A) and § 1415(i). *I.L. through Taylor*, 257 F. Supp. 3d at 961; *see also M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842,

---

[3]    Indeed, this very question—"whether a state education agency may be held liable under the IDEA, and if so under what circumstances"—is currently before the Sixth Circuit Court of Appeals in a series of related matters.  *See, e.g.*, *In re: Hamtramck Pub. Sch.*, No. 24-108 (Jul. 3, 2025), ECF No. 9.

860 (9th Cir. 2014) (affirming the district court's dismissal of IDEA claims against the California Department of Education for staying its state complaint investigation pending a due process complaint hearing, on the grounds that neither § 1412(a) nor § 1415(a) create a private cause of action), *as amended* (Oct. 1, 2014).

And if the Court is wary of whether the IDEA creates an express cause of action for claims related to the state complaint process, it is far warier of an implied cause of action for the same. As the Supreme Court recently emphasized in *Medina v. Planned Parenthood South Atlantic*, the "typical remedy" for a state's violation of conditions set forth in statutes enacted under the Spending Clause "is not a private enforcement suit, 'but rather action by the Federal Government to terminate funds to the State.'"  145 S. Ct. 2219, 2227–28 (2025) (first citing *South Dakota v. Dole*, 483 U.S. 203, 207–208 (1987); and then quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)); *cf. Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622 (6th Cir. 2010) ("Because Congress specifically delegated regulatory and enforcement authority to the Secretary of Education, 20 U.S.C. § 1417, it would be problematic to allow local educational agencies to maintain lawsuits against state educational agencies for their alleged non-compliance with the IDEA's procedural safeguards.").  In short, Plaintiffs used the procedures mandated by the IDEA and created by the Department to obtain the relief they ultimately obtained by settlement. If Plaintiffs wanted something more, their remedy was to keep litigating in the IDEA process, not settle and sue the Department that created the process.

This segues into another argument by the Department: each of the plaintiffs have received compensatory education or a compensatory education fund under their settlement agreements with the school districts.  Other courts have dismissed IDEA claims against state educational agencies following a settlement between the plaintiffs and their school districts.  *See Denise H. v. Tex. Educ.*

*Agency*, No. 23-50287, 2024 WL 1044758, at *1–2 (5th Cir. Mar. 11, 2024); *cf. N.H. Dep't of Ed.*, 878 F. Supp. at 320–23 (finding that the parent-plaintiffs' entry into a settlement agreement with their child's school district mooted their claim that they were denied effective participation in the state complaint process). These cases suggest that once a school district has agreed to provide a student with compensatory education, and in the absence of evidence that such compensatory education is inadequate to provide the student with a FAPE, the court can no longer provide meaningful relief under the IDEA. *Tex. Educ. Agency*, 2024 WL 1044758, at *1–2. Despite their blanket assertions at oral argument, Plaintiffs provide no evidence that the compensatory education or compensatory education funds they received as a part of their settlement agreements with the districts are insufficient to afford them each a FAPE.

Ultimately, this Court need not decide in this case whether § 1415(i) is broad enough to sustain a cause of action in some cases against state educational agencies for deficient complaint procedures. Assuming that it is possible at all, such a claim would have to allege and establish something more than IDEA noncompliance on the part of the local educational agency. Otherwise, the state would become liable for every failure by the local or intermediate school district in particular IDEA cases. That would effectively impose exactly the kind of *respondeat superior* liability on the State that the Sixth Circuit was keen to avoid in *Hamtramck*. Arguably, a case alleging sustained and repeated violations by a school of the same IDEA failures in multiple cases could establish something akin to a *Monell* policy and practice basis for liability. *See, e.g.*, *J.M. by & through Mata v. Tenn. Dep't of Educ.*, 358 F. Supp. 3d 736, 748 (M.D. Tenn. 2018) (concluding that "a student may sue a state educational agency under the IDEA, if the state educational agency's failures actually led to the denial of the student's FAPE" and collecting cases concluding the same); *see also D.R. v. Mich. Dep't of Ed.*, No. 16-13694, 2017 WL 4348818, at

*6–7 (E.D. Mich. Sept. 29, 2017) (quoting *Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006)). (denying the state educational agency's motion to dismiss a putative class action complaint against it for systemic violations of the IDEA). But the Court is satisfied that Plaintiffs have made no such showing here.

To support their contention that deficiencies in the Department's complaint process directly denied Plaintiffs FAPEs, the Department points to a series of complaints against KPS that predated Plaintiffs' complaints. (ECF Nos. 86-16, 86-22, 86-25). As with Plaintiffs Bush and Shepherd-Friday, these complaints led the Department to issue district-level CAPs requiring KPS to revise or develop its Child Find procedures. (ECF No. 86-16, PageID.2060; ECF No. 86-22, PageID.2087; ECF No. 86-25, PageID.2107). Plaintiffs argue that these complaints, and the Department's response thereto, demonstrate a pattern by which KPS would fail its Child Find obligations, the Department would issue a vague, district-wide CAP requiring KPS to submit unspecified documentation that it had corrected its non-compliance, and then the Department would accept as proof of correction documentation that demonstrated little to no change in KPS's Child Find procedures. (ECF No. 84, PageID.1141-1150).

Indeed, a consultant report commissioned by the Department in 2016 noted various issues with the implementation of the Department's CAPs, including a "lack of systematic verification of correction of noncompliance." (ECF No. 86-12, PageID.1946). And a follow-up report by the same consultant in 2021 identified "corrective action development and verification of noncompliance as a weakness." (EF No. 86-13, PageID.1978). But the 2021 report also acknowledged that the Department had developed "training, templates, corrective action guidance, and other investigatory supports" that were not accounted for in the survey underlying the report. (*Id.*) At most, this indicates that the Department understood and tried to address underlying

18

deficiencies at the local level; it does not establish anything like a *Monell*-style policy and procedure of indifference.

Plaintiffs attempt to allege a liability-imposing pattern also ignores the nuances of the individual complaints here.  The first complaint that Plaintiffs rely on as evidence of the Department's "broken" complaint process concerned systemic violations of KPS's Child Find obligations.  (ECF No. 86-16, PageID.2060).  But the core issues underlying those violations were found to be potentially inconsistent eligibility guidelines and a lack of "checks and balances among ancillary staff regarding the initial evaluations."  (ECF No. 86-18, PageID.2065, 2067).  In contrast, the next complaint arose out of KPS's failure to create and maintain appropriate documentation regarding its previous efforts to evaluate the students' eligibility for special education, and a misunderstanding of potential exclusionary factors under MARSE.  (ECF No. 86-23, PageID.2091).  And Plaintiff Shepherd-Friday's complaint[4] appears to have arisen out of a general failure to assess students enrolled in KPS's ALP.  (ECF No. 86-59, PageID.2301).  In sum, KPS's IDEA failures often fell under the umbrella of Child Find, but that does not amount to a pattern of the same kind of failure that could arguably establish a basis for something akin to pattern and practice liability.  Rather, the differences in each case highlight the unique aspects of each proceeding, and demonstrate why holding the Department liable here would effectively be making the Department the insurer of outcome in each individual case, rather than the custodian of a process giving parents and students a meaningful opportunity to obtain and enforce the provisions of IDEA at the local level, exactly as each plaintiff did here.

---

[4]     The core issues underlying KPS's failure to identify or evaluate Plaintiff Bush were not identified.  (*See* ECF No. 86-30, PageID.2126).  And the Department did not find KPS to be out of compliance with respect to Plaintiff Lewis, though it is worth noting that his complaint concerned whether his IEP was sufficiently tailored to his educational needs.  (ECF No. 80-14, PageID.561, 569).

Ultimately, KPS fell short of its IDEA obligations on multiple occasions, which even KPS effectively acknowledged by settling with the individual plaintiffs.  But the record reflects that on as many occasions as KPS fell short of its obligations, the Department stepped in and directed KPS to correct course.  The Department, in other words, made sure to tend the overall process for which it was responsible.  Perhaps KPS failed to adhere to those directions, just as lower courts sometimes fail to properly apply the mandates and holdings of appellate courts.  But that does not make the Department responsible for the local district's shortcomings any more than the appellate court is responsible for the lower court's imperfect application of a mandate.  Moreover, Plaintiffs chose to settle their claims—they cannot now ask for a second bite of the apple by suing the Department on an identical basis.[5]  The Court therefore grants the Department's motion for summary judgment as to this claim.

**CONCLUSION**

This Court finds that neither the IDEA, nor Section 504 of the RA, nor Title II of the ADA renders a state educational agency vicariously liable for the actions of a local educational agency on this record.

Accordingly,

---

[5]      Plaintiffs do request state-wide relief in the form of an injunction against the Department. Obviously, their settlements with the individual school districts provided no such relief.  But on this record, there is no factual predicate for state-wide relief.  This case involves three plaintiffs. The alleged "pattern" of deficiencies concerns a single school district.  As the Sixth Circuit has long acknowledged, "injunctive relief benefitting an entire class in an individual suit . . . is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (quoting *Sharpe v. Cureton,* 319 F.3d 259, 273 (6th Cir. 2003)); *see also Trump v. CASA, Inc.,* 606 U.S. 831, 851 (2025) ("The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" (emphasis in original) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U. S. 488, 507 (1928)).

**IT IS ORDERED** that Defendant's motion for summary judgment (ECF No. 78) is **GRANTED**.  A separate judgment will enter.

**IT IS SO ORDERED.**

Dated:  September 24, 2025                         /s/ Robert J. Jonker
                                                  ROBERT J. JONKER
                                                  UNITED STATES DISTRICT JUDGE